UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ABDULHADI ALBOUNI, NAVZOBAN DHALIWAL, JUSTIN FORMICA, SOPHIA GRANADO, GAVIN GUYAH, KARRAR KASHIFALGHITA, NEWAR KERIM, LAKOTA KORNFELD, CHRISTIAN MARTINEZ, ANDREW MILLER, BRETT MYERS, JOHN PALMER, ERIC PORAT, ALEX PRESLEY, KHALED SALEM, IAN SINGH, and BRENDEN TRUONG,<br><br>        Plaintiffs,<br><br>        v.<br><br>ALEX LARSON SCHULTZ, OVERHERE LIMITED, CLINTON SO, AND TUAH THE MOON FOUNDATION,<br><br>        Defendants. | No. 24-cv-8650<br><br>**COMPLAINT**<br>**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ..................................................................................1

II.     JURISDICTION AND VENUE ..........................................................................3

III.    PARTIES ............................................................................................................4

       A.     Plaintiffs ..................................................................................................4

       B.     Defendants ...............................................................................................5

IV.    FACTUAL ALLEGATIONS ..............................................................................6

       A.     Background on Memecoins and the $HAWK Token .............................6

       B.     Haliey Welch ..........................................................................................8

       C.     The $HAWK Token..................................................................................9

       D.     $HAWK Tokens are Securities Subject to Regulation Under the Securities Act..15

            i.      The $HAWK Involved a Common Enterprise...........................16

            ii.     The $HAWK Tokens Were Sold and Purchased With the Expectation of Profits from the Efforts of Others.....................18

            iii.    The Sale and Purchase of the $HAWK Took Place in the United States ........................................................................................21

       E.     The Sale of the $HAWK Token Violated the Securities Act .................23

       F.     The Defendants Are Liable to Plaintiffs for the Sale of Unregistered Securities Pursuant to Section 12(a)(1) of the Securities Act.................24

       G.     Plaintiffs' Section 12(a)(1) Securities Act Claims Are Timely ............25

V.      CAUSES OF ACTION .....................................................................................25

VI.    PRAYER FOR RELIEF ...................................................................................26

VII.   JURY DEMAND...............................................................................................26

Plaintiffs (defined below), by and through their attorneys, allege the following upon information and belief, except as to allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based upon, among other things, Plaintiffs' counsel's investigation, which includes, without limitation, review and analysis of news articles, websites, state corporate filings, other publicly available information concerning Alex Larson, overHere Limited, Clinton So, and the Tuah The Moon Foundation (the "Defendants"), as well as the $HAWK Token.

## I.   NATURE OF THE ACTION

1.   This action arises from the unlawful promotion and sale of the Hawk Tuah cryptocurrency memecoin, known as the "$HAWK" token (the "Token" or "$HAWK"), which Defendants offered and sold to the public without proper registration.

2.   Defendants leveraged the extensive social media following of Hailey Welch, a prominent social media personality known as the "Hawk Tuah Girl," to market the Token as a groundbreaking cryptocurrency project. Through aggressive promotional campaigns and promises of future growth, Defendants created a speculative frenzy that caused the Token's market value to spike shortly after launch, reaching a significant market capitalization.

3.   The Token was offered by Defendants in collaboration with overHere, a Web3 launchpad platform. $HAWK was supposed to emphasize community engagement, inclusivity, and bridge mainstream culture with the cryptocurrency world.

4.   Defendants' promotional efforts included posts highlighting the Token's groundbreaking nature, inclusivity, and roadmap for adoption. Defendants leveraged Welch's celebrity status and connections to enhance the Token's credibility and appeal, including discussing the $HAWK project during Welch's podcasts featuring notable guests.

5.     The pre-launch marketing for $HAWK framed the Token as more than a speculative asset, portraying it as a cultural movement with significant growth potential. Welch's involvement and her reputation as a trusted public figure signaled to her followers and potential investors that the project was poised for success, fostering an expectation of profits based on her efforts.

6.     The $HAWK token launched on the Solana blockchain. The launch had rapid growth in trading activity and market capitalization. However, the Token's value experienced significant volatility, losing a substantial portion of its value in hours. The Token launched with a market capitalization of $16.69 million. Within hours, the token's market value surged to $491 million. However, shortly after that, it plummeted more than 90%.

7.     The $HAWK Token exhibits all the characteristics of an unregistered security under established legal precedent. Investors made a monetary investment by purchasing Tokens during the pre-sale or on decentralized exchanges. A common enterprise exists, as evidenced by the pooling of funds and the Token's success being tied to the collective efforts of Welch. The marketing campaign, led by Defendants, created a reasonable expectation of profits among investors through statements like "Tuah to the Moon" and promises of redefining the crypto space. Finally, the Token's success depended entirely on the entrepreneurial and managerial efforts of Welch and her project team, with investors playing no active role in its development or adoption. Despite these clear indications of its status as a security, the $HAWK Token was not registered by Defendants.

8.     Many of the investors were first-time cryptocurrency participants drawn to the project through Welch's involvement. The rapid decline in the Token's value caused substantial damages to investors who relied on Welch's participation and the project's stated roadmap.

9.    At all relevant times, the Token has been a security as defined by Section 2(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).  However, no registration statement has ever been filed with the U.S. Securities and Exchange Commission ("SEC") to register the Tokens for sale.

10.    In fact, in a Twitter Space that was held after the collapse of the Token, Defendant So explained that the Token holders would be "decentralized shareholders" in the "common movement" where the Token holders and the project would be mutual beneficiaries.

11.    The Defendants issued, sold, promoted, solicited the sale of, and/or solicited Plaintiffs to purchase unregistered securities in violation of Sections 5 and 12(a)(1) of the Securities Act of 1933 (the "Securities Act").  15 U.S.C. §§ 77e, 77l(a)(1).

## II.    JURISDICTION AND VENUE

12.    This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 77v, which vests jurisdiction for claims under the Securities Act in U.S. District Courts.

13.    This Court has personal jurisdiction over each of the Defendants because each either conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 77v because some of the Plaintiffs are residents of this District.

15.    In connection with the acts, transactions, and conduct alleged herein, Defendants:

a)    Made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell the unregistered securities at issue in this litigation through the use or medium of any prospectus or otherwise;

b)      Carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, the unregistered securities at issue in this litigation for the purpose of sale or for delivery after sale; and

c)      Made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise the unregistered securities at issue in this litigation.

## III.    PARTIES

### A.    Plaintiffs

16.      This action is brought on behalf of 12 plaintiffs who invested in the Tokens from the Defendants (the "Plaintiffs").

17.      Collectively, the Plaintiffs suffered damages in excess of $151,000.

18.      Plaintiff Abdulhadi Albouni is a resident of Pasadena, California, who suffered damages of $18,500.

19.      Plaintiff Navzoban Dhaliwal is a resident of Manteca, California and suffered damages of $7,800.

20.      Plaintiff Justin Formica is a resident of Battle Mountain, Nevada and suffered damages of $10,000.

21.      Plaintiff Sophia Granado is a resident of Dallas, Texas and suffered damages of $1,000.

22.      Plaintiff Gavin Guyah is a resident of Germantown, Maryland and suffered damages of $2,000.

23.      Plaintiff Karrar Kashifalghita is a resident of Los Angeles, California and suffered damages of $1,000.

24. Plaintiff Newar Kerim is a resident of Murfreesboro, Tennessee and suffered damages of $2,800.

25. Plaintiff Lakota Kornfeld is a resident of Martinsburg, West Virginia and suffered damages of $1,200.

26. Plaintiff Christian Martinez is a resident of Griffith, Indiana and suffered damages $1,000.

27. Plaintiff Andrew Miller is a resident of Mooresville, North Carolina and suffered damages of $2,100.

28. Plaintiff Brett Myers is a resident of Santa Ana, California and suffered damages of $1,000.

29. Plaintiff John Palmer is a resident of San Pedro, California and suffered $1,000.

30. Plaintiff Eric Porat is a resident of Brooklyn, New York and suffered damages of $70,000.

31. Plaintiff Alex Presley is a resident of Cornelius, North Carolina and suffered damages of $5,500.

32. Plaintiff Khaled Salem is a resident of Chicago, Illinois and suffered damages of $8,350.

33. Plaintiff Ian Singh is a resident of Secaucus, New Jersey and suffered damages of $8,000.

34. Plaintiff Brenden Truong is a resident of Bridgewater, New Jersey and suffered damages of $10,000.

**B.    Defendants**

35. Defendant Alex Larson Schultz ("Larson") promoted the project online, including on X, hosting Twitter Spaces where he discussed the project. Larson also uses the persona "Doc

Hollywood" in his online accounts and other ventures.  Larson is a resident of Los Angeles, California.

36.     Defendant overHere Limited ("overHere") is a web3 developer that served as a launchpad for $HAWK and promoted the project.  Defendant overHere is registered for business in Hong Kong.  However, a moderator with the username "missmaceee" on the official Discord server for overHere recently posted on December 18, 2024 at 10:20 a.m. "Hey fam, OverHere is a global team and it's not just based on one country." https://discord.com/channels/1180032774426595408/1180032774426595411/13189611869763 05313

37.     Defendant Clinton So ("So") is the founder and controller of Defendant overHere. Defendant So personally promoted the project in online spaces, including on X.  Defendant So is a resident of Hong Kong.

38.     Defendant Tuah The Moon Foundation ("Tuah Foundation") received funds from the sale of the Token.  The Tuah Foundation is registered and headquartered in the Cayman Islands.

IV.     FACTUAL ALLEGATIONS

A.      Background on Memecoins and the $HAWK Token

39.     In the last few years, memecoins have emerged as a distinctive category within the cryptocurrency ecosystem, characterized by their deep-rooted connection to internet culture, humor, and community engagement.

40.     These digital assets, while functioning as tradable cryptocurrencies on blockchain networks, derive their primary appeal from their association with viral trends, social media phenomena, and celebrity endorsements.  The term "memecoin" aptly reflects the reliance of

these assets on cultural references and branding strategies that resonate strongly with online communities, serving as a tool to build awareness and attract participants.

41.    The $HAWK Token is a memecoin.

42.    One of the defining features of memecoins is their accessibility and the relatively low barrier to entry for creation and launch.

43.    Leveraging existing blockchain infrastructures such as Ethereum or Solana, developers can create and distribute memecoins with comparative ease. These tokens are typically introduced through decentralized token sales or public offerings, accompanied by marketing campaigns that emphasize community-driven narratives and distinctive branding. This approach allows memecoins to quickly capture the attention of potential investors and community members.

44.    In order to generate initial interest in a memecoin, the coin's promoters will often give away free, promotional, or discounted coins. This is often referred to as "whitelisting" or "airdropping."

45.    Potential investors also want to be able to buy or sell these tokens in an active market. In order to ensure that there is a market at the time of the initial launch, developers frequently establish liquidity pools on decentralized exchanges, such as overHere, to facilitate trading and ensure market access for participants, further enhancing the accessibility of these tokens.

46.    The appeal of memecoins lies primarily in their integration of internet culture and their ability to foster highly engaged communities. These communities, often thriving on platforms such as X (formerly Twitter), Reddit, and Discord, play a pivotal role in the promotion and adoption of memecoins.

47.     Investors are drawn to the sense of belonging and collaboration that these communities offer, creating a self-reinforcing cycle of engagement and promotion.

48.     The speculative nature of memecoins, combined with their accessibility and liquidity, attracts participants seeking opportunities for financial gain in the volatile cryptocurrency market.

49.     While memecoins often lack inherent utility in the traditional sense, their value is frequently driven by a combination of community participation, trading activity, and speculative demand. This unique value proposition sets memecoins apart from other cryptocurrencies that may focus more on technological innovation or specific use cases.

50.     In some instances, memecoins are marketed as offering additional features or utilities beyond their branding and community appeal, seeking to establish a more substantial foundation for long-term value.

**B.     Hailey Welch**

51.     Welch, known as the "Hawk Tuah Girl," rose to prominence following a viral video in June 2024.  Her spontaneous and humorous response during a street interview at the CMA Fest in Nashville catapulted her into the public eye, establishing her as a recognizable figure in digital culture.  Welch's distinctive and relatable personality quickly resonated with audiences, leading to a significant expansion of her social media presence.

52.     Following her viral moment, Welch amassed millions of followers across social media platforms such as Instagram, TikTok, and Snapchat.  Her posts, which blend personal insights, promotional content, and collaborations, consistently receive high levels of engagement from her fans, underscoring the strength and dedication of her community.

53.     Welch's influence extends across multiple online spaces, where she is recognized as a trendsetter and a trusted figure among her followers.

54.     In September 2024, Welch launched the podcast "Talk Tuah with Haliey Welch," which quickly achieved significant popularity, ranking as high as No. 3 in podcast charts shortly after its debut.  The podcast, featuring conversations with celebrities from various fields, further solidified Welch's role as a multifaceted content creator and influential voice in modern media

### C.    The $HAWK Token

55.     The $HAWK Token is a memecoin–based cryptocurrency project created by overHere, a platform purporting to integrate Web2 and Web3 audiences through innovative projects.

56.     From its inception, $HAWK relied on Welch's personal brand and influence to generate significant anticipation among her followers and the broader cryptocurrency community.  Unlike some other memecoins, $HAWK emphasized community engagement, inclusivity, and bridging mainstream culture with the cryptocurrency world.

57.     The $HAWK Token was presented as an initiative designed to reshape how non-crypto investors engage with blockchain technology.  This narrative framed the Token as an accessible entry point into the cryptocurrency space for everyday investors.

58.     The marketing campaign for $HAWK began with Welch announcing the Token on her social media platforms, generating immediate excitement among her millions of followers.

59.     Welch portrayed $HAWK as a unique project that would unite her diverse fan base, including listeners of her podcast "Talk Tuah," buyers of her merchandise, and supporters of her philanthropic work. Defendants leveraged Welch's celebrity status and connections to enhance the Token's credibility and appeal, notably discussing the $HAWK project during an episode of her podcast featuring entrepreneur Mark Cuban.

60.     Welch's promotional efforts emphasized the Token's groundbreaking nature and inclusivity while creating an expectation that it would redefine the crypto space.

61.     To build further engagement, Welch's team launched a pre-sale campaign that included free or discounted token distributions through airdrops and whitelists.

62.     These efforts allowed select investors to receive free tokens and priority access to the project. The use of whitelists conveyed exclusivity and incentivized early participation, fostering a sense of urgency among Welch's followers and the cryptocurrency community at large.

63.     Defendants actively promoted these initiatives on social media platforms, positioning $HAWK as an inclusive yet innovative project.



64.	On November 5, 2024, Welch tweeted on X, "Tuah to the Moon," directly invoking a widely recognized phrase in cryptocurrency markets that signals a dramatic rise in value.  This statement, made to her substantial social media following, reinforced the notion that $HAWK would experience significant appreciation. Welch's credibility as a public figure and her direct involvement with the project amplified the statement's impact, particularly on her audience, many of whom were unfamiliar with cryptocurrency markets but trusted her endorsement.



65.	Throughout the promotion and launch of $HAWK, Defendants made sure that Welch played a central role in marketing and generating demand for the token.

66.	Welch's statements and involvement directly tied the Token's success to her leadership and influence.

67.	Promotional materials distributed by overHere on X referred to Welch as the "internet's favorite meme queen" and emphasized her ability to unite fans from various platforms into the $HAWK ecosystem.  These efforts by Defendants positioned Welch as the driving force

behind the Token's adoption and potential value appreciation, creating a reasonable expectation among investors that their profits would result from her entrepreneurial and managerial efforts.



68.     The $HAWK officially launched on December 4, 2024, at 22:00 UTC on the Solana blockchain.  For example, Defendant overHere posted the schedule on their Discord:



https://discord.com/channels/1180032774426595408/1313987145333084190

69. In preparation for the launch, a pre-sale of $HAWK tokens raised approximately $2.8 million at a valuation of $16.69 million.

70. Tokens sold during the pre-sale were unlocked at the Token Generation Event, enabling investors to trade them immediately upon launch.

71. The $HAWK also established liquidity pools on decentralized exchanges to facilitate trading and ensure market access for investors.

72. Upon its launch, $HAWK quickly gained traction on Solana-based decentralized exchanges, experiencing significant trading activity and a rapid increase in market capitalization. Within hours, the Token's market value surged to $491 million.

73. Investors were drawn to the project by the $HAWK's marketing materials, which emphasized its long-term vision and Welch's direct association with its success.

74. However, this initial success was short-lived.

75. Following its rapid rise in value, $HAWK experienced extreme volatility within hours of its launch.

76. The Token's market capitalization plummeted by over 90%, dropping below $100 million shortly thereafter.

77.     Many investors—drawn to the project through Welch's outreach—suffered significant financial losses as they were left holding tokens that had lost substantial value.

78.     In a Twitter Space held on December 5, 2024[1], after the collapse of the Token price, Defendants Larson and So—speaking on behalf of Defendant overHere—tried to explain what happened.  Larson explicitly made it clear that the Hawk Tuah meme was a famous and known meme in the United States.  He said that if you walked down the street in Hollywood, California, "you ask 10 people, do you know what Hawk Tuah is, right? Nine out of 10 people will fucking know what that is."  He continued to say that "Hawk Tuah is a cultural meme. We're not launching some celebrity bullshit. That's not what we're doing, right? Hawk Tuah is a cultural meme *that everyone knows here in America*. (emphasis added)"   The project clearly was intended to take advantage of the American market.

79.     Defendant So also explained that the team at overHere attempted to skirt the American securities laws.  The project sold an initial allocation of 17% of the Tokens to a select group of individuals.  As Defendant So explained, they were advised by lawyers that they should construct the Tuah Foundation as an off-shore entity and sell that 17% through that entity:

> We heard the request for us to do this in a public matter. And I think that we having consulted with lawyers, I guess the legal opinion was that in order to protect Haley and mitigate any considerations around potentially being deemed to have sold unregulated securities to Americans, that it should be done by SAFT agreements that would be by this legal structure that we were advised to set up in, I believe it was Cayman or BVI. And we tried to essentially have that as 5k checks and scale that. Ultimately, that was kind of like quite difficult.

80.     Defendant Larson said something similar:  "Yes, there was a strategic allocation that was done through SaaS for people outside the United States of America because of all the security laws."

---

[1] https://t.co/wJYUEnM0d2

81.     However, they continued to market the remaining 83% of the Tokens to the market as a whole, and no serious attempt was made to restrict purchasers to non-American purchasers.

82.     Furthermore, around the 21 minute mark in this Twitter Space, Defendant So tried to explain the economics of how the system was supposed to work based on social media engagement metrics.  In linking the success of the social media influencer like Welch, he literally said that the Token holders would essentially be shareholders:

> And, you know, like it's like this kind of way that, you know, by being holders in, uh, you know, I guess like mutual holders in this token, you know, you then become like, um, I guess like decentralized shareholders in this kind of, you know, common movement, um, where, you know, we're both, you know, obviously we both beneficiaries, uh, ultimately, you know, if you're a holder of the token, you ultimately a beneficiary, um, if the token does well.

**D.     $HAWK Tokens are Securities Subject to Regulation Under the Securities Act**

83.     Section 2(1) of the Securities Act defines the term "security" to mean:

> any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(a)(1).

84.     An "investment contract" includes transactions involving an investment of money in a common enterprise with the expectation of profits to come from the efforts of others.

85.     The $HAWK Tokens are investment contracts, and are therefore securities subject to regulation under the Securities Act.

86.     Furthermore, as discussed above, Defendant So admitted that the Token holders were really shareholders.

### i.     The $HAWK Involved a Common Enterprise

87.     The $HAWK Token involves a common enterprise because they concern a sharing or pooling of the funds of investors, and the fortunes of each investor in the pool of investors are tied to one another and to the success of the investment pool. The sale of the $HAWK was used by the Defendants to secure financial investment from the public, including Plaintiffs, for the purpose of funding the development, marketing, and infrastructure of the $HAWK token project.

88.     The pooling of investor funds, shared risks and rewards, and the direct link between investor fortunes and the efforts of Welch and Defendants demonstrate that $HAWK was engaged in a common venture, with its success dependent on the collective performance of the token and the actions of its promoters.

89.     The pre-sale of $HAWK tokens raised approximately $2.8 million, which was not allocated to individual investor accounts but instead aggregated to fund the development, marketing, and infrastructure necessary for the token's launch. This pooling of resources created a collective investment vehicle where the success or failure of the project would impact all investors uniformly.

90.     The roadmap and promotional materials for $HAWK consistently emphasized that the Token's value was contingent on achieving widespread adoption and growing the ecosystem.

91.     Defendants' messages underscored that the success of individual investments was inextricably linked to the collective performance of the Token as a whole.  For instance, the marketing campaign highlighted the importance of community engagement and the $HAWK project's ability to onboard "hundreds of thousands of non-crypto users," directly tying individual investor outcomes to the overall success of the $HAWK ecosystem.

92.     All $HAWK investors faced identical risks, as the value of their investment was directly tied to the demand created by Welch's promotion and the execution of the project's roadmap.  The community-driven focus promoted during the pre-sale phase further reinforced this shared risk, emphasizing that collective engagement and adoption by all participants were critical to the token's success.  This alignment of risks and rewards among all investors is a hallmark of horizontal commonality.

93.     Strict vertical commonality is also present in the $HAWK project, as investors' fortunes were directly tied to the expertise, efforts, and management of Welch and Defendants. Welch's promotional campaign consistently emphasized her direct involvement in the project, portraying her as an integral driver of its success.  Her social media posts, including the tweet "Tuah to the Moon," created a direct link between her personal brand and the Token's potential for appreciation.

94.     The $HAWK project's roadmap, which outlined the Token's utility and long-term vision, required the active and effective execution of Welch and Defendants.

95.     Investors reasonably relied on Welch's influence and credibility to attract widespread adoption and drive market demand.  The marketing materials repeatedly highlighted Welch's status as "the internet's favorite meme queen" and her ability to unite her diverse fanbase, including TikTok followers, podcast listeners, and merchandise buyers, into the $HAWK ecosystem.

96.     The reliance on Welch's celebrity status, promotional reach, and the project team's technical capabilities established a clear link between the fortunes of investors and the efforts of the Token's promoters.

97.     The $HAWK Token's emphasis on bridging mainstream culture with the crypto world, as well as its promise to redefine the memecoin space, further reinforced the dependence of investor outcomes on the Defendants' expertise and execution.

98.     Welch's repeated public assurances and direct involvement in marketing the Token fostered investor confidence, further tying their expectations of success to the actions and competence of the promoters.  Welch's participation in high-profile events, such as discussing the $HAWK project on her podcast with entrepreneur Mark Cuban, created a perception of legitimacy and potential for success that investors relied upon.

99.     As such, the sale of the Tokens involved a common enterprise.

### ii.     The $HAWK Tokens Were Sold and Purchased With the Expectation of Profits from the Efforts of Others

100.     The Securities were sold and purchased with the expectation of profits to come from the efforts of the Defendants and others.

101.     The Defendants' promotional, marketing, and solicitation activities fostered a reasonable belief among investors that they would receive profits, particularly through staking mechanisms, profit sharing, and the potential appreciation in the value of the $HAWK.

102.     The $HAWK was marketed and promoted in a manner that created a reasonable expectation of profits for investors. Through public statements made by Welch and Defendants, the token was framed as a unique investment opportunity with the potential for significant financial returns.  This expectation was fostered through explicit language, visual cues, and the broader promotional campaign, which tied the success of the token to its anticipated market performance.

103.     On November 5, 2024, Welch tweeted, "Tuah to the Moon," directly invoking a widely recognized phrase in cryptocurrency markets that signals a dramatic rise in value.  This

statement, made to Welch's substantial social media following, reinforced the notion that $HAWK would experience significant appreciation. Welch's credibility as a public figure and her direct involvement with the project amplified the statement's impact, particularly on her audience, many of whom were unfamiliar with cryptocurrency markets but trusted her endorsement.

104. On November 26, 2024, overHere announced on Twitter: "🚀 Big Announcement! The $HAWK token allowlist is now live! 🎊 Secure your spot and be among the first to join the movement. 👉"

105. The use of phrases like "Big Announcement" and "Secure your spot" emphasized exclusivity and urgency, encouraging potential investors to view early participation as a unique opportunity to benefit from the Token's anticipated growth. The inclusion of celebratory emojis, such as a rocket and confetti, reinforced the speculative excitement surrounding $HAWK, further suggesting that the Token would appreciate in value.

106. The promotional efforts for $HAWK also included an X thread posted by overHere on November 26, 2024, which highlighted the unique aspects of the Token and its anticipated success. The thread began with the announcement of a partnership with Welch, described as "the internet's favorite meme queen," and emphasized that $HAWK was not "just another token launch" but a memecoin "sets to redefine the crypto space." The explicit claim that $HAWK would "redefine the crypto space" framed the Token as a significant and valuable innovation, encouraging investors to view it as a project poised for success.

107. The thread further described $HAWK as a "meaningful step in bridging mainstream audiences with the crypto world," positioning the Token as an entry point for new users into the blockchain space. This narrative of bridging Web2 and Web3 audiences

underscored the $HAWK's potential for widespread adoption and long-term growth, reinforcing the expectation of profits among investors.

108.    The marketing statements from the $HAWK's website reinforced an expectation of profits among potential investors by framing the token as an innovative, inclusive, and highly valuable project.  The description of $HAWK as "more than just a Memecoin" but rather "a part of the culture" sought to differentiate the token from other cryptocurrency projects.  By highlighting Welch's role in uniting her diverse community, the statement emphasized the token's potential to onboard "hundreds of thousands of non-crypto users."  This messaging directly tied the $HAWK's success to Welch's ability to engage her global fanbase, creating an expectation that this widespread adoption would drive the Token's value upward.

109.    The website further framed $HAWK as "The Meme Coin for Everyone" and promoted its accessibility to non-crypto investors.  By describing $HAWK as the "entry ticket to begin your degen roller coaster ride," the statement invoked the speculative excitement commonly associated with high-growth investments in the crypto space, reinforcing the expectation of profits.

110.    The call-to-action to "Secure your spot on the Allowlist and be part of the $HAWK community from day one" further amplified the sense of urgency and exclusivity, directly associating early participation with potential financial benefits.

111.    The references to Welch's "infectious energy," "Talk Tuah podcast fame," and "global fanbase" under "The Haliey Welch Effect" highlighted her influence as a key driver of the Token's anticipated success.  The statement characterized $HAWK as "more than a coin— it's a movement," leveraging Welch's cultural prominence to create investor confidence in the Token's growth potential.  This language, coupled with the portrayal of $HAWK as a bridge

"bringing memes to the everyday person," positioned the Token as an innovative and valuable asset.

112. The statement that $HAWK is "bringing a diverse community of meme loving degens and some of the blockchain's best" to "transform the way people think of a meme coin" underscored its broader vision and ambitions. By presenting the token as a convergence of culture, technology, and community, the messaging encouraged investors to view $HAWK as a transformative project with substantial financial upside. Collectively, these statements created a compelling narrative that tied the success of $HAWK to its widespread adoption, innovative features, and Welch's influence, reinforcing a reasonable expectation of profits from the efforts of others. As such, profits for the $HAWK were to be derived solely from the efforts of others.

### iii. The Sale and Purchase of the $HAWK Took Place in the United States

113. The sale and purchase of the $HAWK predominantly occurred within the United States, despite attempts by the Defendants to create the appearance of excluding United States participants.

114. The $HAWK website, which served as the primary platform for token distribution and marketing, was fully accessible to users in the United States without any meaningful restrictions.

115. United States persons, including the Plaintiffs, were able to access the site and participate in token-related activities without the need for a VPN or any other technical workaround.

116. For example, on December 18, 2024, user jaimer23 posted that he had received his Tokens in the United States:



jaimer23 12/5/24, 12:35 PM
Got my free token yesterday at 4 pm pst and I'm in the USA

https://discord.com/channels/1180032774426595408/1180032774426595411/131428408210830
1343

117.     Defendants' failure to implement effective measures to prevent participation in the United States is evident in the absence of IP-based geo-blocking or any other robust technological barriers.

118.     The website lacked a click-through mechanism that would require users to affirmatively confirm their non-U.S. status before accessing token-related content or participating in the offering.  This lack of enforcement mechanisms allowed American investors to freely engage with the $HAWK token ecosystem, effectively conducting the sale and purchase of tokens within the United States.

119.     The marketing and promotional efforts for $HAWK were largely targeted at and accessible to American audiences.  Welch, a United States-based influencer with a significant following in America, played a central role in the project.  Her social media posts, podcast appearances, and other promotional activities were readily available to United States residents and directly encouraged their participation in the $HAWK Token ecosystem.  The involvement of high-profile American figures, such as Mark Cuban in Welch's podcast discussion about $HAWK, further demonstrates the $HAWK's focus on and connection to the American market.

120.     The pre-sale and launch of $HAWK, including the distribution of Tokens through airdrops and whitelists, were conducted in a manner that allowed and even encouraged American participation.

121. The timing of key events, such as the Token launch on December 4, 2024, at 22:00 UTC, corresponded to evening hours in the United States, facilitating active participation from U.S.-based investors. The rapid increase in trading activity and market capitalization immediately following the launch strongly suggests significant involvement from U.S. participants, given the Token's marketing focus and the timing of its availability.

122. Additionally, Defendant Larson is located in the U.S.

123. Furthermore, the Tokens were promoted on websites that were based in, and accessible in, the United States, such as X, Discord, and YouTube.

**E.    The Sale of the $HAWK Token Violated the Securities Act**

124. Unless a registration statement is in effect with respect to a security, Section 5(a) of the Securities Act makes it unlawful for any person:

> (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

15 U.S.C. § 77e(a).

125. Section 5(c) also makes it unlawful for any person "to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security." 15 U.S.C. § 77e(a).

126. A registration statement has never has been in effect, or even filed, to register the Securities with the SEC.

127. The sales and solicitations of these Tokens were conducted through the internet, a means of interstate communication. For example, the Defendants used platforms such as

overHere, and sold the Tokens across state lines and internationally, all without registering the Tokens with the SEC.  This constitutes a clear violation of 15 U.S.C. § 77e(a).

**F.      The Defendants Are Liable to Plaintiffs for the Sale of Unregistered Securities Pursuant to Section 12(a)(1) of the Securities Act**

128.    Section 12(a)(1) of the Securities Act provides that any person who sells a security in violation of Section 5 is liable to:

> the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77l(a)(1).

129.    A person is liable under Section 12(a)(1) of the Securities Act if that person is a statutory seller, defined as a person who (1) passed title, or other interest in the security, to the buyer for value, or (2) successfully solicited the purchase of securities, so long as the person is motivated at least in part by a desire to serve his, her, or its own financial interests or those of the security's owner.

130.    The Defendants passed title to the $HAWK Tokens to Plaintiffs starting on November 26, 2024, making them statutory sellers with regard to those sales.

131.    Further, the Defendants and/or their agents made numerous public statements touting the Tokens, their potential for profit, and encouraging the purchase of the Tokens. As such these Defendants solicited the purchase of the Tokens for their own financial interest.  Among other things, the Tuah Foundation received a 15% fee for every transaction, which amounted to millions of dollars.

132.    For example, on November 5, 2024, Welch tweeted, "Tuah to the Moon," a phrase commonly associated with cryptocurrency price speculation.  This statement, made to Welch's

substantial social media following, reinforced the notion that $HAWK would experience significant appreciation.

### G. Plaintiffs' Section 12(a)(1) Securities Act Claims Are Timely

133. The statute of limitations for claims under Section 12(a)(1) is one year from purchase or delivery, whichever is later.

134. Defendants began offering $HAWK Tokens on December 4, 2024. Investors were allowed to join a $HAWK Token "allowlist" on November 26, 2024. This was the earliest possible time that Plaintiffs could have received the Tokens, which was less than one year ago. As a result, no Plaintiff purchased Tokens more than one year ago.

## V. CAUSES OF ACTION

### COUNT I

**For Violations of Sections 5 and 12(a)(1) of the Securities Act**
**Against All Defendants**

135. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

136. This Count is asserted against all Defendants, and is based upon Sections 5 and 12(a)(1) of the Securities Act.

137. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.

138. For purposes of asserting this Count, Plaintiffs do not allege that the Defendants named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(1) claim.

139. The $HAWK Tokens are and were securities as defined by the Securities Act.

140.    The $HAWK Tokens were not registered as securities with the SEC.

141.    The Defendants are statutory sellers of the $HAWK Tokens because they sold, promoted, or solicited the sale of the $HAWK Tokens and/or passed title to the $HAWK Tokens to Plaintiffs.

142.    Furthermore, the overHere team managed the technical launch of the token on-chain along with a major infrastructure company. The Tuah Foundation supposedly controlled the wallet that receives the fees from Token sales. There is a unique smart contract feature for this token: every transaction incurs a 15% fee that is sent to a wallet controlled by the Tuah Foundation. This wallet has collected around $3 million USD.

143.    Defendants are therefore liable to Plaintiffs for rescissory damages of $151,250 for Plaintiffs' purchases of the $HAWK Tokens in an amount to be determined at trial.

144.    Plaintiffs hereby tender their $HAWK Tokens back to the Defendants.

## VI.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment as follows:

A.    Awarding Plaintiffs damages in an amount that may be proven at trial, together with interest thereon;

B.    Ordering disgorgement of Defendants' unjust enrichment;

C.    Awarding Plaintiffs rescissory damages of $151,250;

D.    Awarding Plaintiffs their reasonable attorneys' and experts' witness fees and other costs;

E.    Awarding Plaintiffs pre-judgment and post-judgment interest; and

F.    Awarding such other relief as this Court deems appropriate.

## VII.  JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.

Dated: December 19, 2024      Respectfully submitted,

**WOLF POPPER LLP**

By:    /s/ Chet B. Waldman
        Chet B. Waldman

Chet B. Waldman
Matthew Insley-Pruitt
Terrence Zhang
845 Third Avenue, 12th Floor
New York, NY 10022
Telephone: (212) 759-4600
Email: cwaldman@wolfpopper.com
      minsley-pruitt@wolfpopper.com
      tzhang@wolfpopper.com

*Attorneys for Plaintiffs*

Max Burwick (*Pro Hac Vice* application forthcoming)
BURWICK LAW, PLLC
43 West 43rd Street, Suite 114
New York, NY 10036
Email: max@burwick.law

*Attorneys for Plaintiffs*