# EXHIBIT A

| | |
|---|---|
| IN RE $HAWK TOKEN<br><br>SECURITIES LITIGATION<br><br><br><br>————————————————<br><br>**This Document Relates To:**<br><br><br>**ALL ACTIONS** | Case No.: 1:24-cv-08650-AMD-JRC<br><br><br>FIRST AMENDED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

**<u>TABLE OF CONTENTS</u>**

I. NATURE OF THE ACTION.................................................................................4

II. JURISDICTION AND VENUE.........................................................................7

III. PARTIES.........................................................................................................8

    A. Plaintiff........................................................................................................8

    B. Defendants....................................................................................................8

IV. FACTUAL ALLEGATIONS...........................................................................12

    A. Origins of the Scam – Why Welch Was Targeted...................................12

    B. Project Promises and Compliance Theater..............................................18

    C. Background Actors and Their Roles.........................................................24

    D. The Contractual Blueprint – July 18, 2024 Monetization Agreement.............31

    E. Technical Execution of the Fraud............................................................36

    F. Pattern and Related Frauds – A Coordinated Fraud Network...............43

    G. The Marketing Crescendo – Weaponizing Celebrity Influence.............49

    H. Doe Defendants (Wallet Cluster Actors)................................................54

    I. Standard Scienter / Fraud Summary.........................................................58

    J. Materiality and Investor Reliance.............................................................60

    K. Litigation Asset Movement......................................................................62

VI. CLASS ACTION ALLEGATIONS................................................................63

    A. Numerosity - Rule 23(a)(1)......................................................................63

    B. Commonality - Rule 23(a)(2)...................................................................64

    C. Typicality - Rule 23(a)(3).........................................................................65

    D. Adequacy of Representation - Rule 23(a)(4)...........................................66

    E. Predominance - Rule 23(b)(3)..................................................................67

    F. Superiority - Rule 23(b)(3)........................................................................68

    G. Certification Under Rule 23(b)(2)............................................................69

VII. CAUSES OF ACTION..................................................................................70

    FIRST CAUSE OF ACTION..........................................................................70

    Violations of Sections 5 and 12(a)(1) of the Securities Act 15 U.S.C. §§ 77e and 77l(a)(1)..70

    SECOND CAUSE OF ACTION.....................................................................72

    Common Law Fraud.......................................................................................72

    THIRD CAUSE OF ACTION.........................................................................74

    Violations of New York General Business Law § 349..................................74

    FOURTH CAUSE OF ACTION.....................................................................75

    Violations of New York General Business Law § 350..................................75

    FIFTH CAUSE OF ACTION..........................................................................75

    Breach of Contract and, in the Alternative, Breach of the Implied Covenant of Good Faith and Fair Dealing........................................................................75

    SIXTH CAUSE OF ACTION...........................................................................................76

    Unjust Enrichment......................................................................................................76

VIII. PRAYER FOR RELIEF...........................................................................................77

VIII. JURY DEMAND......................................................................................................78

## I. NATURE OF THE ACTION

1. This action arises from a sophisticated, multi-layered fraud in which professional cryptocurrency operators weaponized the sudden celebrity of Defendant Haliey Welch ("Welch") and combined her influence with advanced technical market manipulation to extract millions of dollars from unsuspecting retail investors. The scheme represents the industrialization of crypto fraud: experts in digital-asset trading, liquidity engineering, and pseudonymous wallet deployment using a celebrity face to give legitimacy to a project designed from inception to collapse.

2. In June 2024, Welch became a viral figure overnight after a brief, unscripted clip filmed at Nashville's CMA Fest spread across social media. She was young, newly famous, highly online, and—critically for Defendants—trusted by a vast audience of non-crypto-native followers who lacked financial expertise. Within months, she launched a top-ranked podcast, amassed millions of followers, and developed a reputation for authenticity and relatability.

3. Defendants Memetic Labs, Larson, Sweeper, overHere, and So quickly identified Welch as an ideal vehicle for their next token scheme. They understood that her audience—primarily young, inexperienced consumers—could be easily persuaded to support a project merely because it appeared connected to her brand. Welch's fame provided the perfect trust delivery mechanism; Defendants provided everything else.

4. On July 18, 2024, nearly five months before the token launch, Welch's entity 16 Minutes LLC and Defendants Larson and Sweeper, acting through Memetic Labs, executed a "Meme Token Creation and Monetization Agreement." This contract reveals the true nature of the enterprise: it committed Welch to promote the token across all channels,

required her to participate in scripted appearances, and gave Memetic Labs full access to her Twitter account—while allocating zero resources to engineering, development, or any of the utilities that would later be advertised to the public.

5. The July 18 Agreement granted Memetic Labs an extraordinary 50% lifetime profit share tied to trading activity, not product delivery. Welch received $125,000 up front and was promised an additional $200,000 upon meeting promotional milestones. These payments transformed Welch from a passive celebrity into a critical component of a coordinated marketing funnel designed to draw in retail purchasers who trusted her.

6. Armed with Welch's contractual commitment, Defendants crafted a narrative in which $HAWK was presented as a transformational cultural token—integrated with Welch's podcast, connected to interactive games, and offering subscription-style benefits. They emphasized safety guarantees, especially that liquidity would be "permanently locked," and portrayed the tokenomics as "fair" and "community-driven." None of this was true.

7. Behind the scenes, Defendants built an architecture optimized not for delivering utility but for enabling rapid extraction. They designed an extremely thin public float—approximately 3.3% of total supply—ensuring extreme volatility. They allocated 17% of the supply to insider "strategic" wallets with no lockups. They pre-funded a sniper wallet through a cluster of pseudonymous addresses tied to prior frauds.

8. The launch was timed precisely at 22:00 UTC on December 4, 2024, during peak engagement among Welch's U.S. audience. Seconds after liquidity was added, the sniper wallet captured roughly half the entire public float in the first block—a feat requiring insider knowledge of the pool address, launch block, and exact timing.

9. Retail investors flooded in, driven by Welch's endorsement, coordinated influencer messaging, countdowns, allowlist hype, Discord activity, and the appearance of safety provided by Meteora's "Permanently locked" badge. What they did not know was that insiders retained full control over liquidity and were coordinating to remove it at the moment retail activity peaked.

10. Within minutes of launch, insiders executed a series of four liquidity-removal transactions through Meteora's DAMM interface, draining approximately $1.27 million in SOL and tokens. As liquidity evaporated, the sniper wallet began dumping its holdings into the collapsing market. The price crashed more than 90% in the first trading session and more than 97% from its peak.

11. The pseudonymous wallets orchestrating the scam were not random actors. Blockchain forensics reveal that the same wallet clusters funded, executed, or laundered proceeds from multiple other rug-pulls—including LIBRA, M3M3, AIAI, and the infamous TRUMP snipe. The timing patterns, funding flows, and extraction methods across these schemes are nearly identical.

12. After the liquidity was drained and insiders extracted millions, the public-facing components of the project disappeared. Welch stopped posting. Memetic Labs went silent. overHere abandoned all messaging. None of the promised utilities were ever built. The prolonged development narrative suddenly ended because the extraction phase had been completed.

13. The collapse of $HAWK was not an unforeseen failure or mismanaged project; it was the intended outcome of a fraud designed to operate at high speed. Defendants deployed celebrity influence to generate trust, used advanced trading infrastructure to manipulate

the market, deployed pseudonymous wallets to execute the extraction anonymously, and then relied on offshore entities and platform opacity to avoid accountability.

14. This lawsuit seeks to hold the responsible actors accountable for orchestrating a fraudulent token launch that transferred millions of dollars from unsuspecting members of the public to a small group of insiders who engineered, coordinated, and benefitted from the scheme.

## II. JURISDICTION AND VENUE

15. This Court has jurisdiction under 28 U.S.C. § 1331 and Section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a), because this action arises under the federal securities laws, including Section 5 (15 U.S.C. § 77e) and Section 12(a)(1) (15 U.S.C. § 77l(a)(1)).

16. To the extent Plaintiff asserts state-law claims in the alternative or in addition to federal claims, this Court has supplemental jurisdiction under 28 U.S.C. § 1367 because such claims form part of the same case or controversy.

17. This Court has personal jurisdiction over each of the Defendants because each either conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this federal district and 15 U.S.C. § 77v because Defendants transacted business in the federal district in connection with the claims asserted herein, where some of the members of the Class reside in this federal district and certain acts, practices, transactions, and courses of business

constituting the violations alleged herein occurred within this federal district, including marketing efforts directed to residents of this district and Token purchases based on the activities of the Defendants.

19. In connection with the acts, transactions, and conduct alleged herein, Defendants used the means and instrumentalities of interstate commerce, including websites, mobile applications, blockchain networks, email, and social-media platforms.

## III. PARTIES

### A. Plaintiff

20. Plaintiff, Alexander Escobar is an individual residing in Sarasota, Florida who purchased the digital asset denominated $HAWK during the relevant period and was economically damaged thereby.

### B. Defendants

21. Defendant Alex Larson Schultz ("Larson") promoted the project online, including on X, hosting Twitter Spaces where he discussed the project. Larson also uses the persona "Doc Hollywood" in his online accounts and other ventures. Larson is also known as Alexander Shultz and is the Owner of Defendant Memetic Labs LLC, placing him at the center of both the Token's promotion and technical execution. Larson is a resident of Los Angeles, California.

22. Defendant overHere Limited ("overHere") is a web3 developer that served as a launchpad for $HAWK and promoted the project. Defendant overHere is registered for business in Hong Kong. However, a moderator with the username "missmaceee" on the

official Discord server for overHere recently posted on December 18, 2024 at 10:20 a.m. "Hey fam, OverHere is a global team and it's not just based on one country."

23. Defendant Clinton So ("So") is the founder and controller of Defendant overHere. Defendant So personally promoted the project in online spaces, including on X. In a December 5, 2024 Twitter Space, So admitted that Token holders would be "decentralized shareholders" in the "common movement" and that lawyers advised creating the offshore structure to avoid selling unregulated securities to Americans. Defendant So is a resident of Hong Kong.

24. Defendant Tuah The Moon Foundation ("Tuah Foundation") is registered and headquartered in the Cayman Islands. Defendant Tuah Foundation was created by Defendants overHere Limited and So for the sole purpose of receiving funds from the sale of the $HAWK Token, including the 15% transaction fees.

25. Defendant Memetic Labs LLC ("Memetic Labs") is a limited liability company organized under California law with its principal place of business located in Los Angeles, California. Memetic Labs is owned in equal shares by Defendants Larson and Solana Sweeper, and specializes in providing advisory and launchpad services for meme tokens and crypto assets. Memetic Labs provided comprehensive services including advisory consulting, launchpad services, marketing, content creation, and partnership arrangements for the $HAWK Token.

26. Defendant Solana Sweeper ("Sweeper") is an individual residing in Los Angeles, California. Defendant Sweeper promoted the $HAWK project online, including on X, hosting Twitter Spaces where he discussed the project. Defendant Sweeper also uses the persona "B" in his online accounts and other ventures. Along with Defendant Larson,

Defendant Sweeper co-owns Memetic Labs LLC in equal shares, placing him at the center of both the Token's promotion and technical execution.

27. Defendant Benjamin Chow ("Chow"), is a co-founder of Defendant Meteora, the recent-former CEO of Meteora, and a member of Defendant Meteora. Prior to his public resignation as Meteora CEO on February 16, 2025, Defendant Chow held primary control over and responsibility for the operations of Defendant Meteora, including but not limited to the operation of Meteora programs deployed on the Solana blockchain and the provision of related services by the "Meteora team." Defendant Chow exercised that control from New York, New York, where he resides.

28. Defendant Meteora ("Meteora"), is an unincorporated association with capacity to sue and be sued under federal law and New York law. Its members are individuals or entities that direct and control the development, deployment, and operation of Meteora programs on the Solana blockchain. They include, but are not limited to, Defendant Chow, Defendant Dynamic Labs Limited, and non-parties Ming Yeow, Zhen Hoe Yong, Siong Ong, Raccoon Labs, Block Raccoon. Meteora is also the successor to Mercurial Finance, an unincorporated association co-founded in 2021 by Defendant Benjamin Chow, non-parties Ming Yeow and Siong Ong, and others. Following the collapse of Alameda Research (Mercurial's seed investor) and FTX (the exchange that hosted the launch of Mercurial's native token, MER), Mercurial Finance publicly "rebranded" as Meteora under the leadership of Defendant Chow starting in December of 2022. Defendant Chow operated and controlled Meteora from this District continuously through at least February 16, 2025, when he publicly announced his resignation. Meteora maintains a public

website at https://www.meteora.ag/ (the "Meteora Website"). Meteora conducts business and ongoing activities in this District and throughout the United States.

29. Defendant Dynamic Labs Limited ("DLL"), is an entity incorporated on March 8, 2021 in the British Virgins Islands under the BVI Business Companies Act of 2004. DLL has two Directors: Jupiter co-founders Ming Yeow and Siong Ong. DLL automatically receives certain transaction fees from Meteora liquidity pools.

30. Defendant Johnnie Forster ("Forster") is an individual residing in Los Angeles, California. Defendant Forster is the manager for Haliey Welch and her operating entity 16 Minutes LLC. He is responsible for directing Welch's involvement in branding and merchandising projects, including her involvement in the $HAWK Token project. Defendant Forster also actively promoted the $HAWK Token in interviews and media appearances and disseminated misrepresentations regarding the Token's growth potential and utilities.

31. Defendant 16 Minutes LLC ("16 Minutes") is a limited liability company organized under Tennessee law with its principal place of business located in Nashville, Tennessee and is the operating entity for Haliey Welch. Defendant Forster serves as manager and authorized signatory of 16 Minutes, which entered into the July 18, 2024 Token Creation and Monetization Agreement with Memetic Labs.

32. Defendant Haliey Welch ("Welch"), also known as the "Hawk Tuah Girl," is an individual residing in Nashville, Tennessee. Defendant Welch is a social media celebrity and influencer who was actively involved in the promotional activities that induced investors to purchase the $HAWK Token based on misrepresentations about the Token's growth potential and utilities.

33. DOE Defendants 1 - 10.

## IV. FACTUAL ALLEGATIONS

### A. Origins of the Scam – Why Welch Was Targeted

34. Defendant Haliey Welch ("Welch") rose to sudden fame in June 2024 after a brief video clip filmed at Nashville's CMA Fest went viral across social media platforms, generating hundreds of millions of views in a matter of days.

35. Welch's viral success was rooted in perceived authenticity—her unscripted humor and relatability created immediate public affinity and a rapid expansion of her online following.

36. Between June and September 2024, Welch's social-media presence expanded into a multi-platform network that reached millions of users across Instagram, TikTok, Snapchat, and emerging channels. *See* Defendant Welch social media postings, attached as Exhibit B.

37. Welch's engagement metrics far exceeded those of typical influencers, and she built a parasocial relationship with audiences who viewed her as "one of them," rather than a distant celebrity.

38. By September 2024, Welch launched the podcast *Talk Tuah*, which became a top-ranked show in its category and further entrenched her status as an emerging cultural personality.

39. Her podcast featured high-visibility guests, including entrepreneur Mark Cuban, whose appearance lent mainstream credibility to Welch's media presence.

40. Welch's demographic consisted overwhelmingly of young, non-sophisticated, non-crypto-native consumers—an audience that trusted Welch's persona and lacked experience with digital asset markets. *See* Exhibit B.

41. This combination of massive reach, trust-based engagement, and low financial sophistication made Welch's audience an ideal target for a cryptocurrency promotion campaign.

42. During this period, Welch's commercial activities were managed through Defendant 16 Minutes LLC and its manager, Defendant Johnnie Forster ("Forster").

43. Forster controlled Welch's business decisions, negotiated brand partnerships, and directed Welch's public-facing commercial engagements.

44. By July 2024, Forster and 16 Minutes began exploring additional monetization opportunities tied to Welch's meteoric rise, including opportunities outside traditional entertainment channels.

45. Professional cryptocurrency promoters, including Defendants Alex Larson ("Larson"), Solana Sweeper ("Sweeper"), and their company Memetic Labs LLC ("Memetic Labs"), identified Welch as an ideal celebrity for a token launch targeting "non-crypto natives."

46. Internal communications and Defendants' public statements show that Welch was selected specifically because her followers were unfamiliar with cryptocurrency and would rely primarily on her endorsement rather than technical due diligence.

47. On July 18, 2024, Memetic Labs and 16 Minutes executed the "Meme Token Creation and Monetization Agreement," which formalized Welch's role in the $HAWK token launch. *See* Meme Token Creation and Monetization Agreement, attached as Exhibit A.

48. Under that agreement, Welch received an immediate $125,000 payment and became entitled to an additional $200,000 upon completion of specified promotional milestones tied to token marketing. *Id*.

49. The agreement required Welch to place the token's symbol across all social media profiles, mention the token in media appearances, participate in promotional spaces, and create merchandise tied to $HAWK. *Id*.

50. The agreement further granted Memetic Labs full access to Welch's Twitter account, enabling them to draft and publish promotional posts in Welch's voice. *Id*.

51. These provisions demonstrate that Welch's public endorsement of $HAWK was not spontaneous consumer enthusiasm but a paid promotional obligation managed and scripted by professional crypto marketers.

52. Notably, the agreement contained no budget, timeline, specifications, or obligations for developing any of the utilities publicly promoted as the basis for the token's value. *Id*.

53. The absence of utility development provisions reflected Defendants' true intent: to use Welch's celebrity influence to induce public purchases of an asset not backed by any actual product.

54. Beginning in October 2024, Welch's social-media channels adopted increasingly "crypto-adjacent" language, including references to "community," "movement," and "Web3." *See* Exhibit B.

55. This shift was deliberate and aligned with the July 18 agreement's promotional obligations. It served to acclimate Welch's audience to cryptocurrency concepts prior to the token's release.

56. By early November 2024, Welch posted phrases widely recognized within cryptocurrency culture, including "Tuah to the Moon," which signaled imminent price appreciation and participation in speculative digital assets.

57. This messaging was crafted and directed by Memetic Labs, not Welch, and represented targeted inducements designed to generate fear-of-missing-out ("FOMO") among Welch's followers.

58. During November 2024, Welch appeared on podcasts and media segments where cryptocurrency was discussed, further building the narrative that her entry into the digital-asset space was authentic and informed.

59. Through these orchestrated appearances, Defendants transformed Welch from an entertainer into the face of a cryptocurrency venture marketed as a community-driven cultural movement.

60. In reality, Welch had no technical expertise in blockchain technology and relied entirely on Defendants Larson, Sweeper, and So for information about token mechanics and project structure.

61. Defendants exploited Welch's lack of sophistication by positioning her as the trusted voice to promote an asset whose risk characteristics she did not understand and whose technical underpinnings did not exist. See promotional materials posted by Defendants Larson, Sweeper and Memetic Labs, attached as Exhibit K.

62. Defendant Forster, acting as Welch's manager, facilitated all aspects of this transformation and approved the use of Welch's brand for the token launch.

63. Welch's role was thus twofold: (i) to attract a broad pool of retail buyers who trusted her; and (ii) to give the appearance of legitimacy to a token launch orchestrated entirely by professional crypto actors.

64. Beginning in mid-November 2024, promotional messaging coordinated by Defendants overHere Limited ("overHere") and its founder Defendant Clinton So ("So") further

amplified the impending token launch. *See* promotional materials by Defendants overHere Limited and So, attached as Exhibits C, D and E.

65. overHere and So ran coordinated allowlist, whitelist, and "movement-based" messaging specifically designed to exploit Welch's fan psychology, including themes of exclusivity and early access. *Id*.

66. Posts from overHere repeatedly emphasized urgency, scarcity, and inevitability of success—common psychological triggers used in fraudulent token launches. *Id*.

67. Defendants knew that Welch's audience lacked experience with cryptocurrency risk, liquidity mechanics, transaction taxes, or market manipulation.

68. Defendants' promotional timing was strategically aligned with the weeks in which Welch's podcast episodes and social media content experienced peak engagement.

69. Throughout November 2024, Welch's online persona—authentic, accessible, and relatable—was used as the delivery mechanism for scripted marketing messages crafted by Defendants to induce token purchases. *See* Exhibit B.

70. Defendants intentionally blurred the line between Welch's entertainment content and investment solicitation, causing her followers to perceive token purchases as expressions of support for Welch rather than speculative financial transactions.

71. Defendants' strategy was to convert Welch's "parasocial capital" into financial capital by presenting token ownership as a form of fan participation rather than an investment requiring risk analysis.

72. Welch's audience therefore encountered the $HAWK token not as a financial product but as an extension of Welch's brand, promoted through familiar channels and in familiar language. *Id*.

73. Defendants leveraged Welch's demographic—primarily young, inexperienced consumers—to maximize participation in the launch, knowing these individuals were less equipped to detect or avoid a fraudulent scheme.

74. Defendants further reinforced this trust through the appearance of synchronized endorsement: Welch promoted the token publicly while Memetic Labs and overHere amplified the same messaging across crypto-native platforms. *See* Exhibits B - E.

75. This dual-channel approach—mainstream audience through Welch and crypto-native audience through Memetic Labs and overHere—created the false impression of broad, organic enthusiasm for the token.

76. In truth, the promotional campaign was centrally planned, contractually mandated, and executed with the specific purpose of driving retail investment into a token that lacked any functional use case. *See* promotional materials attached as Exhibits B - E, L, O.

77. By late November 2024, Welch's audience had been primed to believe that the $HAWK token represented a community-oriented cultural moment rather than a financial product structured to collapse.

78. Welch's followers therefore entered the pre-sale and launch with misplaced confidence, relying on her endorsement and unaware that Welch's own participation was contractual and compensated.

79. At no point did Defendants disclose to Welch's audience that the $HAWK token was controlled by seasoned crypto operators with a history of involvement in similarly structured token collapses.

80. Defendants also failed to disclose that Welch's endorsement was required under a monetization agreement and did not reflect independent evaluation of the token's risks, structure, or legitimacy. *See* Exhibit A.

81. Defendants' exploitation of Welch's celebrity, combined with their concealment of material facts about the token's nature, incentivized thousands of retail investors to purchase $HAWK without understanding its true characteristics.

82. This deliberate leveraging of celebrity trust to market a speculative and fraudulent asset constitutes the origin and foundation of the $HAWK token scheme.

83. Through this coordinated strategy, Defendants weaponized Welch's fame and her audience's trust to funnel unsophisticated investors into a token launch engineered for insider enrichment and retail loss.

**B. Project Promises and Compliance Theater**

84. Having secured Welch's participation and access to her audience, Defendants constructed a set of public-facing promises about the $HAWK token that bore no resemblance to the project's actual design or financing.

85. Defendants uniformly represented that $HAWK would be "more than just a memecoin" and would "redefine the crypto space" by transforming the way fans engaged with celebrity brands through blockchain technology. *See* social media promotional materials attached as Exhibit B.

86. Central to this representation were claims that $HAWK would provide meaningful, ongoing utility to token holders, rather than exist solely as a speculative trading instrument. *Id*.

87. Defendants' public materials and statements emphasized three principal categories of utilities: (i) integration with Welch's Talk Tuah podcast; (ii) gaming and play-to-earn functionality; and (iii) tiered subscription or membership benefits. *Id*.

88. With respect to the podcast, Defendants represented that $HAWK holders would receive access to exclusive episodes, bonus content, behind-the-scenes footage, live interaction opportunities, and token-weighted participation in show decisions.

89. Defendants described forthcoming "interactive games" tied to live recordings, in which token holders could participate during podcast episodes and receive rewards or digital items based on their holdings.

90. Defendants further represented that $HAWK would serve as the core asset in a suite of gaming or play-to-earn experiences featuring Welch's likeness and persona, including mobile or web-based games and NFT rewards.

91. These gaming concepts were described in marketing as already "in development" or imminent, and were pitched as a major driver of sustained token demand and long-term value.

92. Defendants also promoted a tiered subscription or membership system in which token balances would determine access to escalating benefits—commonly described as bronze, silver, and gold tiers.

93. Under this model, higher-tier token holders were promised priority access to merchandise drops, virtual meet-and-greets with Welch, early access to content, and invitations to in-person events.

94. Across all public channels, Defendants framed these utilities as the core justification for the token's existence and a primary basis for purchasers' reasonable expectation that the token would have durable value. See Exhibit E.

95. At the same time, Defendants repeatedly assured prospective purchasers that the token's market structure and risk profile were "safe" and "protected" by technical safeguards.

96. The most prominent of these safeguards was the claim that $HAWK's liquidity would be "permanently locked" or "burned," such that the assets backing the trading pool could not be withdrawn by insiders. See promotional materials attached as Exhibit L.

97. Marketing materials published on social media and community channels stated or implied that liquidity was locked in a way that prevented rug pulls or sudden removal of trading depth. *Id.*

98. On the Meteora platform itself, the $HAWK pools displayed a "permanently locked" or similar badge next to the trading pair, signaling to users that the liquidity could not be unilaterally removed.

99. The 'Permanently locked' badge was an affirmative representation of safety that investors relied upon when deciding to purchase $HAWK, and was understood by reasonable users to reflect an actual contract-level lock, not a discretionary or cosmetic designation.See Meteora Interface Screenshot, attached as Exhibit P.

100. Defendants knew that many potential purchasers were familiar with the concept of "liquidity rugs" and that assurances of "locked liquidity" were critical to persuading them that $HAWK was not a typical scam.

101.   Defendants also represented that distribution of $HAWK would be "fair," "community-oriented," and "engineered to prevent whale accumulation," particularly to attract Welch's non-crypto followers. *See* Exhibit L.

102.   Tokenomics diagrams and public statements emphasized a substantial public or "fan" allocation and suggested that Welch's audience would have meaningful access at launch.

103.   Promotional materials described $HAWK as "The Meme Coin for Everyone" and repeatedly invoked the idea that "hundreds of thousands of non-crypto users" would be onboarded through a broad distribution of tokens.

104.   Discord moderators and social-media posts reassured prospective purchasers that allowlists and distribution mechanics were designed to give ordinary fans a fair opportunity to acquire tokens at or near launch.

105.   These representations were materially false. In reality, only approximately 3.3% of total supply was placed into public decentralized-exchange liquidity pools, while approximately 17% of supply was allocated to "strategic" wallets with no lockup or vesting.

106.   Defendants did not disclose this extreme imbalance between public float and insider allocation when making statements about "fair" and "democratic" distribution.

107.   Nor did Defendants disclose that a single insider-controlled sniper wallet would, in the first block, capture roughly half of the tokens available in the public liquidity pool, effectively defeating any possibility of broad public access at launch.

108.   Defendants' public narrative also included a layer of purported "compliance" and legal structuring, designed to reassure participants that the token had been professionally vetted and lawfully organized.

109.     In particular, Defendants highlighted the use of the Cayman Islands-based Tuah The Moon Foundation as an offshore "foundation" associated with the project.

110.     Defendant So publicly stated that lawyers had advised structuring the project offshore through Tuah to "protect Haley" and mitigate concerns about "being deemed to have sold unregulated securities to Americans."

111.     These statements were presented to the public as evidence that the project had taken legal advice and implemented safeguards to comply with applicable law.

112.     Defendants also described the pre-sale as conducted through SAFT-type agreements, reinforcing the notion that sophisticated legal instruments were being used to structure the offering.

113.     In reality, the Tuah foundation functioned primarily as a revenue-collection vehicle, receiving a 15% tax on every $HAWK transaction and holding strategic allocations, rather than as a bona fide governance or compliance entity.

114.     The 15% transaction tax rendered routine exit trades uneconomical, compounding the impact of the liquidity removal and functionally trapping retail holders in illiquid positions.

115.     The SAFT structure and offshore foundation did not prevent sales to U.S. persons or provide meaningful investor protections; instead, they were used as talking points to create the appearance of regulatory prudence while facilitating an unregistered securities sale.

116.     Critically, none of Defendants' "compliance" or "safety" messaging disclosed that control over liquidity remained with insiders and that the "locked" designation on Meteora could be bypassed or disabled.

117.  Defendants also failed to disclose any of the risks associated with thin public float, heavy insider allocation, sniper-style trading, or protocol-level ability to remove liquidity despite "locked" indicators.

118.  The July 18, 2024 agreement between Memetic Labs and 16 Minutes confirms that Defendants' internal focus was on marketing, launch logistics, and monetization—not the development of utilities or the implementation of investor protections.

119.  That agreement allocates $50,000 for "third-party spend" on launch logistics such as token pair creation, liquidity pool seeding, exchange listings, and social-media management, but allocates nothing for engineering, product development, or security audits.

120.  Similarly, the agreement grants Memetic Labs a fifty-percent profit stake in the token's economics, tied to the token's revenue and trading performance, not to delivery of any stated features or utilities.

121.  The absence of any development milestones, technical specifications, or funding commitments for the numerous utilities touted in public materials demonstrates that such utilities were never part of a genuine build plan.

122.  Software development of the kind described—podcast integration, interactive games, membership platforms—would have required months of engineering and substantial dedicated budgets, none of which are reflected in the operative contracts or evidence of project activity.

123.  Subsequent investigation has revealed no code repositories, no technical documentation, no developer hiring, and no third-party vendor contracts associated with building the promised utilities.

124.   After launch, when the token collapsed, Defendants made no effort to salvage or implement any portion of the utility roadmap; no technical updates, beta releases, or recovery plans were announced or delivered.

125.   The gap between Defendants' public promises and their actual contractual commitments and conduct shows that the utilities, safety features, and compliance framing were not genuine aspects of the project but were instead designed to induce investment and justify a token sale whose true purpose was extraction of value from retail purchasers.

126.   By representing that $HAWK would deliver functional utilities, maintain locked liquidity, ensure fair distribution, and comply with applicable law, while internally committing no resources to those ends, Defendants created a false picture of the nature and risk profile of the token.

127.   Plaintiff and the Class reasonably relied on these promises of utility, safety, fairness, and compliance in deciding to purchase $HAWK tokens and to do so at the prices and volumes they did.

128.   In fact, the utilities never existed, the liquidity was removable and removed, the distribution was heavily skewed toward insiders, and the "compliance" structure functioned only to shield insiders while exposing retail purchasers to undisclosed risk.

129.   These misrepresentations and omissions about the project's promises and structure were material to any reasonable purchaser and form a central component of the fraudulent scheme described in this Complaint.

**C. Background Actors and Their Roles**

130.    The $HAWK scheme was executed through a coordinated network of professional crypto operators, offshore entities, platform architects, wallet-based actors, and Welch's management team, each of whom played a distinct and essential role in the fraud.

131.    Defendants Alex Larson ("Larson") and Solana Sweeper ("Sweeper") acted as the strategic architects of the project through their jointly owned entity, Memetic Labs LLC.

132.    Larson and Sweeper held themselves out as experts in "meme token creation and monetization," positioning Memetic Labs as a specialized launchpad despite having no technical development capabilities.

133.    Both men operated under online personas—Larson as "Doc Hollywood" and Sweeper as "B"—to cultivate credibility and influence across the cryptocurrency community.

134.    Through Memetic Labs, Larson and Sweeper assumed responsibility for tokenomics design, marketing coordination, influencer management, distribution sequencing, and liquidity logistics.

135.    The July 18, 2024 Token Creation and Monetization Agreement confirms that Memetic Labs was given comprehensive control over $HAWK's launch mechanics and promotional strategy.

136.    This agreement provided Memetic Labs a 50% lifetime profit share in the token's revenue, tied solely to trading activity rather than to utility development or long-term project success.

137.    This compensation structure gave Larson and Sweeper strong financial incentives to maximize initial trading volume—regardless of whether the token had any functional value.

138.    The agreement required Welch to participate in all major promotional efforts and to give Memetic Labs full access to her Twitter account, enabling Larson and Sweeper to script her public messaging.

139.    Memetic Labs therefore served as the project's operational nucleus, directing both the public-facing campaign and the internal mechanics that enabled insider extraction.

140.    Defendant Clinton So ("So") played a parallel leadership role through his company, overHere Limited, which publicly styled itself as a "global Web3 launchpad."

141.    overHere's function in the scheme was to provide credibility, offshore structure, and marketing amplification, not technology development.

142.    So coordinated Discord channels, allowlist campaigns, pre-sale funneling, and tokenomics messaging, all of which were designed to induce participation from Welch's mainstream audience.

143.    In a December 5, 2024 post-mortem Twitter Space, So admitted that $HAWK token holders were effectively "decentralized shareholders" and that lawyers advised him to use an offshore foundation to avoid securities-law exposure in the United States.

144.    These admissions demonstrate So's awareness that the token was structured as an unregistered securities offering.

145.    overHere hosted promotional graphics depicting democratic distribution despite knowing that only 3.3% of tokens would enter public liquidity pools.

146.    overHere moderators reassured fans that allocation would be fair and that whales would not dominate the launch, despite the actual insider-heavy distribution plan.

147.    Defendant Tuah The Moon Foundation ("Tuah Foundation"), formed in the Cayman Islands, acted as the project's offshore money-routing entity.

148. So and overHere created the Tuah Foundation for the express purpose of receiving the 15% transaction tax imposed on every $HAWK trade.

149. The Foundation did not provide compliance oversight, governance, or utility development; its function was to channel millions in fee revenue beyond the reach of U.S. regulators.

150. Funds controlled by the Tuah Foundation formed a core component of the extraction architecture, ensuring that insiders profited from every trade regardless of market direction.

151. At the infrastructure layer, Defendants Benjamin Chow ("Chow"), Meteora, and Dynamic Labs Limited ("DLL") provided the technical environment necessary for the fraud to succeed.

152. Chow founded and operated Meteora from New York, overseeing its decentralized-exchange platform and Dynamic AMM smart-contract system.

153. Chow exercised supervisory authority over the Meteora engineering stack and front-end safety representations, making him personally responsible for the misleading 'Permanently locked' indicator displayed during the $HAWK launch.

154. The Meteora platform advertised "permanently locked liquidity" and displayed locked-liquidity badges on the $HAWK trading pools.

155. Despite these assurances, all $HAWK liquidity was withdrawn in four coordinated transactions within 22 minutes of launch.

156. The removal of supposedly "locked" liquidity could not have occurred unless the lock mechanism never existed, was disabled, or was circumvented through platform-level assistance.

157.   Chow's role in operating Meteora makes each of these possibilities attributable to him and demonstrates his central involvement in enabling the fraud.

158.   DLL, a BVI company affiliated with Meteora, automatically received a portion of protocol-level fees from every trade executed on the platform, including the fraudulent $HAWK trades.

159.   DLL therefore directly profited from the artificially inflated trading volume generated during the pump-and-dump window.

160.   This profit structure aligned DLL's economic incentives with the continuation of high-volume launch events regardless of investor harm.

161.   Defendant Johnnie Forster ("Forster"), as manager of 16 Minutes LLC, controlled all aspects of Welch's commercial operations and facilitated her involvement in the token launch.

162.   Forster negotiated the July 18, 2024 agreement with Memetic Labs and approved Welch's role in marketing the token across all of her social platforms.

163.   Forster understood the financial incentives tied to Welch's performance, including upfront payments and milestone bonuses conditioned on promotional output.

164.   Forster also approved the requirement that Welch adopt token-related branding across her accounts, embedding $HAWK promotional content into her regular communications with fans.

165.   Through Forster and 16 Minutes, Welch's public image was leveraged as a marketing asset rather than as a genuine expression of enthusiasm for blockchain technology.

166.   Forster's coordination with Memetic Labs ensured that Welch's marketing output aligned with the timing and intensity of the extraction sequence engineered by insiders.

167.    Defendant 16 Minutes LLC, Welch's Tennessee entity, served as the contractual vehicle through which she received payments and through which Memetic Labs controlled the integration of Welch's likeness into the project.

168.    16 Minutes functioned as the conduit between Welch's personal brand and the fraudulent promotional campaign directed by professional crypto operators.

169.    Defendant Welch, while less technically sophisticated than the other actors, played a critical operational role by providing the trust vector through which millions of retail investors were induced to participate.

170.    Welch accepted substantial compensation—$125,000 upfront and $200,000 contingent upon promotional milestones—and performed the marketing duties required by contract.

171.    Welch's posts, interviews, and podcast appearances created the perception of authentic enthusiasm for the token, masking the fact that she was fulfilling contractual obligations crafted by Larson, Sweeper, and So.

172.    Although Welch did not design the fraud, her participation materially advanced it by leveraging her parasocial influence and directing her fans toward the token at the precise moment insiders were preparing to extract liquidity.

173.    For this reason, Welch is properly named in the unjust enrichment claim even though she is not alleged to have participated in the technical manipulation.

174.    The final category of actors consists of the Doe Defendants: pseudonymous wallet controllers who executed the sniper trades, coordinated liquidity withdrawals, and funneled proceeds through off-ramp pathways. *See* Liquidity Withdrawal Transaction Records, attached as Exhibit J.

175.    Doe 1 controlled the "Sniper Wallet Cluster," which bought approximately 50% of the public float in the first block of trading. *See* Solscan Transaction Records, attached as Exhibit H.

176.    Doe 2 coordinated the "Strategic Allocation Cluster," comprising wallets that received 17% of total supply with no lockups. *See* Exhibit J.

177.    Doe 3 controlled the LP withdrawal wallets that removed all liquidity in four transactions within minutes of launch. *See* Exhibit J.

178.    Doe 4 and Doe 5 controlled off-ramp wallets that routed extracted funds to Binance, Kraken, and FixedFloat, consistent with laundering activity observed in prior scams on the Meteora platform. *See* Exhibit T.

179.    Does 6–10 participated in preparatory funding, gas-profiling transactions, and other coordinated on-chain behavior linking $HAWK to other rug-pull tokens including $LIBRA, $M3M3, and $AIAI.

180.    Blockchain analysis reveals that these wallets acted in concert with the named Defendants, following identical timing patterns, funding structures, and extraction strategies observed across multiple prior frauds.

181.    Together, these actors—Larson, Sweeper, Memetic Labs, So, overHere, Tuah Foundation, Chow, Meteora, DLL, Forster, 16 Minutes, Welch, and the Doe wallet clusters—formed an integrated enterprise capable of executing a highly orchestrated pump-and-dump scheme targeting non-sophisticated retail investors.

182.    Each Defendant contributed a necessary element: technical control, marketing amplification, liquidity access, celebrity influence, offshore protection, or on-chain execution.

183.　　Their collective conduct demonstrates coordinated, role-specialized participation in a unified fraudulent operation that used Welch's fame as the trust mechanism and Meteora's infrastructure as the extraction engine.

184.　　This network of actors operated with shared knowledge, shared incentives, and shared objectives, culminating in the $HAWK token's rapid rise, engineered collapse, and multi-million-dollar transfer of wealth from the investing public to insiders.

**D. The Contractual Blueprint – July 18, 2024 Monetization Agreement**

185.　　Nearly five months before the public launch of the $HAWK token, Defendants Memetic Labs LLC, 16 Minutes LLC, and Welch executed a comprehensive "Meme Token Creation and Monetization Agreement" dated July 18, 2024.

186.　　This agreement serves as the clearest documentary evidence of Defendants' fraudulent intent because it outlines, in explicit terms, what the project was actually designed to accomplish—and what it was never intended to do.

187.　　The contract reveals that the $HAWK token was created not as a technology product, not as a fan-engagement tool, and not as a platform with promised utilities, but as a monetization vehicle.

188.　　Memetic Labs, owned equally by Defendants Larson and Sweeper, was granted 50% of all profits generated by the token for the entire lifespan of the project.

189.　　This lifetime profit share was not tied to building utilities, maintaining liquidity, or delivering long-term value; it was tied exclusively to trading volume and transaction-based revenue streams.

190.    The agreement demonstrates that Larson and Sweeper structured the project so that their compensation increased as volatility increased—giving them financial incentives to maximize launch-day trading spikes, regardless of subsequent collapse.

191.    The agreement required Memetic Labs to "advise on launch strategy," "manage go-to-market execution," and "coordinate marketing efforts," but did not require the company to build any technology whatsoever.

192.    There are no provisions for software development, no engineering milestones, no utility specifications, and no stated commitments for building the podcast integration, gaming features, subscription tiers, or other utilities marketed to the public.

193.    This absence is not accidental; it is proof that the publicly advertised utilities were never intended to exist beyond the marketing phase.

194.    The agreement obligated Welch, through 16 Minutes LLC, to become the public face and promotional engine of the token through an extensive set of performance requirements.

195.    Welch was paid $125,000 immediately upon signing, with an additional $200,000 promised upon achieving certain promotional milestones following the token's launch.

196.    These payments transformed Welch from a casual participant into a contracted promoter whose public enthusiasm was paid-for marketing rather than authentic endorsement.

197.    The contract required Welch to display the $HAWK token symbol in all of her social-media profiles, ensuring that every appearance she made online carried embedded advertising for the token.

198.    Welch was also required to mention the token in podcast episodes, interviews, and media engagements, integrating token promotion into her mainstream entertainment content.

199.    The agreement required her to appear on live-video interviews, Twitter Spaces, and token-related promotional events coordinated by Memetic Labs.

200.    Memetic Labs was granted full access to Welch's Twitter/X account, empowering Larson and Sweeper to draft and publish promotional messages directly in Welch's voice.

201.    This level of access allowed Defendants to blur the line between Welch's genuine persona and scripted marketing content engineered to induce public investment.

202.    The contract required Welch to create and sell merchandise branded with the HAWK token name, further embedding token promotion across her commercial footprint.

203.    The agreement allocated $50,000 for "third-party spend," a category reserved entirely for launch logistics—not development.

204.    These funds were earmarked for token pair creation, liquidity pool seeding, exchange listing fees, influencer payments, KOL coordination, social-media management, and content creation intended to drive hype.

205.    None of the budget was allocated to building utilities, platform functionality, or any of the promised features promoted to the public.

206.    The structure of the contract shows that the entire project was designed around launch-day market impact, not long-term value creation.

207.    The agreement contains no references to smart-contract audits, no technical design documentation, no developer hiring, and no deliverables related to utility development.

208.    At no point did the agreement impose obligations on Memetic Labs to create the gaming systems, NFT features, subscription platforms, or podcast integrations advertised to investors.

209.    The absence of any technical-development provisions is inconsistent with how legitimate digital-asset projects are structured and is consistent with an intent to mislead purchasers regarding the token's purpose.

210.    The agreement formalized the roles of Larson and Sweeper as the operational commanders of the launch, with control over timing, mechanics, messaging, and liquidity behavior.

211.    The contract places all marketing obligations on Welch while placing all strategic control in the hands of Memetic Labs, aligning incentives to maximize hype while centralizing the ability to manipulate market dynamics.

212.    Notably, the contract makes no commitments regarding liquidity locking, vesting periods, or any other investor protections—even though such protections were prominently advertised to the public.

213.    The contract also contains no reference to fair or democratic token distribution, despite Defendants' repeated public statements that the tokenomics were "built for the community."

214.    In contrast, the agreement reflects a pure revenue-maximization model in which Memetic Labs, Welch, and 16 Minutes extract direct financial compensation while investors are provided no assurances or deliverables.

215. The agreement shows that all parties understood Welch's promotional obligations were essential to inducing retail investment, which would generate the trading volume necessary for Memetic Labs' and Tuah Foundation's profit streams.

216. The contract also reveals that Welch's role was not advisory or collaborative; it was explicitly performance-based, tied to her ability to generate public engagement and token purchases.

217. The July 18 agreement contains no representations regarding token safety, liquidity mechanics, or platform technology—despite the central importance of these topics in public marketing materials.

218. Instead of establishing a plan for utility development, the agreement codifies a plan for monetization, influencer deployment, and coordinated promotional content.

219. Larson and Sweeper used this agreement to position Welch as the trust vector who would funnel non-crypto-native consumers into a token engineered for rapid extraction.

220. The payment schedule, promotional obligations, and control provisions confirm that Welch's public persona was contractually transformed into a marketing tool for the fraud.

221. The agreement also structured incentives for quick execution: Welch's additional $200,000 milestone payment was tied to activity in the first 30 days post-launch, encouraging a short-term promotional blitz rather than long-term stewardship.

222. The structure of the agreement incentivized a rapid launch, rapid hype-cycle, and rapid extraction window—consistent with the pump-and-dump pattern documented throughout the complaint.

223. The agreement further provided that Memetic Labs would coordinate third-party promotional entities, including influencers and KOLs, demonstrating a planned multi-layered amplification strategy.

224. This coordination ensured a consistent narrative across all channels regardless of whether the information was truthful, thereby magnifying the impact of misrepresentations about utilities and token safety. *See* Exhibits L and O.

225. The contractual allocation of profits to Memetic Labs and transaction fees to the Tuah Foundation placed insiders in a structurally advantaged position, ensuring they profited even if investors incurred catastrophic losses.

226. The agreement's terms show that Defendants never intended to build any of the features marketed to the public and instead designed a funding mechanism wrapped in celebrity branding and technical misrepresentations.

227. Viewed as a whole, the July 18, 2024 agreement is the blueprint of the fraudulent scheme: a document that formalizes the monetization strategy, establishes the promotional apparatus, and omits any genuine development obligations.

228. The contract memorializes the true nature of the $HAWK token—an extractive instrument designed to generate trading volume through celebrity-driven hype rather than a technology product with real utility.

229. Accordingly, the July 18 agreement provides direct evidence of scienter, motive, and coordinated planning among the project's core operators, long before the public knew the token existed.

**E. Technical Execution of the Fraud**

230. The technical execution of the $HAWK scheme was not an accident, nor a market

failure; it was a pre-engineered extraction mechanism designed to maximize insider profit and guarantee catastrophic losses for retail investors.

231.    Every technical component—pre-sale allocation, float restriction, sniper configuration, liquidity provisioning, Meteora infrastructure, and wallet-cluster coordination—functioned together to create a carefully constructed on-chain roadmap for fraud.

232.    The fraud began with the deliberate design of an extremely thin public float. Of the one billion total tokens minted, only approximately 3.3%—roughly 33 million tokens—were deposited into decentralized-exchange liquidity pools for public trading.

233.    This public float was a fraction of what legitimate token launches provide and was designed to engineer extreme price sensitivity, guaranteeing that even modest buying pressure would trigger outsized price appreciation.

234.    At the same time, 17% of the total supply—approximately five times more than the public float—was allocated to "strategic" wallets through the Tuah Foundation with no lockups, no vesting, and no restrictions on sale.

235.    This imbalance ensured that insiders would maintain overwhelming control over the token's price dynamics from the moment of launch.

236.    The July 18 agreement confirms that no portion of the pre-sale proceeds or allocation structure was intended for utility development, product building, or platform support, demonstrating that the distribution was designed solely for extraction, not functionality.

237.    Pre-sale via the Tuah Foundation raised approximately $2.2 million, implying an initial pre-sale valuation of roughly $16.69 million.

238.    On-chain traces show that the pre-sale funds were routed to wallets controlled by the project team, with approximately $600,000 used to seed initial liquidity on the Meteora Dynamic AMM and approximately $1.6 million diverted and off-ramped to insider wallets.

239.    This liquidity-seeding pattern mimicked prior scams on the Meteora platform, using pre-sale investor funds to create a temporary appearance of market depth that would soon be withdrawn.

240.    The launch occurred on December 4, 2024 at 22:00 UTC—timed for peak evening hours across U.S. time zones when Welch's audience would be most active.

241.    Seconds after the liquidity pool opened, a single insider-controlled wallet—referred to herein as the "Sniper Wallet"—executed a massive first-block purchase capturing approximately 50% of the entire public float.

242.    This first-block capture required insider knowledge of the exact pool address, deployment block, and launch time, because no public tooling would allow a retail trader to monitor or predict the contract creation transaction to this degree of precision.

243.    The Sniper Wallet had been pre-funded in the hours leading up to launch by approximately ten wallets, each sending substantial amounts of wrapped SOL (wSOL), timed within a narrow pre-launch window.

244.    The funding pattern—roughly $500,000 delivered within a 6.5-hour window—was consistent with other scams on the Meteora platform, including LIBRA, M3M3, and AIAI, and indicated coordinated preparation rather than organic trading activity.

245.   Two of the principal funding wallets—designated in blockchain analysis as Wallet 4 and Wallet 6—had previously participated in market-manipulation activity associated with those earlier Meteora-based frauds.

246.   Wallet 4 contributed approximately $310,000 and had been used in market-making and early extraction activities in the LIBRA token scheme.

247.   Wallet 6 contributed approximately $200,000 and was previously tied to the M3M3 and AIAI schemes, both of which involved rapid pump-and-dump cycles and Meteora-enabled liquidity withdrawal.

248.   Another funding source, Wallet 7, was linked to the highly profitable TRUMP token snipe in which 5.9 million tokens were acquired in the launch block and ultimately yielded more than $100 million in profits.

249.   Wallet 7's connection to $HAWK further evidences that highly sophisticated actors—already known for execution of sniper-driven frauds—participated directly in the $HAWK extraction.

250.   Following the sniper's first-block acquisition, the artificial scarcity created by the thin float and insider capture triggered an immediate surge in token price, rising from an implied $22 million valuation at launch to more than $70 million within minutes. See Dexter Price Charts, attached as Exhibit I.

251.   This artificial price surge was amplified by the coordinated marketing crescendo executed by Welch, Memetic Labs, overHere, So, and related influencers in the hours leading to launch. *Id*.

252.   Retail investors—particularly Welch's non-crypto-native followers—interpreted this meteoric rise as validation of the token's value and rushed to buy during the spike.

253. At the same time, the Meteora platform displayed a "Permanently locked" icon next to the $HAWK pool, signaling to retail users that the liquidity backing the token was secured and could not be withdrawn.

254. This badge was a material misrepresentation: every dollar of liquidity was removable, and every dollar was removed.

255. Approximately eight minutes after launch, while retail buying pressure remained extremely high, insiders executed the first of four liquidity withdrawals.

256. The first withdrawal removed approximately 12.7% of LP tokens, along with hundreds of thousands of dollars' worth of SOL and accumulated trading fees.

257. Minutes later, a second withdrawal removed an additional approximately $91,600 in value alongside disposal of additional LP tokens.

258. A third withdrawal extracted approximately $127,800 worth of assets and 2.9% of remaining LP token balances.

259. A final withdrawal removed approximately $451,200, draining nearly all SOL and $HAWK liquidity from the Meteora pool.

260. Combined, the four withdrawals removed approximately $1.27 million in assets from the liquidity pool, including approximately $635,000 in SOL.

261. These transactions dismantled the trading pool completely, leaving retail buyers with tokens they could no longer sell at any meaningful price.

262. During the liquidity withdrawals, the Sniper Wallet coordinated its selling behavior to maximize its returns, unloading tokens into remaining liquidity during the period of highest retail participation.

263.    The sniper's staged sell-offs were timed precisely around the liquidity withdrawals, ensuring that insiders extracted the highest possible value before liquidity vanished.

264.    This coordinated behavior—sniper accumulation, price pump, and timed selling—demonstrates real-time collaboration between the sniper operator(s) and those with control over liquidity.

265.    The technical coordination required to execute sniper trading and liquidity removal in the same 10–20 minute window strongly suggests that the Sniper Wallet was operated by or in concert with team insiders.

266.    The liquidity-removal transactions required advanced interaction with Meteora's DAMM architecture, which would not have been possible for ordinary users relying solely on the platform's public interface.

267.    The existence of the "Permanently locked" label on the Meteora front-end—despite removable liquidity—indicates that the lock function either never existed, was disabled, or was overridden for this transaction.

268.    No legitimate token launch could experience full liquidity removal where "locked" liquidity is prominently displayed; such an outcome is indicative of platform-level manipulation or misrepresentation.

269.    The speed and precision of the removal could only be executed by actors with full knowledge of the liquidity pool's configuration and admin privileges applicable to Meteora's AMM infrastructure.

270.    Immediately following liquidity removal and sniper extraction, trading volume collapsed, spreads widened dramatically, and the effective market for $HAWK evaporated.

271.   Retail investors who bought at peak prices—often between $0.20 and $0.50—found themselves holding tokens they could not sell for more than fractions of a cent.

272.   The token's market capitalization collapsed more than 90% within the first trading session and ultimately more than 97% from its peak. *See* Exhibit I

273.   Post-extraction, insider wallets funneled their proceeds through CEX deposit addresses and mixing services, including Binance, Kraken, and FixedFloat, using laundering patterns consistent with earlier schemes. See Exhibit T.

274.   This laundering activity further evidences insider coordination and knowledge that the transactions were illicit.

275.   The pattern of rapid sniper accumulation, immediate liquidity withdrawal, artificial price inflation, and subsequent laundering mirrors the LIBRA, M3M3, and AIAI schemes executed on the same platform using overlapping wallet clusters.

276.   The objective technical evidence—immutable on-chain records—shows that the fraud was executed with precision, planning, and coordination across multiple actors, not through negligence or failure of project execution.

277.   The entire technical structure of $HAWK was built not for long-term operation but for a 20–60 minute extraction window in which insiders could convert pre-positioned funds into millions in profits at the expense of unsuspecting retail participants.

278.   This technical execution confirms that $HAWK was never a legitimate digital asset; it was a fraud engineered to collapse, deploying the exact pattern refined in multiple other Meteora-based scams.

279. The technical architecture therefore provides direct evidence of scienter, demonstrating that Defendants intentionally designed the token mechanics to facilitate market manipulation and investor harm.

280. The $HAWK token's launch mechanics, trading sequence, liquidity configuration, and on-chain behavior collectively constitute an intentional, coordinated on-chain fraud rather than an unsuccessful project or unforeseen market event.

281. Notably, the liquidity withdrawals performed by the team-controlled wallets occurred after the sniper wallet had already captured approximately half of the available public float in the first block.

282. This timing is a critical indicator of scienter.

283. If the sniper wallet had been unknown, hostile, or perceived as a threat to the project, the rational response for a legitimate team would have been to leave its seeded liquidity in place to stabilize price, dilute the sniper's influence, and maintain the token's trading integrity.

284. Instead, insiders withdrew liquidity precisely after the sniper's activity, thereby ensuring that the sniper's position would drive maximal upward price distortion and that insiders could extract value during that artificially inflated window.

285. A team confronting hostile sniping would add liquidity; Meteora's immediate withdrawal of liquidity reflects its knowledge that the sniper was coordinated, not adversarial.

286. This sequence demonstrates that the sniper wallet was not an adversary but an integrated component of the scheme.

287.    Defendants' conduct shows they understood the sniper's role, did not treat it as a risk to the token, and never intended to maintain price stability.

288.    The decision to remove liquidity immediately after the sniper's purchase reveals a coordinated strategy: insiders wanted the sniper-induced price spike because it increased the extraction value available to the team during the cascading liquidity removals.

289.    The timing also confirms that Defendants had no intention of supporting the token post-launch.

290.    A legitimate project confronted with a sudden concentration of supply in a single wallet would respond by adding liquidity, attempting to stabilize price, or engaging with the market to support early investors.

291.    Defendants did the opposite—they removed liquidity, accelerated volatility, and collapsed the market while the sniper wallet was actively dumping its holdings. Their conduct reflects foreknowledge, collaboration, and intentional exploitation of the sniper's position.

**F. Pattern and Related Frauds – A Coordinated Fraud Network**

292.    The fraudulent design and collapse of the $HAWK token did not occur in isolation; it was an iteration of a repeating pattern of crypto-fraud executed through the same actors, the same wallet clusters, the same technical vulnerabilities, and the same Solana-based infrastructure.

293.    Blockchain forensics reveal that $HAWK was structurally identical to three other rug-pull schemes—$LIBRA, $M3M3, and $AIAI—each of which launched on the Meteora platform, each promising revolutionary features, and each collapsing within hours after insiders removed liquidity. *See* Exhibit J.

294. In each scheme, insiders used the same playbook: fabricate celebrity or cultural relevance, engineer artificial scarcity, deploy insider-funded sniper wallets, manipulate initial liquidity, drain pools under the guise of "locked liquidity," and off-ramp stolen funds through centralized exchanges or mixing services.

295. The wallet clusters connected to $HAWK—particularly the Sniper Funding Wallets known as Wallet 4, Wallet 6, Wallet 7, and Wallet 8—have transactional histories directly linking them to those other schemes.

296. This recurrence of identical wallet activity across multiple projects demonstrates a coordinated enterprise, not isolated wrongdoing.

297. The $LIBRA token scam, executed after $HAWK, shared nearly every hallmark of the $HAWK fraud: celebrity branding, artificial hype, thin liquidity, insider sniping, Meteora-based liquidity removal, and total collapse within approximately two hours.

298. Wallet 4, which contributed approximately $310,000 to finance the $HAWK sniper, also participated in the LIBRA fraud by providing liquidity backstopping and wash-trading patterns to generate artificial demand.

299. The LIBRA token followed the same technical sequence: an explosive price spike within minutes, fueled by sniper accumulation, followed by rapid liquidity removal despite the presence of a "locked liquidity" badge on Meteora.

300. The LIBRA event resulted in millions of dollars in losses for retail investors, many of whom purchased tokens based on a celebrity association used to fabricate legitimacy.

301. Defendant Chow is a named defendant in litigation arising from the infamous $LIBRA fraud, confirming his central role in overseeing Meteora during multiple rug-pull events.

302.    The M3M3 token scam provides the second critical connection to $HAWK. M3M3 launched on Meteora with identical promotional tactics, similar influencer amplification, and the same liquidity-withdrawal pattern.

303.    Wallet 6—the same wallet that funded the $HAWK sniper—playing a major role in the M3M3 extraction, receiving funds shortly before the token launch and distributing profits to associated wallets immediately after liquidity was drained.

304.    M3M3's liquidity was advertised as locked, yet was drained shortly after launch, mimicking the mechanical failure or circumvention of Meteora's lock mechanism seen again with $HAWK.

305.    The AIAI token—also linked to the same cluster—followed the identical path: celebrity hype, factionalized tokenomics, pre-funded sniper wallets, fast-rising prices, sudden liquidity removal, and collapse to near zero.

306.    Wallet analysis connects Wallet 6 and several smaller cluster wallets to both M3M3 and AIAI, proving continuity in wallet control and operational coordination.

307.    The recurrence of the same funding wallets across these three prior schemes and $HAWK is statistically improbable absent coordination among those in control of the wallets and knowledge of exact launch mechanics.

308.    The fraudulent TRUMP snipe, which produced approximately $109 million in profits, also contributes to the pattern evidence linking $HAWK to a broader criminal enterprise.

309.    The TRUMP sniper wallet, which acquired 5.9 million TRUMP tokens in the launch block, transferred its entire holdings to one of the $HAWK Sniper Funding Wallets (Wallet 6), proving common control or collaboration.

310.    Wallet 7, which helped fund the $HAWK sniper, received more than $740,000 in SOL over several weeks from Wallet 6—the same wallet that previously received the TRUMP snipe.

311.    Wallet 8 also engaged in synchronized pre-funding and post-extraction transfers tied to $HAWK, and later off-ramped more than $1M of USDC through Kraken, consistent with laundering patterns used in M3M3 and AIAI. *See* Exhibit T.

312.    The timing of wallet activity across frauds is consistent: wallets remain dormant for weeks or months, then become highly active during the 6–12 hour window before and after a new scam token launches.

313.    These timing patterns demonstrate operational coordination and premeditation, not spontaneous market participation.

314.    The same set of wallets conduct "aging" transactions—small trades designed to create the appearance of legitimate activity—days before each fraud, then suddenly receive large inflows shortly before launch.

315.    In each scam, these wallets fund the sniper, coordinate liquidity-removal actions, dump insider allocations, and route proceeds through the same off-ramp pathways.

316.    The Meteora platform plays a central role across, at least, all four scams: LIBRA, M3M3, AIAI, and HAWK.

317.    Each of these tokens launched on Meteora's AMM infrastructure, each displayed Meteora's "Permanently locked" badge, and each experienced full liquidity drainage through complex contract interactions.

318. The replication of this failure across multiple tokens and time periods demonstrates that Meteora's lock mechanism was either fraudulent, disabled, or selectively circumventable.

319. Under Chow's leadership, Meteora repeatedly served as the technical venue for celebrity-based pump-and-dump schemes, attracting inexperienced retail investors with false safety assurances.

320. The transaction patterns in each scam are so similar that they follow a standardized script:

    a.   Pre-funded sniper wallets deliver wSOL hours before launch;

    b.   Sniper captures majority of public float in the first block;

    c.   Rapid price appreciation generates FOMO;

    d.   Insiders remove liquidity through Meteora AMM interactions;

    e.   Sniper sells into remaining liquidity during collapse;

    f.   Funds are off-ramped via Kraken, Binance, or FixedFloat.

321. These shared stages demonstrate that $HAWK was executed using a refined methodology developed through various fraud iterations.

322. The presence of insider technical knowledge is further shown by the precision timing of liquidity removal transactions—each carefully spaced to extract maximum value during the period of peak retail buying.

323. This timing was identical in LIBRA, M3M3, AIAI, and HAWK, suggesting that the operators had intimate knowledge of Meteora's DAMM mechanics and the ability to coordinate transactions across multiple team-controlled wallets.

324.    The appearance of identical wallet clusters across multiple schemes also confirms that these wallets were not independent actors but were controlled by a small, organized group.

325.    This group included, at a minimum, the operators behind Memetic Labs, overHere, Tuah Foundation, Meteora, DLL, and the Doe wallet holders.

326.    Each scam used nearly identical marketing patterns: celebrity endorsements, influencer amplification, Discord-based hype, rocket emoji campaigns, and promises of "revolutionary utility."

327.    Each scam used nearly identical tokenomics patterns: thin float, unlocked insider allocations, and misleading diagrams of community ownership.

328.    Each scam used nearly identical liquidity patterns: initial liquidity seeded using pre-sale funds and full liquidity removal shortly after launch.

329.    Each scam used nearly identical laundering patterns: routing funds through Kraken, FixedFloat, and other off-ramps within hours of extraction. *See* Exhibit T.

330.    The most compelling evidence of a coordinated fraud network is that the same actors continued perpetrating new scams even after prior ones produced litigation, regulatory scrutiny, and public exposure.

331.    This conduct demonstrates not error or oversight, but brazen confidence that offshore structuring and pseudonymous wallets would shield them from accountability.

332.    The repetition of fraud across multiple tokens and time periods also shows that the economic objective was not project development but mass extraction, executed repeatedly until detected.

333.    The fraudulent patterns observed across LIBRA, M3M3, AIAI, TRUMP, and HAWK reveal a methodical, technologically sophisticated, multi-jurisdictional criminal scheme.

334.    $HAWK embodied every successful tactic from surrounding iterations—celebrity branding, thin float, sniper capture, removable liquidity, offshore structuring, influencer amplification, and platform-level manipulation.

335.    Together, the pattern evidence establishes that $HAWK was not an isolated token collapse—it was the predictable and intentional operation of a fraudulent enterprise that executed multiple high-velocity extraction schemes through the same platform and actors.

336.    This repeated pattern of conduct demonstrates scienter, motive, knowledge, coordination, and a deliberate disregard for investor harm, supporting all claims asserted in this complaint.

337.    Although LIBRA, M3M3, and AIAI collapsed after the $HAWK scheme, their execution reveals the continuation—not the origin—of Defendants' fraud pattern.

338.    The same wallets that funded and executed the $HAWK extraction reappeared in these later schemes, performing identical sniping, liquidity-removal, and off-ramp behaviors.

339.    This recurring pattern across subsequent tokens demonstrates that $HAWK was the first iteration in a series of coordinated, repeatable, high-speed extraction events conducted by the same network of insiders.

340.    Rather than viewing $HAWK as a one-off failure, the later frauds confirm that Defendants refined and repeatedly deployed the same method, thereby reinforcing the inference of scienter and coordinated intent at the time of the $HAWK launch.

**G. The Marketing Crescendo – Weaponizing Celebrity Influence**

341.    The success of the $HAWK extraction depended on an intense, coordinated marketing crescendo engineered to peak during the hours immediately preceding the token's launch.

342.    This marketing surge was not organic; it was the deliberate execution of contractual obligations, timed messaging, influencer amplification, and psychological manipulation intended to generate maximum retail demand.

343.    Defendant Welch's involvement was central to this strategy. As a newly minted celebrity who had built a reputation on authenticity and relatability, Welch served as the trust vector through which the scheme accessed millions of non-crypto-native consumers.

344.    On November 5, 2024—exactly one month before launch—Welch posted "Tuah to the Moon" on her X (Twitter) account, a phrase universally interpreted by cryptocurrency investors as a call for imminent price appreciation.

345.    This was not a casual or spontaneous expression. It was the contractual beginning of Welch's promotional obligations under the July 18, 2024 agreement with Memetic Labs.

346.    From that point forward, Welch's social-media presence transitioned from entertainment content to investment solicitation cloaked in fan-friendly language.

347.    Her posts began incorporating rocket-ship emojis, "to the moon" slogans, and other visual markers widely associated with speculative crypto hype.

348.    These signals were intentionally designed to capture the attention of Welch's youthful audience, most of whom lacked the sophistication to understand the risks associated with token launches.

349. Memetic Labs exercised full access to Welch's Twitter/X account, enabling Defendants Larson and Sweeper to post promotional content in Welch's tone and cadence as if originating from her personally.

350. This blurring of authorship created the false impression that Welch was independently enthusiastic about the token rather than performing contractual advertising duties.

351. The marketing crescendo extended across all of Welch's digital platforms, including Instagram, TikTok, Snapchat, and YouTube Shorts, each of which reached different subsets of her audience.

352. Her posts, stories, and videos referenced "big things coming," "huge surprises," and joining a "movement," priming followers through vague but emotionally resonant language. *See* Exhibit B.

353. These messages created a sense of inevitability and anticipation, conditioning fans to believe they were witnessing a once-in-a-lifetime opportunity aligned with Welch's newfound success.

354. Concurrently, Defendants So and overHere orchestrated a high-intensity promotional campaign across crypto-native platforms, including Discord servers and Twitter Spaces. *See* promotional materials by Defendant So and overHere, attached as Exhibits C, D, E and N.

355. On November 26, 2024, overHere announced that the $HAWK allowlist was "now live," urging fans to "secure your spot" and "be among the first to join the movement." *See* promotional statements by Defendants overHere and So, attached as Exhibit E.

356. The language of exclusivity and early access exploited psychological biases known to influence retail investors, particularly around FOMO.

357.    The allowlist announcement was accompanied by rocket emojis, celebratory icons, and excited community replies—all designed to simulate momentum and social proof.

358.    overHere moderators reassured users that allowlist participants would have priority access and that the project was built "for the community," further instilling confidence.

359.    These assurances were knowingly false: insiders had already arranged for a sniper wallet to capture half of the public float and had allocated 17% of the supply to strategic insiders. *See* Cluster Wallet Analysis attached as Exhibit R, Exhibit H.

360.    Defendants coordinated a series of Twitter Spaces hosted by Larson, Sweeper, and So, in which participants discussed "building culture," onboarding "hundreds of thousands of new users," and making HAWK a "revolutionary" project.

361.    During these Spaces, skeptical questions were minimized, deflected, or reframed as misunderstandings by those who "didn't get Web3 culture."

362.    These events created an echo chamber of uncritical enthusiasm, with influencers praising Welch's authenticity and the project's "mass adoption" potential.

363.    Welch herself appeared in several Spaces, delivering scripted talking points about how excited she was to "bring her fans into Web3" and "share something special."

364.    Listeners interpreted Welch's participation as evidence of the project's legitimacy, not realizing she was contractually obligated to attend.

365.    Welch's Talk Tuah podcast also became part of the marketing machine. Several episodes in November included tangential discussions about crypto, digital culture, and "building something new together."

366.    These segments served to acclimate her audience to the idea of participating in a token project while leveraging the credibility of her high-profile guests.

367. The appearance of entrepreneur Mark Cuban on the podcast was repeatedly referenced in promotions for $HAWK, despite Cuban having no connection to the token whatsoever.

368. Cuban's presence on the show was falsely framed as third-party validation of Welch's entry into the crypto space.

369. By late November, Welch began posting videos that portrayed token participation as both fun and supportive—framing purchases not as financial decisions but as expressions of loyalty.

370. This messaging obscured the risks and created a social-identity incentive for her fans to participate.

371. As launch approached, the marketing campaign intensified, with coordinated posts across all project-controlled accounts emphasizing urgency, exclusivity, and imminent announcements.

372. Defendants timed these messages to correspond with known peak engagement windows for Welch's audience, particularly evenings and weekends.

373. overHere, Memetic Labs, and Welch's accounts deployed synchronized countdown graphics and teaser videos to maximize anticipation.

374. Influencers recruited by Memetic Labs began posting threads analyzing why HAWK would "redefine crypto culture," repeating talking points that had no basis in technical reality.

375. These influencers were compensated through pre-sale allocations and promotional payments, but these conflicts of interest were not disclosed to followers.

376.    Discord channels run by overHere and Memetic Labs created a high-pressure environment where community moderators banned skeptical users and highlighted bullish commentary.

377.    During the final 48 hours before launch, Defendants released a flurry of short videos, graphics, and fan-targeted memes, all designed to create emotional momentum and suppress critical analysis.

378.    This content emphasized joining "the journey," "being early," and "supporting Haley"—all tactics that reframed speculative investment as fandom participation.

379.    Defendants intentionally conflated token purchases with personal support for Welch, leveraging the parasocial relationship she had cultivated with her audience.

380.    On launch day, December 4, 2024, Welch posted multiple pieces of content encouraging followers to "get ready," "stay tuned," and "be part of something big."

381.    These posts were timed to coincide with insider activities: sniper wallet preparation, liquidity pool creation, and scripted timing for the extraction sequence.

382.    The marketing crescendo reached its apex in the final hour before launch, with synchronized messaging across Welch's profiles, overHere announcements, Memetic Labs postings, Discord pings, and influencer tweets.

383.    Retail investors—particularly Welch's young fanbase—were primed to purchase tokens immediately at launch, believing they were joining a cultural movement backed by their favorite celebrity.

384.    In reality, these messages funneled investors directly into an engineered price spike created by the insiders controlling the sniper wallet.

385.    The marketing crescendo had one purpose: to maximize retail participation during the narrow extraction window in which insiders planned to sell into rising prices and drain liquidity.

386.    Defendants abandoned the project almost immediately after launch. Welch ceased promotional posting, Memetic Labs went silent, and overHere stopped discussing the token.

387.    The silence following the collapse exposed that the marketing campaign was never intended to support a real project, but to temporarily inflate demand long enough to complete the extraction.

388.    The crescendo of marketing activity—paired with its immediate disappearance—confirms that Defendants executed a coordinated promotional scheme designed solely to induce purchases during an engineered pump.

389.    The weaponization of Welch's celebrity status and her followers' trust was not an incidental feature of the launch; it was the central mechanism by which Defendants induced thousands of victims to participate in the scheme.

390.    The marketing crescendo therefore provides direct evidence of fraudulent inducement, scienter, and coordinated orchestration among all Defendants.

**H. Doe Defendants (Wallet Cluster Actors)**

391.    The Doe Defendants are pseudonymous individuals or entities who controlled the wallets responsible for funding, executing, and profiting from the coordinated on-chain fraud that caused the collapse of the $HAWK token. See off chain transfer of assets, attached as Exhibit V

392. Although their real-world identities are not yet known, their on-chain behavior is traceable, coordinated, and consistent with insider knowledge of launch mechanics, Meteora platform functions, and the extraction strategy implemented in multiple prior frauds.

393. Blockchain analysis demonstrates that Doe Defendants acted in concert with the named Defendants Larson, Sweeper, So, Chow, overHere, Memetic Labs, Meteora, DLL, Forster, and 16 Minutes to carry out the technical aspects of the scheme.

394. Doe Defendants executed pre-launch funding transactions, sniping operations, insider dumping, liquidity removal sequencing, and off-ramping of illicit proceeds, all within minutes or hours of the token's launch.

395. Doe 1 is the operator of the primary "Sniper Wallet Cluster," the wallet that captured approximately 50% of the public float in the first block immediately following the launch of $HAWK. *See* Exhibit R.

396. This wallet executed a first-block buy of enormous magnitude, requiring knowledge of the exact pool address, launch block, and precise moment at which liquidity would be added—knowledge that could only come from insiders or from collaboration with insiders. *Id*.

397. Doe 1's wallet had been pre-funded with over $500,000 in wrapped SOL by approximately ten separate addresses in the six-and-a-half hours preceding launch, demonstrating premeditation and coordinated capital deployment. *Id*.

398. Among the wallets funding Doe 1's sniper wallet were Wallet 4 and Wallet 6, each of which is tied to frauds on the Meteora platform, including LIBRA, M3M3, and AIAI.

399.  Doe 2 is the operator of the "Strategic Allocation Cluster," comprising the wallets that collectively received approximately 17% of the total token supply through pre-sale arrangements with the Tuah Foundation. *Id*.

400.  These wallets acted in a coordinated manner, with some dumping immediately into the artificial price spike, some providing temporary liquidity during the extraction window, and others attempting but failing to trade due to congestion engineered by creator insiders.

401.  The synchronized behavior of these wallets demonstrates common control or pre-arranged execution instructions timed with the extraction sequence.

402.  Doe 3 is the operator of the wallets that executed the liquidity-removal transactions on the Meteora DAMM, draining the pool of approximately $1.27 million in value within 22 minutes of launch.

403.  These transactions required advanced technical sophistication, including direct smart-contract interactions not accessible through the standard Meteora front-end, strongly suggesting insider-level expertise.

404.  The wallets controlled by Doe 3 removed liquidity in four coordinated bursts, each timed to coincide with sniper dumps and surges in retail buying, maximizing insider profits and accelerating the collapse.

405.  Doe 3's execution of liquidity removal contradicts the "Permanently locked" badge displayed on the Meteora interface, further indicating that Doe 3 either had platform-level access or acted with knowledge that the lock mechanism did not function as publicly represented.

406. Doe 4 and Doe 5 controlled wallets used to route proceeds from the extraction to centralized exchanges—including Binance, Kraken, and FixedFloat—for conversion into fiat or other crypto assets. *See* Exhibit T.

407. The timing of off-ramp transactions shows that Doe 4 and Doe 5 acted within hours of extraction, consistent with laundering behavior observed in prior scams involving the same wallet clusters.

408. In some instances, funds moved from the sniper wallet to Doe 4 or Doe 5 within minutes, demonstrating a coordinated money-flow architecture designed to obscure the ultimate destination of the stolen assets.

409. Wallet 7—connected to Doe 4—was tied to the TRUMP token snipe, which generated more than $100 million in profit and later transferred all 5.9 million TRUMP tokens to one of the $HAWK funding wallets, demonstrating deep entanglement between prior frauds and $HAWK operations.

410. Doe 6 through Doe 10 were involved in preparatory transactions, including "aging" the sniper wallet with small, purposeless trades to create the appearance of legitimate activity and reduce detection risk.

411. These wallets also performed timing tests, gas-profiling, and dry-run purchases hours before launch, indicating direct access to pool information not available to the public.

412. Each Doe Defendant wallet participated in the actor network that executed LIBRA, M3M3, and AIAI, following nearly identical transaction patterns and timing sequences. *See* Exhibit R.

413. The recurrence of these wallets across multiple schemes strongly supports the conclusion that they are controlled by a stable group of operators acting as a team.

414.   Doe Defendants acted within a larger enterprise involving coordinated roles: some funded the scheme, some executed trades, some removed liquidity, some off-ramped proceeds, and some obscured transaction paths.

415.   Together, this group performed the technical functions necessary to convert the hype created by Welch, Memetic Labs, and overHere into immediate financial extraction from unsuspecting investors.

416.   Doe Defendants' actions were essential to the success of the fraud; without their coordinated execution, the engineered pump-and-dump cycle could not have occurred.

417.   The identities of Doe Defendants are currently unknown but will be ascertainable through discovery, including subpoenas to centralized exchanges, analytics of on-chain metadata, and review of IP, device, and log-in records.

418.   At all relevant times, Doe Defendants acted in concert with the named Defendants and are therefore jointly and severally liable for the harm caused by the fraudulent $HAWK scheme.

## I. Standard Scienter / Fraud Summary

419.   The totality of the allegations set forth above demonstrates Defendants' scienter—that is, their knowledge and intent that the $HAWK token launch was designed to deceive, manipulate, and defraud investors.

420.   The July 18 monetization agreement reveals that the project was conceptualized as a monetization scheme, not a technology initiative, and that Defendants allocated no resources to utility development. *See* Exhibit A.

421.    Defendants' coordinated marketing crescendo was not a good-faith promotional effort but a structured inducement designed to push unsophisticated investors into the market at the precise moment of insider extraction.

422.    The technical setup—including thin public float, unlocked strategic allocations, and pre-positioned sniper wallets—was engineered to guarantee price manipulation, not to enable legitimate trading.

423.    The Meteora platform, operated by Chow, displayed false safety indicators (e.g., "Permanently locked") while insiders retained full ability to withdraw liquidity, showing that Defendants knew their public statements were false.

424.    Only Meteora, through its operators including Chow and DLL, possessed the technical visibility to know that liquidity remained fully removable despite the platform's public representation to the contrary.

425.    The liquidity-removal transactions were timed, precise, and conducted through complex smart-contract interactions, proving that Defendants intended to drain the pool during peak retail activity.

426.    The sniper wallet's pre-funding, timing, and coordinated dump pattern reflect insider knowledge and premeditated manipulation.

427.    The fact that Wallets 4, 6, 7, and 8—wallets deeply tied to other frauds—funded the sniper wallet demonstrates that Defendants operated through a stable fraud network.

428.    The nearly identical structure of other frauds (LIBRA, M3M3, AIAI, TRUMP) shows that Defendants refined and repeatedly deployed the same fraudulent method. *See* Exhibit R.

429.     Defendants' immediate abandonment of the project after launch confirms that no utilities were built, no roadmap was produced, no recovery efforts were made, and no investor communication was issued after the collapse.

430.     Defendants' offshore structuring through the Tuah Foundation and reliance on DLL routing fees reflects an intent to shield illicit profits from U.S. regulators and investors.

431.     The coordinated off-ramping of funds through Kraken, Binance, and FixedFloat demonstrates a deliberate attempt to conceal proceeds and avoid tracing. *See* Exhibit T.

432.     Each defendant's role—celebrity promotion, marketing amplification, offshore structuring, platform manipulation, liquidity removal, sniper execution—was necessary to the scheme's success.

433.     The combined facts show an intentional, coordinated plan to lure investors into a token launch engineered to transfer wealth from the public to insiders.

434.     This is not a case of business failure, mismanagement, or unexpected market dynamics; it is a case of deliberate fraud.

435.     The timing and sequencing of the extraction further confirm Defendants' scienter.

436.     Team-controlled wallets withdrew liquidity only after the sniper wallet had captured roughly half of the entire public float in the first block, demonstrating that the insiders did not perceive the sniper as a risk to the project but rather as a coordinated participant in the scheme.

437.     If the sniper had been unknown or hostile, a legitimate team would have increased liquidity or at minimum left their seeded liquidity in place to stabilize the token's price.

438.    Instead, Defendants withdrew liquidity immediately after the sniper activity, revealing that they anticipated, understood, and relied upon the sniper's role to inflate price and create an extraction window.

439.    Defendants' decision to drain liquidity following the sniper's purchase shows that they never intended to maintain a healthy market or protect purchasers; their only objective was to maximize the value of insider-held tokens during the artificial price surge.

440.    This behavior is only consistent with foreknowledge and participation: Defendants knew who controlled the sniper wallet, coordinated their actions around it, and exploited the sniper-induced price distortion to accelerate the rug pull.

441.    Scienter is also demonstrated by the fact that Defendants used pre-sale investor funds—not their own capital—to seed liquidity, fully aware that they intended to remove that same liquidity minutes after the token launched.

442.    The liquidity pool existed solely because purchasers funded it, and Defendants' plan to withdraw it immediately shows intentional deception and misuse of investor assets.

443.    Defendants' scienter is further established by their concealment of the true token distribution.

444.    They designated more than 40% of the supply for "fans" and "community" yet never delivered those tokens, ensuring that Welch's followers—the group publicly promised the greatest benefit—received none of the supply. Only insider or crypto-native wallets received tokens that were actually tradeable at launch.

445.    Defendants also inflated the strategic allocation by distributing tokens to more than 80 wallets that never contributed any pre-sale funds.

446. This manufactured and undisclosed distribution pattern shows intentional concealment of insider concentration and a desire to obscure the fact that the token was never intended to reach the people marketed as its primary beneficiaries.

447. Scienter is further demonstrated by Defendants' use of pseudonymous wallets—many of which had participated in prior rug-pulls—to fund the sniper wallet, execute the extraction, and launder proceeds.

448. The recurrence of the same wallets in subsequent schemes such as LIBRA, M3M3, and AIAI does not negate scienter here; rather, it confirms that $HAWK was the first iteration of a continuing extraction strategy that Defendants then repeated.

449. The later frauds show that Defendants refined and redeployed the same method again and again, validating that the $HAWK extraction was deliberate, not accidental.

450. Taken together, the liquidity timing, coordinated sniper activity, exclusive insider tradability, misappropriation of pre-sale funds, concealment of true allocations, pseudonymous laundering, and later replication of the same scheme in subsequent tokens present overwhelming evidence of scienter.

451. Defendants acted knowingly, intentionally, and with the specific purpose of deceiving purchasers and extracting maximum value from the public in the shortest period of time possible.

452. Accordingly, the scienter requirement for all fraud-based claims—including common law fraud and consumer protection claims—is overwhelmingly satisfied.

## J. Materiality and Investor Reliance

453.    The misrepresentations and omissions described above were material because they concerned facts that a reasonable investor would consider important when deciding whether to purchase the $HAWK token.

454.    A reasonable investor would view the existence of genuine utilities—such as podcast integration, gaming functionality, and token-gated subscription tiers—as essential to understanding the token's value proposition. *See* utility promotional materials, attached as Exhibit E.

455.    A reasonable investor would similarly consider the safety of their investment to be material, particularly the representation that liquidity was "permanently locked," which was explicitly marketed as protection against rug-pull scenarios.

456.    The false assurances of fair and democratic token distribution were also material because distribution structure directly affects price stability, market integrity, and the likelihood of manipulation.

457.    A reasonable investor would attach significant importance to representations suggesting that the project had undergone proper legal structuring, compliance review, and professionalized oversight.

458.    Defendants' marketing narrative—framing $HAWK as "more than a memecoin," "built for the community," and "part of the culture"—was designed to shift investor focus away from risk and toward an emotional, identity-driven basis for purchase.

459.    These statements were material because they induced non-crypto-native investors, particularly Welch's fanbase, to participate in the token sale based on trust in Welch rather than understanding of cryptocurrency risks.

460. Plaintiff and Class members reasonably relied on Defendants' uniform statements and omissions in deciding to purchase $HAWK tokens during the pre-sale, at launch, and during the initial trading window.

461. This reliance was justified because Defendants presented themselves as reputable actors—Memetic Labs as a professional launchpad, overHere as a global Web3 developer, Meteora as a safe DEX, and Welch as an authentic public figure.

462. Plaintiff and Class members had no access to the information exclusively in Defendants' possession, including the true tokenomics, the unlocked strategic allocations, the thin public float, the pre-funded sniper wallets, and the ability to remove liquidity despite the "locked" badge.

463. Defendants intentionally exploited this information asymmetry, presenting a curated, misleading picture of the token's safety, value, and prospects.

464. Plaintiff and Class members also relied on the immutable signals embedded in the Meteora interface, which displayed "Permanently locked" despite insiders having full ability to drain the pool.

465. Reliance on this platform indicator was reasonable because investors were entitled to assume that decentralized-finance platforms display accurate information regarding smart-contract functions and liquidity status.

466. The widespread and coordinated promotion by influencers, Welch, and Memetic Labs created powerful social proof effects, reinforcing reliance among investors who lacked technical sophistication.

467.   Defendants intended for investors to rely on these representations and omissions, as demonstrated by the timing of marketing efforts, contractual obligations, influencer campaigns, and synchronized messaging in the hours before launch.

468.   As a direct result of this reliance, Plaintiff and Class members purchased $HAWK tokens at artificially inflated prices and suffered immediate and devastating losses when insiders executed their pre-planned extraction.

469.   The materiality of the misrepresentations and the reasonableness of investor reliance are further demonstrated by the fact that tens of thousands of individuals from Welch's audience and the broader market purchased tokens within minutes of launch.

470.   The resulting investor harm—more than 97% loss of value—was the foreseeable and intended outcome of Defendants' coordinated deception.

## K. Tokenomics Fraud and Distribution Misrepresentation

471.   The fraud underlying the $HAWK token extended beyond promotional misrepresentations and technical manipulation; it was structurally embedded in the tokenomics and distribution model itself.

472.   Defendants repeatedly represented that $HAWK would be a "community-driven" token built for Welch's fans, with large allocations dedicated to community access, fan claims, and retail participation.

473.   In reality, more than 80% of all $HAWK tokens never reached the market, never became tradable, and never became available to any of the individuals the project claimed to serve.

474.   The tokenomics documents show that substantial portions of the supply were allocated to "Reserve", "Community Fund", "Strategical Allocation", "Free claim for

Haley's Fans, Web2", and "Haley" buckets, none of which entered circulation or were accessible to the public. *See* Token Claim Allowlist attached as Exhibit F.

475.    These undisclosed and opaque allocations totaled more than 35% of the entire supply and were held in wallets not labeled, identified, or transparently disclosed at any point to the public.

476.    Even more critically, the 20% of tokens designated as a "Free Claim for Haley's Fans, Web2" were never distributed at all.

477.    Despite being the centerpiece of the "community" narrative, no Web2 fan claims were processed, and Welch's audience—who were told this token was created "for them"—received zero tokens.

478.    The only individuals who actually received tokens and were capable of trading them at launch were wallets controlled by crypto-native users, insiders, or pseudonymous addresses tied to prior frauds.

479.    The promised "Community Fund" and "Free Claim for Haley's Fans, Web2," which together constituted 41% of the token supply on paper, were not used for any community purpose, nor were they made accessible to any real members of Welch's fanbase.

480.    Defendants also represented that 17% of the supply had been allocated to "Strategic Allocation" purchasers—pre-sale buyers who had allegedly obtained the token in advance of public trading. *See* Pre-Sale/Strategic Allocation Wallet List attached as Exhibit G.

481.    In reality, these tokens were distributed across 287 wallets, far exceeding the actual number of pre-sale purchasers and including more than 80 additional wallets that were never associated with any real purchase. *Id*.

482.  These additional wallets received token distributions without any recorded transaction, consideration, or SAFT entry, indicating that Defendants used the "strategic" bucket to mask insider distribution and artificially inflate apparent decentralization.

483.  Even among the real strategic purchasers, nearly 70% were unable to trade their tokens or suffered immediate losses because the rug-pull occurred within minutes of the token generation event.

484.  Rather than using this capital for development or operations, Defendants used approximately $869k of pre-sale funds to seed liquidity pools on Meteora and Raydium.

485.  Defendants contributed none of their own capital to create the liquidity pool that was later drained; the liquidity existed solely because retail investors provided it.

486.  The use of investor funds to seed liquidity created a false impression of legitimate market depth and trading support.

487.  Defendants then removed this liquidity, draining approximately $1.27 million during the extraction window while leaving investors with worthless tokens. *See* Exhibit J.

488.  Funds remaining in the pre-sale investment wallets were later used for off-ramping to centralized exchanges, transfers to Sideshift.ai, and even speculative trading on the Jupiter Perpetual Futures Platform, where one such leveraged trade was fully liquidated. *See* Exhibit V.

489.  These activities demonstrate not only misrepresentation but active misappropriation of investor funds following the extraction event.

490.  Defendants' failure to disclose the true nature of token allocations, the undistributed fan tokens, the insider-only tradability, the over-allocation of strategic wallets, and the

use of investor funds for liquidity and speculation constitutes material deception. *See* chain analysis, attached as Exhibit S.

491. Plaintiff and Class members reasonably relied on Defendants' representations regarding distribution fairness, community access, and token availability.

492. But the actual distribution shows a token engineered for one purpose: to concentrate supply and control in insider wallets while presenting the illusion of community ownership and broad participation.

493. The structure and execution of the tokenomics fraud provide additional, independent evidence of scienter, motive, and coordinated intent to deceive and extract value from retail purchasers.

**L. Post-Filing Asset Movement**

494. After this lawsuit was filed, the wallets holding pre-sale investment funds continued to move and dissipate assets.

495. One wallet converted 1,745 SOL into stablecoins. It sold 220 SOL for about $30,000 in USDC, then sent $24,000 of that to a Coinbase account. It then sold another 1,300 SOL for roughly $179,000 USDC, leaving 224 SOL behind.

496. The wallet then sent all of its USDC—about $185,000—to an "Off-Boarding Wallet."

497. From there, $118,000 was sent to Sideshift.ai, and $13,000 was sent to Kraken. The remaining $54,000 was sent to a Jupiter perpetual-futures platform, where the wallet opened a 10x leveraged long position on SOL. That trade was fully liquidated on June 4, 2025, wiping out the entire $54,000.

498. Finally, the last 224 SOL held in the original wallet was sold for about $28,000 USDC and also sent to Coinbase.

499.     This sequence shows steady off-ramping, speculation, and irreversible dissipation of pre-sale investor funds after the filing of this action.

500.     Similarly, Hawk Team Wallet 1 has moved out almost $550,000, with activity in that wallet as recently as 24 days ago as the wallet offboarded tens of thousands of dollars through the MEXC exchange.

501.     Similarly, Pre-Sale Investment Funds Wallet has moved and offboarded approximately $200,000 of USDC since the filing of this action.

## VI. CLASS ACTION ALLEGATIONS

502.     Plaintiff brings this action individually and as a class action on behalf of all other similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

503.     Plaintiff seeks to represent the following Class: All persons who purchased or otherwise acquired $HAWK tokens during the period from November 26, 2024 through the present (the "Class Period") and were damaged thereby.

504.     Excluded from the Class are Defendants, their officers, directors, and employees, their immediate family members, their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

505.     Plaintiff reserves the right to expand, limit, modify, or amend this Class definition, including the addition of one or more subclasses, in connection with the Court's class certification orders, after discovery, and/or at trial.

### A. Numerosity - Rule 23(a)(1)

506.     The members of the Class are so numerous that joinder of all members is impracticable.

507.    Blockchain Evidence of Numerosity: As alleged, blockchain analysis reveals that over 12,000 unique wallet addresses currently hold $HAWK tokens, representing individual investors who purchased tokens and suffered losses. This number represents only current holders and does not include investors who sold at losses during the collapse.

508.    Geographic Dispersion: Class members are geographically dispersed across the United States and internationally. As detailed in, Defendant Welch's millions of followers across Instagram, TikTok, Snapchat, and other platforms came from all 50 states and numerous countries. The token was marketed through globally accessible platforms and sold through blockchain networks that operate without geographic boundaries.

509.    Trading Volume Evidence: The token achieved a market capitalization of $491 million at peak, generating hundreds of millions in trading volume that necessarily involved thousands of individual transactions by Class members. The coordinated marketing campaign was designed to reach "hundreds of thousands of non-crypto users" , demonstrating the intended and actual broad participation.

510.    Small Individual Claims: Many Class members hold relatively small positions that make individual litigation economically impracticable. As calculated in   461, if 10,000 of Welch's followers purchased tokens, each would have averaged only 3,300 tokens worth approximately $55 at launch—amounts too small to justify individual lawsuits but collectively representing millions in damages.

**B. Commonality - Rule 23(a)(2)**

511.    There are questions of law and fact common to the Class that predominate over any individual questions.

512.    Common Questions of Law Include:

● Whether the $HAWK tokens constitute securities under federal law;

● Whether Defendants violated Section 5 and Section 12(a)(1) of the Securities Act by offering and selling unregistered securities;

● Whether Defendants engaged in common law fraud;

● Whether Defendants violated New York GBL §§ 349 and 350;

● Whether Defendants breached express or implied contractual obligations;

● Whether Defendants were unjustly enriched at Class members' expense;

● Whether Class members are entitled to rescission or damages.

513.    Common Questions of Fact Include:

● Whether Defendants made material misrepresentations about the $HAWK token's utilities, as documented in the July 18, 2024 agreement showing no development resources allocated;

● Whether the promised features including podcast integration, gaming functionality, and subscription tiers ever existed;

● Whether liquidity was actually "permanently locked" as advertised or was removed within 22 minutes as shown by blockchain records;

● Whether the token distribution was fair and democratic or restricted to benefit insiders;

● Whether the sniper wallet was controlled by or coordinated with Defendants;

● Whether Defendants operated a systematic fraud network across multiple tokens;

● Whether Defendants knew their representations were false when made.

514.    Common Scheme and Conduct: All Class members were subjected to the same fraudulent scheme executed through identical mechanisms. Every purchaser relied on the same false marketing materials, bought tokens with the same absent utilities, traded in the same manipulated market, and suffered losses from the same orchestrated collapse.

## C. Typicality - Rule 23(a)(3)

515.    Plaintiff's claims are typical of the claims of the Class members because Plaintiff and all Class members were injured through the same wrongful conduct by Defendants.

516.    Identical Injuries: Plaintiff purchased $HAWK tokens during the Class Period based on Defendants' misrepresentations and suffered economic damage when the tokens collapsed in value. This experience is identical to all Class members who purchased worthless tokens based on false promises of utilities, locked liquidity, and fair distribution.

517.    Same Legal Theories: Plaintiff asserts the same legal theories that apply uniformly to all Class members—violations of federal securities laws, common law fraud, consumer protection violations, breach of contract, and unjust enrichment. These claims arise from the same nucleus of operative facts affecting all purchasers equally.

518.    No Unique Defenses: Plaintiff is not subject to any unique defenses that would make his claims atypical. He purchased tokens through the same channels, relied on the same representations, and suffered the same proportional losses as all Class members.

## D. Adequacy of Representation - Rule 23(a)(4)

519.    Plaintiff will fairly and adequately protect the interests of the Class.

520.    Aligned Interests: Plaintiff's interests are fully aligned with those of absent Class members. All seek to recover losses from purchasing $HAWK tokens based on

Defendants' fraudulent scheme. Plaintiff has no interests antagonistic to or in conflict with the Class.

521. Commitment to Vigorous Prosecution: Plaintiff has demonstrated commitment to vigorous prosecution by retaining qualified counsel, investigating the complex blockchain evidence, and pursuing claims against well-funded Defendants including offshore entities. The detailed factual allegations spanning blockchain analysis, contract review, and wallet tracing demonstrate Plaintiff's dedication to thorough representation.

522. Qualified Counsel: Plaintiff has retained counsel experienced in complex class action litigation, securities fraud cases, and digital asset disputes. Counsel has the resources, expertise, and determination to prosecute this action against sophisticated Defendants operating across multiple jurisdictions.

**E. Predominance - Rule 23(b)(3)**

523. Questions of law and fact common to Class members predominate over any questions affecting only individual members.

524. Common Evidence Proves All Claims: The core evidence is common to all Class members and maintained in immutable blockchain records. The smart contract code, transaction history, wallet movements, and liquidity events documented in apply identically to every purchaser. The July 18, 2024 agreement proves the scheme's fraudulent nature for all claims.

525. Standardized Misrepresentations: All Class members were exposed to the same standardized misrepresentations through Defendants' coordinated marketing campaign. The promises of utilities, locked liquidity, and fair distribution were disseminated uniformly across platforms, not tailored to individuals.

526.    Objective Falsity: The falsity of Defendants' representations is objectively provable through documentary evidence. Either utilities were built or they were not– here, they were not. Either liquidity was locked or it was not– here, it was not. These binary determinations apply equally to all Class members.

527.    Common Market Manipulation: The price manipulation through the sniper wallet and coordinated trading affected all purchasers simultaneously. The market dynamics, artificial price inflation, and orchestrated collapse impacted every token holder identically regardless of individual purchase timing or amount.

528.    Formulaic Damages: Damages can be calculated through common methodology using blockchain records showing purchase prices, quantities, and current values. The 97% loss from peak applies proportionally to all holders.

**F. Superiority - Rule 23(b)(3)**

529.    A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

530.    Judicial Economy: Thousands of individual lawsuits raising identical claims about the same fraudulent scheme would waste judicial resources and risk inconsistent verdicts. The common nucleus of facts and law makes consolidated adjudication far more efficient.

531.    Small Individual Claims: Many Class members' losses, while significant to them personally, are insufficient to justify individual litigation costs. As noted in    461, average holdings of $55-$100 cannot support separate lawsuits, but aggregate damages in the tens of millions justify class treatment.

532.    Defendants' Coordinated Conduct: Defendants operated as a coordinated network to perpetrate a single fraudulent scheme. It would be inefficient and potentially impossible

for individual plaintiffs to pursue claims against all responsible parties across multiple jurisdictions including the Cayman Islands.

533.    Evidence in Defendants' Control: Critical evidence including internal communications, wallet private keys, and platform data remains in Defendants' exclusive control. Class counsel can efficiently obtain and analyze this evidence once, rather than forcing thousands of plaintiffs to separately pursue discovery.

534.    Uniform Relief Needed: The fraudulent scheme requires uniform remedial action including disgorgement of ill-gotten gains, injunctive relief preventing future frauds, and equitable distribution of any recovery. Only class treatment can ensure consistent and complete relief.

535.    Manageability: This case is readily manageable as a class action. Class members can be identified through blockchain records, notices can be disseminated through digital channels where the tokens were marketed, and damages can be calculated using objective market data.

## G. Certification Under Rule 23(b)(2)

536.    In addition or in the alternative to certification under Rule 23(b)(3), certification is appropriate under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, making final injunctive relief appropriate.

537.    Ongoing Harm: Many Class members still hold worthless tokens and remain subject to ongoing harm from Defendants' continued control over project infrastructure and potential for future manipulation.

538.    Need for Injunctive Relief: The Court should enjoin Defendants from engaging in future token offerings, require disgorgement of fraudulent proceeds, and mandate

corrective disclosures to prevent repetition of the systematic fraud pattern documented across multiple schemes.

539.    Generally Applicable Conduct: Defendants' operation of the fraudulent scheme applied uniformly to all Class members, making injunctive relief appropriate on a class-wide basis to remedy the common harm and prevent future violations.

540.    Plaintiff respectfully requests that the Court certify this action as a class action pursuant to Rule 23, appoint Plaintiff as Class Representative, appoint Plaintiff's counsel as Class Counsel, and grant such other and further relief as the Court deems just and proper.

## VII. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violations of Sections 5 and 12(a)(1) of the Securities Act 15 U.S.C. §§ 77e and 77l(a)(1) (Against All Defendants Except Defendant Welch)

541.    Plaintiff realleges all prior paragraphs as though fully set forth herein.

542.    Section 5 of the Securities Act makes it unlawful to offer or sell a security unless a registration statement is filed and in effect, or an exemption applies.

543.    Section 12(a)(1) provides a private right of action against any person who offers or sells an unregistered security.

544.    The $HAWK token constitutes an investment contract and therefore a "security" under Section 2(a)(1) and the Howey test.

545.    Plaintiff and Class members invested money in exchange for $HAWK tokens through pre-sale transactions, SAFT-style agreements, and public purchases at launch.

546.    Investors participated in a common enterprise in which their fortunes were tied to Defendants' managerial and entrepreneurial efforts to build and promote the token.

547.    Defendants created a reasonable expectation of profits through promises of utilities, gaming features, token-gated podcast integrations, premium tiers, and community-based incentives.

548.    Defendants maintained full managerial control over token distribution, marketing, liquidity, platform functionality, and promotional messaging, satisfying the "efforts of others" prong of Howey.

549.    At all relevant times, no registration statement was filed or in effect for the offer and sale of $HAWK tokens.

550.    The offering did not qualify for any exemption under the Securities Act.

551.    Defendants other than Welch acted as statutory sellers and/or substantial participants in the offer and sale of $HAWK tokens.

552.    Defendants Memetic Labs, Larson, and Sweeper executed the July 18 monetization agreement, coordinated marketing, and scripted Welch's promotional obligations, thereby soliciting purchases for financial gain.

553.    Defendants overHere and So structured the pre-sale, ran the allowlist and Discord, made public promotional statements, and encouraged U.S. purchasers to participate.

554.    Defendant Tuah Foundation acted as the Cayman entity through which SAFT-style agreements were executed and was the recipient of the 15% transaction fee extracted from purchasers.

555.    Defendants Meteora, Chow, and DLL provided the trading venue, displayed

misleading safety indicators ("Permanently locked"), enabled the listing and trading of the token, and received platform-level fees tied to $HAWK trading.

556. DLL's receipt of protocol-level fees from each $HAWK transaction, coupled with its role in maintaining and licensing Meteora's trading infrastructure, placed DLL in the chain of solicitation and materially contributed to the offer and sale of an unregistered security.

557. Doe Defendants 1–10 executed the distribution, sniping, insider dumping, liquidity removal, and sale of the unregistered security to Plaintiff and Class members.

558. Each of these Defendants, except Welch, either directly solicited sales, caused sales, or was a substantial factor in the chain of solicitation.

559. Plaintiff and Class members purchased $HAWK tokens in reliance on Defendants' solicitation and promotional efforts.

560. Plaintiff and Class members are entitled to rescission or rescissory damages, including the return of consideration paid for their tokens, plus interest.

561. Because the tokens are now effectively worthless, rescission is the appropriate remedy.

## SECOND CAUSE OF ACTION

### Common Law Fraud
### (Against All Defendants Except Defendant Welch)

562. Plaintiff realleges all prior paragraphs.

563. The Non-Welch Defendants made material misrepresentations and omissions concerning the nature, safety, value, distribution, liquidity, and promised utilities of the $HAWK token.

564.    These misrepresentations included, without limitation:

   a.    that liquidity was permanently locked;

   b.    that utilities such as podcast integration, gaming, and subscription tiers were under development;

   c.    that the token would have fair and community-driven distribution;

   d.    that the project was structured with compliance and investor protection in mind; and

   e.    that the token was not part of a fraudulent scheme.

565.    These statements were false when made.

566.    Defendants knew, or were reckless in not knowing, that liquidity could be removed, utilities did not exist, distribution heavily favored insiders, and the project was designed for rapid extraction.

567.    The July 18 agreement shows scienter because it contained zero provisions for utility development and assigned profit shares based solely on trading volume.

568.    Defendants Meteora, Chow, and DLL reinforced falsehoods by displaying a "Permanently locked" indicator that did not reflect actual contract functionality.

569.    Defendants So and overHere made statements in Twitter Spaces and promotional content falsely implying compliance and proper structure for U.S. consumers.

570.    Memetic Labs, Larson, and Sweeper managed the narrative across social media, scripting Welch's messaging to induce purchases.

571.    Doe Defendants executed coordinated manipulative trades, including first-block sniping, insider dumping, and liquidity removal, to artificially influence price and deceive investors.

572. Plaintiff and Class members reasonably relied on the false representations and omissions because they appeared credible, were repeated across multiple platforms, and were delivered by trusted influencers and entities.

573. Plaintiff and Class members were unaware of the undisclosed insider allocations, pre-funded sniper wallets, or the intent to pull liquidity.

574. As a direct and proximate result, Plaintiff and Class members purchased $HAWK at inflated prices.

575. Defendants' conduct caused immediate and catastrophic losses of more than 97% of value.

576. Plaintiff and Class members suffered damages including loss of investment principal, lost trading opportunities, and fees extracted by the 15% transaction tax.

577. Accordingly, all Non-Welch Defendants are liable for common law fraud.

### THIRD CAUSE OF ACTION

### Violations of New York General Business Law § 349
### (Against All Defendants Except Defendant Welch)

578. Plaintiff realleges all prior paragraphs.

579. The Non-Welch Defendants engaged in consumer-oriented conduct by marketing the $HAWK token to millions of retail consumers across the United States and New York.

580. This consumer-facing conduct included social-media advertising, influencer campaigns, Discord promotions, tokenomics graphics, allowlist announcements, and platform safety indicators.

581. These Defendants engaged in deceptive acts and practices by making false statements about utilities, locked liquidity, fair distribution, and compliance.

582. The deception was material because it concerned core aspects of the token that would influence a reasonable consumer's decision to purchase.

583. Plaintiff and Class members suffered injury, including purchasing tokens at inflated prices and losing their investments when the market collapsed.

584. Defendants' deceptive conduct occurred in part in New York because Meteora and Chow operated from New York and because New York consumers purchased the token.

585. The Non-Welch Defendants are therefore liable under GBL § 349.

### FOURTH CAUSE OF ACTION

**Violations of New York General Business Law § 350**
**(Against All Defendants Except Defendant Welch)**

586. Plaintiff realleges all prior paragraphs.

587. Non-Welch Defendants engaged in false advertising by disseminating misleading promotional materials across social media, Discord, podcasts, and the Meteora platform.

588. This advertising included false statements about utilities, safety features, "Permanently locked," community ownership, and long-term project plans.

589. The advertising was materially false and intended to induce purchases.

590. Plaintiff and Class members relied on this false advertising in making their investment decisions.

591. The false advertising caused monetary injury, including immediate loss of investment and payment of undisclosed fees.

592. The Non-Welch Defendants are therefore liable under GBL § 350.

## FIFTH CAUSE OF ACTION

### Breach of Contract and, in the Alternative, Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Against All Defendants Except Defendant Welch)

593.    Plaintiff realleges all prior paragraphs.

594.    Defendants created express and implied contracts with purchasers through tokenomics publications, launch announcements, marketing materials, SAFT-style agreements, and public representations about utilities and liquidity.

595.    Non-Welch Defendants breached these contracts by failing to deliver promised utilities, failing to maintain liquidity, and failing to implement fair distribution structures.

596.    In the alternative, Defendants breached the implied covenant of good faith by using their exclusive control over marketing, tokenomics, and liquidity to destroy token value and extract insider profits.

597.    These breaches proximately caused Plaintiff and Class members to suffer significant financial losses.

## SIXTH CAUSE OF ACTION

### Unjust Enrichment
### (Against All Defendants)

598.    Plaintiff realleges all prior paragraphs.

599.    All Defendants—including Welch—were enriched at the expense of Plaintiff and Class members.

600.    Welch personally received $125,000 up front under the July 18 agreement, plus an additional $200,000 in promised promotional compensation tied to the token launch.

601. This compensation was funded directly or indirectly through investor purchases induced by the fraudulent marketing campaign she was contractually obligated to perform.

602. Memetic Labs, Larson, Sweeper, overHere, So, Tuah Foundation, Meteora, DLL, Forster, 16 Minutes, and Doe Defendants also received financial benefits including profit shares, transaction fees, and extracted trading gains.

603. Equity and good conscience require restitution because the enrichment was obtained through deception, market manipulation, and fraudulent inducement.

604. Plaintiff and Class members are entitled to disgorgement of all amounts wrongfully obtained by all Defendants.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself/herself and all others similarly situated (if a class is pled), respectfully prays for judgment as follows:

A. Rescission of all purchases of $HAWK, and an order requiring Defendants to return the consideration paid for the tokens, together with pre-judgment and post-judgment interest, upon tender of the tokens;

B. In the alternative to rescission, rescissionary damages in an amount to be proven at trial, together with pre-judgment and post-judgment interest;

C. Actual and statutory damages under the New York General Business Law §§ 349–350, including:

(i) injunctive relief enjoining Defendants from engaging in deceptive, misleading, or false advertising practices; (ii) an order requiring corrective disclosures an

curative advertising concerning the nature and function of $HAWK; and (iii)

reasonable attorneys' fees, expert fees, and costs as permitted by law;

D. Expectation damages or rescissionary relief on the claims for Breach of

Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing,

including consequential damages and pre- and post-judgment interest;

E. That the Class be certified, Plaintiff named Class Representative and Plaintiff's

counsel be named Class Counsel;

F. Reasonable attorneys' fees, expert fees, and costs of suit as permitted by law,

including those recoverable under GBL §§ 349–350 and any other applicable

statutes;

G. Equitable and injunctive relief as the Court deems just and proper, including an

order establishing a class-wide tender and escrow process to effectuate

rescission and protect purchasers;

H. Such other and further relief as the Court may deem just and proper.

## VIII. JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands

a trial by jury on all issues so triable.

Dated: November 17, 2025
New York, New York

Respectfully submitted,

BURWICK LAW, PLLC

*/s/ Luis Munoz*
Luis Munoz
Max Burwick (*Pro Hac Vice* Anticipated)
1 World Trade Center, 84th Fl.
New York, NY 10007
(646) 762-1080
luis@burwick.law
max@burwick.law

*Counsel for Plaintiffs*

# Exhibit A

**MEME TOKEN CREATION AND MONETIZATION AGREEMENT**

THIS MEME TOKEN CREATION AND MONETIZATION AGREEMENT ("Agreement") is made and entered into on this 18th day of July, 2024, by and between MEMETIC LABS, LLC, a limited liability company organized and existing under the laws of the State of California ("MEMETIC"), with its principal place of business at 2049 Century Park East, Suite 1400, Los Angeles, CA 90067, and 16 MINUTES LLC, a limited liability company organized and existing under the laws of the State of Tennessee f/s/o HALIEY WELCH ("CLIENT"), with its principal address at 2006 Acklen Avenue, STE 120763, Nashville, TN 37212. MEMETIC and CLIENT collectively shall be referred to as the "Parties" and individually as a "Party".

WHEREAS, MEMETIC specializes in providing advisory and launchpad services for meme tokens, NFTs, and other crypto assets for high-profile clients; and

WHEREAS, CLIENT rose to viral fame through the highly successful "Hawk Tuah" meme, which has garnered widespread recognition and popularity on various social media platforms; and

WHEREAS, CLIENT seeks to engage MEMETIC for the creation and monetization of a meme token leveraging CLIENT's widespread meme and social media presence;

NOW, THEREFORE, in consideration of the mutual promises herein contained, MEMETIC and CLIENT agree as follows:

## 1. PURPOSE

The purpose of this Agreement is to set forth the terms and conditions under which MEMETIC shall provide consulting, advisory, and execution services to create and launch a meme token (the "Token") leveraging the CLIENT's brand and social media presence.

## 2. GOALS

2.1 Take advantage of a burgeoning meme token market to elevate CLIENT's profile in the cryptocurrency space.

2.2 Mentor and provide advisory services on navigating the cryptocurrency space with best practices and methodologies that preserve CLIENT's integrity and grow community trust.

2.3 Outline key deliverables for the successful launch and sustained maintenance of a meme token that aligns with CLIENT's brand and values.

2.4 Launch an exclusive meme token with an optimal profit-taking strategy that aims to provide maximum gains while maintaining the health of the Token over the long term.

1

## 3. ASSUMPTIONS

3.1 CLIENT agrees to leverage MEMETIC for consulting and professional services related to any current and future cryptocurrency-related endeavors and offers MEMETIC first bid opportunities for any future opportunities not outlined within this Agreement.

3.2 CLIENT will make the best effort to learn about the meme token ecosystem under the guidance of MEMETIC.

3.3 MEMETIC will provide cryptocurrency-related services with CLIENT's brand integrity in mind and within strict ethical and legal guardrails.

3.4 Neither CLIENT nor MEMETIC are responsible for Token price impact caused by fluctuating meme token market conditions and sentiment shifts.

3.5 The Token will be launched on the Solana blockchain using the Metaplex protocol.

3.6 MEMETIC will maintain strict control over Token supply to prevent toxic selling or other negative impacts within their purview.

## 4. DELIVERABLES AND MILESTONES

4.1    MEMETIC Deliverables

4.1.1    Intro to the meme token ecosystem – Week 1 - MEMETIC will advise CLIENT on the optimal strategy for beginning a path towards building a following within the cryptocurrency\meme token space via co-marketing campaigns and activations with key meme token influencers and KOLs in a way that appears organic and comes from a place of genuine interest in the space and the community

4.1.2    Promotional plan – Weeks 1-3 -MEMETIC will provide a detailed plan to promote the official "Hawk Tuah" branded meme token (Token Name TBD) including resource allocation, marketing, content creation, and social media management – all within the most frictionless manner possible

4.1.3    Token launch execution – Week 4 - MEMETIC will use their experience to launch a token presale using fair launch methods

4.1.4    Post-launch – Weeks 4+ -MEMETIC will continue to sustain content and social media sustenance.

4.1.5    Dedicate resources toward the successful creation and launch of CLIENT meme token, including using a presale and fair launch model

4.1.6    MEMEMIC will assist in providing helpful answers to cryptocurrency related questions (aka interview prep) to assist

2

CLIENT with any media campaigns to enhance CLIENT knowledge and performance.

4.1.7   MEMEMIC will also provide the following advisory, launchpad/startup, content creation and marketing services:

4.1.7.1   ADVISORY
   4.1.7.1.1   Consulting on branding, blockchain selection, market timing vs. sentiment, creative direction, take profit strategies, tokenomics, creative direction, etc.

4.1.7.2   LAUNCHPAD\STARTUP SERVICES
   4.1.7.2.1   Token creation
   4.1.7.2.2   Bundle sniping
   4.1.7.2.3   Whitelisting strategies
   4.1.7.2.4   Presales
   4.1.7.2.5   Telegram creation
   4.1.7.2.6   Telegram moderation
   4.1.7.2.7   Website design
   4.1.7.2.8   Social media creation\management (X, TikTok, IG, etc)
      4.1.7.2.8.1   CoinGecko, CMC, Jupiter, etc.

4.1.7.3   MARKETING
   4.1.7.3.1   Scheduling of crypto related X spaces, podcasts, interviews, etc
   4.1.7.3.2   KOL recruitment and management
   4.1.7.3.3   Token supply management
   4.1.7.3.4   Access to Youtube creators such as Crypto Banter, Ben Armstrong, etc.
   4.1.7.3.5   Copy writers
   4.1.7.3.6   SEO management
   4.1.7.3.7   Whale network access
   4.1.7.3.8   Celebrity access at key market caps

4.1.7.4   CONTENT CREATION
   4.1.7.4.1   Illustrators
   4.1.7.4.2   GIF creation
   4.1.7.4.3   VFX team
   4.1.7.4.4   Animation Studio
   4.1.7.4.5   Script Writers
   4.1.7.4.6   Voiceover actors PARTNERSHIPS
   4.1.7.4.7   Market Making
   4.1.7.4.8   Exchange listings
   4.1.7.4.9   Access to OTC desks/coin options investors
   4.1.7.4.10   Venture Capitalists
   4.1.7.4.11   Platforms (Jupiter, Meteora, Solflare, etc)

 3 

4.2     CLIENT Deliverables

4.2.1     Place Token cashtag symbol in all of Client's social media profiles.

4.2.2     Provide full access of CLIENT's X\Twitter account to MEMETIC.

4.2.3     For the first Three Weeks leading up to Token Launch, Client will:

4.2.3.1     Mention the meme token name in media interviews.

4.2.3.2     Participate in a YouTube video announcing the Coin upon launch (answering Q&A which will showcase CLIENT's entrepreneurial spirit)

4.2.3.3     Participate in additional video interviews organized in part by MEMETIC

4.2.3.4     Participate in additional video interviews organized in part by MEMETIC

4.2.3.5     Participate in X spaces organized in part by MEMETIC

4.2.3.6     Create and sell a branded merchandise line that includes the meme token name

4.2.3.7     Meet via ZOOM at least once a week thereafter with MEMETIC for status updates and strategic planning (if CLIENT unavailable, a CLIENT representative will attend)

4.3     For the avoidance of doubt, CLIENT shall have creative approval rights over all branding, marketing, usage of name, image, and likeness, etc.


## 5. COST STRUCTURE AND FUNDING

5.1     MEMETIC Deliverables

MEMETIC will dedicate $50,000 USD upfront costs for third-party spending toward the resources needed for the planning and execution of a successful token launch, including:

5.1.1     Token pair creation.

5.1.2     Liquidity pool funding.

5.1.3     Token listings (e.g., Coin Market Cap).

5.1.4     Telegram moderation.

5.1.5     Social media management.

5.1.6    Copywriters.

5.1.7    SEO management.

5.1.8    Web design.

5.1.9    Content creation (illustrations, VFX editing, animations).

5.2    This upfront cost is recoupable from the initial CLIENT profits.

5.3    Any other spending allocated solely to CLIENT must be mutually approved.

## 6. PAYMENT TERMS

7    MEMETIC agrees to pay CLIENT as follows:

7.1    $125,000 USD in advance upon signing this Agreement.

7.2    $200,000 USD upon CLIENT meeting all CLIENT deliverables within 30 days of Token launch.

7.3    50% of all profits, including token sales, for the lifetime of the Token, in accordance with the Accounting Provisions listed on the attached Schedule A, affixed and incorporated herein.

## 8. COMPLIANCE WITH FTC GUIDELINES

8.1    CLIENT agrees to disclose the nature of their partnership and "material connection" with MEMETIC and the endorsement of the Token in accordance with FTC guidelines.

This includes but is not limited to:


8.1.1    Transparent disclosure in social media posts.

8.1.2    Display of appropriate disclaimers in all promotional content.

8.1.3    Full transparency about the compensated nature of the promotional engagements.

## 8. INDEMNITY

Each Party agrees to indemnify, defend, and hold harmless the other Party from and against any and all claims, expenses, liabilities, losses, damages, and costs, including reasonable attorneys' fees, resulting from the indemnifying Party's breach of this Agreement or gross negligence.

## 9. ARBITRATION

Any disputes arising out of or relating to this Agreement shall be resolved by binding arbitration administered by the American Arbitration Association under its



5

Commercial Arbitration Rules. The place of arbitration shall be Los Angeles, California, and the judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

## 10. GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to its conflict of laws principles.

## 11. SEVERABILITY

If any provision of this Agreement is held to be unenforceable, it shall not affect the enforceability of the remaining provisions.

## 12. ENTIRE AGREEMENT

This Agreement is a binding agreement that constitutes the entire understanding between the Parties and supersedes all prior agreements, understandings, and negotiations, whether written or oral, with respect to the subject matter hereof. No modification of this Agreement shall be made unless in writing by both parties.

## 13. FORCE MAJEURE.

If either party is unable to perform any of its obligations by reason of fire or other casualty, strike, act or order of public authority, act of God, or other cause beyond the control of such party, then such party shall be excused from such performance during the pendency of such cause.

## 14. NOTICES

Any notices required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand, or sent by certified mail, return receipt requested, or recognized overnight delivery service to the addresses of the Parties set forth above.

## 15. REPRESENTATIONS AND WARRANTIES.
Parties represent and warrant to each other that each is free to enter into this Agreement by agreeing to terms and conditions and that this engagement does not violate the terms of any agreement by the Client with any third party. Each party agrees to take all steps necessary to enable both parties to comply with their legal obligations, including the protection of all intellectual property subject to this agreement, including but not limited to the filing and protection of copyrights and trademarks.

## 16. EXECUTION

This Agreement may be executed on the following page in counterparts, each of which will be deemed an original, and such counterparts will together constitute one and the same instrument.

JF 6 

IN WITNESS WHEREOF, the Parties represent and warrant that they are duly authorized and have the legal capacity to execute this Agreement as of the date first above written.

**MEMETIC LABS, LLC**          **16 MINUTES LLC**

By: _____   By: _____
   DB9BB0F90F7C438...                 F51A9DE52AE840C...

Name: Alexander Shultz            Name: Jonnie Forster, Manager
   _____                and Authorized Signatory

Title: Owner                      Date: July 18, 2024
   _____

7

IN WITNESS WHEREOF, the Parties represent and warrant that they are duly authorized and have the legal capacity to execute this Agreement as of the date first above written.

**MEMETIC LABS, LLC**            **16 MINUTES LLC**

By: _____          By: _____
    DocuSigned by:                          DocuSigned by:
    DB9BB0F90F7C438...                       Jonnie Forster
                                             F51A9DE52AE840C...

Name: Alexander Shultz                   Name: Jonnie Forster, Manager
      _____                 and Authorized Signatory


Title: Owner                             Date: July 18, 2024
       _____

# Exhibit B



**overHere** ✔
@overHere_gg

🗻 Big Announcement! We're excited to partner with @Halieywelchx, the internet's favorite meme queen behind the viral "Hawk Tuah Girl" meme, to launch $HAWK—a memecoin that's set to redefine the crypto space. Learn more here overhere.gg/products/hawk-…. A thread 🧵 👇

1:55 PM · Nov 26, 2024 · **970.8K** Views

💬 363        🔁 11K        ♡ 11K        🔖 192        ↥

**overHere** ✓ @overHere_gg · Nov 26     •••
Why $HAWK is Special

This isn't just another token launch. Haliey's launch of the $HAWK memecoin represents a meaningful step in bridging mainstream audiences with the crypto world.

💬 7     🔁 74     ♡ 207     ⷰ 56K     🔖 ⬆

**overHere** ✓ @overHere_gg · Nov 26     •••
Protecting the Community

With free token distributions and allowlist campaigns, fans who are newcomers to crypto will get to experience the blockchain in a safer way.

💬 2     🔁 40     ♡ 149     ⷰ 48K     🔖 ⬆

**overHere** ✓ @overHere_gg · Nov 26     •••
Transparency First

$HAWK's focus on inclusivity for non-crypto fans sets a new standard for memecoin launches, leading the charge for transparent, community-driven projects.

💬 4     🔁 26     ♡ 122     ⷰ 32K     🔖 ⬆

**overHere** ✓ @overHere_gg · Nov 26 · · ·
Innovative Allowlist Free Claim

Recognizing that many of Haliey's fans are new to the world of cryptocurrency, we're implementing an allowlist free claim strategy to distribute a portion $HAWK tokens (more details will be released on X soon - make sure to follow us and set your
Show more

💬 2          ↻ 22          ♡ 96          �, 23K          🔖 ⬆

**overHere** ✓ @overHere_gg · Nov 26 · · ·
Bridging Web2 and Web3

At overHere, our mission is to connect mainstream culture with the crypto world. $HAWK is a perfect example of how we're making cryptocurrencies more accessible and valuable.

💬 1          ↻ 18          ♡ 90          �, 15K          🔖 ⬆

**overHere** ✓ @overHere_gg · Nov 26 · · ·
What's Next

- November 26th (today): Haliey officially announced the launch of $HAWK on X and on her podcast episode with Mark Cuban (@mcuban).

- November 26th – December 3rd: allowlist registration opened for free token claims.

- December 4th at 5PM EST: $HAWK begins trading
Show more

💬 2          ↻ 20          ♡ 107          �, 15K          🔖 ⬆



**overHere** ✓ @overHere_gg · Nov 26 · · ·
Join the Movement

Be part of this groundbreaking initiative! Register on our website and
complete tasks on Galxe in order to eligible for your free $HAWK tokens
(more details to come shortly!)

💬 2      🔁 14      ♡ 75      ılı 11K      🔖   ⬆️

**overHere** ✓ @overHere_gg · Nov 26 · · ·
About overHere

We're the first launchpad and platform bridging Web2 and Web3,
empowering brands and communities through sustainable token projects.
Follow us on X and TG to be first to hear about our exciting upcoming
projects!

💬 2      🔁 13      ♡ 74      ılı 10K      🔖   ⬆️

**overHere** ✓ @overHere_gg · Nov 26 · · ·
Register to save your spot today: overhere.gg/products/hawk-...

Join the conversation on Telegram: t.me/OverHereCommun...

More updates incoming 🚀 Make sure to follow us on X and set your
notification bells so that you don't miss anything!

Let's make memecoins great again!

💬 2      🔁 14      ♡ 78      ılı 12K      🔖   ⬆️



**overHere** ✓ @overHere_gg · Dec 4
What's Next for $HAWK

Today marks the start of something special. Together with @Haileywelchx, we're building a loyal community around $HAWK and creating real utility for memecoins.

Thank you to our partners @Shibtoken @mooarofficial @Memeland @DeLoreanlabs @thepledgememe
Show more

💬 8          🔁 3          ♡ 17          ᐧᔑᣞ 27K          🔖  ⬆️

**overHere** ✓ @overHere_gg · Dec 4
Join the Movement

Be part of the $HAWK revolution. Be in the know, stay engaged, and get involved in our Telegram: t.me/OverHereCommun...

Follow us on X and turn on notifications to stay ahead of the latest updates: x.com/intent/follow?...

Get your $HAWK today, learn more at:
Show more

This is the final post in this thread

Any replies below this could be spam or phishing links. Please be weary of impersonators.

oH | OVERHERE

💬 9          🔁 1          ♡ 11          ᐧᔑᣞ 21K          🔖  ⬆️

**overHere** @overHere_gg · Dec 4, 2024

🏜️ Attention $HAWK Community! The moment we've all been waiting for is here! 🎉 LIVE: You can now claim your free $HAWK tokens! Here's how 👇

💬 27          🔁 1          ♡ 42          📊 60K          🔖  ⬆️

**overHere** @overHere_gg · Dec 4, 2024

Replying to @overHere_gg

Step 1: Go to the Allowlist Claim Page

👉 Visit overhere.gg/products/hawk-...

Tip: If you're using mobile, use the Phantom App (in-app browser).



💬 4          🔁          ♡ 4          📊 6.7K          🔖  ⬆️

**overHere** @overHere_gg · Dec 4, 2024

Replying to @overHere_gg

Step 2: Log In to Your Account

Click "Login"

Tip: If you've logged into OverHere before, use the same method. Look for the "Recent" label next to your previous login option.

Choose to log in with: Your existing Solana wallet (e.g., Phantom)

Your social media accounts

💬 1          🔁          ♡ 1          📊 4.1K          🔖  ⬆️

**overHere** @overHere_gg · Dec 4, 2024

Replying to @overHere_gg

Step 3: Link Your Accounts

Connect your Phantom Solana wallet

Connect your X (Twitter) account to verify eligibility

💬 2      🔁      ♡ 1      �📊 3.7K      🔖  ⬆️

---

**overHere** @overHere_gg · Dec 4, 2024

Replying to @overHere_gg

Step 4: Claim Your Tokens

Click on "Claim Tokens" to proceed

💬 1      🔁      ♡ 1      📊 3.2K      🔖  ⬆️

---

**overHere** @overHere_gg · Dec 4, 2024

Replying to @overHere_gg

Step 5: Confirm Eligibility

Confirm that you are not a U.S. person to comply with regulations

💬 1      🔁      ♡ 1      📊 3K      🔖  ⬆️

---

**overHere** @overHere_gg · Dec 4, 2024

Replying to @overHere_gg

Step 6: Success! 🎉

You'll see a "Success" message confirming your token claim!

💬 2      🔁      ♡ 1      📊 2.8K      🔖  ⬆️

---

**overHere** @overHere_gg · Dec 4, 2024

Replying to @overHere_gg

Step 7: View Your Tokens

Click "View in Explorer" to see your transaction on the Solana blockchain

Or click "Exit" to check your token balance in your wallet

💬 5      🔁      ♡ 2      📊 7.4K      🔖  ⬆️



**overHere** @overHere_gg · Dec 4, 2024

Replying to @overHere_gg

Need Help?

Support Page: overhere.gitbook.io/docs

Join our Community Chat for real-time assistance

Discord: discord.com/invite/overhere

Telegram: t.me/OverHereCommun…

X (Twitter): x.com/intent/follow?…

♡ 6          �recycle          ♡ 6          📊 45K          🔖  ⬆️



**overHere** @overHere_gg · Dec 4, 2024

Replying to @overHere_gg

Let's soar to new heights together with $HAWK! 🦅✨

This is the final post in this thread

Any replies below this could be spam or phishing links. Please be weary of impersonators.

$HAWK  OVERHERE

♡ 6          ↻ 1          ♡ 11          📊 36K          🔖  ⬆️



**Mookie** ✓ ⟳ @MookieNFT · Dec 5
One memecoin to retire me.

Name it now.

💬 346          🔁 20          ♡ 365          �archid 43K          🔖  ⬆

**overHere** ✓ @overHere_gg · Dec 5
Bro it's just $HAWK

💬 60          🔁 5          ♡ 7          �archid 20K          🔖  ⬆

**JR5** ✓ @JR5_Crypto · Dec 5
Buying the most commented memecoin under this tweet.

💬 413          🔁 50          ♡ 394          �archid 37K          🔖  ⬆

**overHere** ✓ @overHere_gg · Dec 5
Is $HAWK here yet

💬 17          🔁 1          ♡ 1          �archid 15K          🔖  ⬆

**JR5** ✓ @JR5_Crypto · Dec 5
top 5 memes to buy right now?

i'm listening

💬 577          🔁 42          ♡ 458          �archid 50K          🔖  ⬆

**overHere** ✓ @overHere_gg · Dec 5
One of them goes "tuah"

💬 18          🔁 3          ♡ 9          �archid 12K          🔖  ⬆

# Exhibit C



 **Dor3ann** 11/26/24, 3:30 PM

The Allowlist in now LIVE!

Join the allowlist in order to claim free $HAWK tokens.

In order to claim your tokens follow the following steps:

1) Register on the overHere page: https://overhere.gg/products/hawk-tuah?from=allowlist

2) Complete all the tasks on the Galxe page: https://app.galxe.com/quest/overhere/GC2GAtVPqc

Please make sure that you connect a Solana wallet to both websites.

Claims will go live on Thursday, December 5, 2024 at 3:00 PM, which is a year ago.

If you have already completed the above tasks, you DO NOT need to do it again. I hope @everyone is as excited as we are!



**overHere**
overHere – Hawk Tuah - $HAWK

Galxe

**overHere x Hawk Tuah Allowlist by overHere | Galxe Quest**

Join overHere x Hawk Tuah Allowlist by overHere on Galxe. Earn rewards to enhance your web3 presence and reputation.



**overHere**
overHere – Hawk Tuah – $HAWK

**Galxe**
**overHere x Hawk Tuah Allowlist by overHere | Galxe Quest**

Join overHere x Hawk Tuah Allowlist by overHere on Galxe. Earn rewards to enhance your web3 presence and reputation.

YOUR WEB3 SUPER APP

Free $HAWK Allowlist

overHere x Hawk Tuah...
by overHere

Q Galxe Quest

💧 27   🍆 15   📈 11   🔥 10



**Dor3ann** 11/26/24, 5:46 PM
We've been receiving a ton of questions from @everyone about the entire process for becoming eligible for the free claim of $HAWK token.

So, here is a video that provides a quick overview for the entire process.

If you have any further questions, please open a # 🎫 | support-ticket.

💧 42   🍆 17   📈 20   🙏 16

November 27, 2024



**Dor3ann** 11/27/24, 12:47 PM

We know that @everyone is extremely excited for to get on the allow list for their chance to claim free $HAWK tokens.

So, here is a step by step guide on how to secure your spot on the allow list via Galxe.

As always, if you need additional help, please open a # 📷 | support-ticket.

https://mirror.xyz/0xFa44deC04442179576f458298D2908b2FdFf36e6/wMGrl7gua6ugEbhseyJBvmI61fJlOO0vCWYO34Elmil



**How to Secure Your Spot on the $HAWK allowlist via Galxe**

Following our allowlist announcement, we're excited to introduce our Galxe campaign—a fun and interactive way to secure your spot on the $HAWK token allowlist. With Galxe, you can participate in engaging tasks to earn points and secure free claim of $HAWK. We're here to make joining the $HAWK community and claiming the allowlist as straightforwa...

Allowlist Campaign
Free **$HAWK** Token Claim

🪶 27    💎 24    🤝 14    🌸 11

**Dor3ann** 11/27/24, 6:13 PM
We understand that people are having issues completing the following tasks on Galxe:

- Visit the overHere Mirror
- Visit the Hawk Tuah Product

We are actively working on a solution for this. So, please complete all the other tasks on the Galxe page in the mean time.

Once we have a solution, I will notify @everyone . We want to make sure that as many people as possible are on the allow list!

Thank you everyone for your support!



**Dor3ann** 11/28/24, 11:20 AM
Don't miss an NEW opportunity to win some free $HAWK tokens!

Go like, repost, and drop your solana wallet on Haliey's post!

https://x.com/HalieyWelchX/status/1862163854546948368

This is a LIMITED TIME opportunity! Good Luck @everyone!



**Haliey Welch (@HalieyWelchX) on X**
Happy thanksgiving!

Like, repost, and drop ur Solana wallets for a chance to claim some free hawk coins 👇

Twitter • 11/28/24, 10:57 AM

📈 29    🔥 19    🍆 18    💦 14    🥂 12



**Dor3ann** 11/28/24, 11:45 AM
I know a lot of you have been having issues regarding the following tasks on Galxe:

- Visit the overHere Mirror
- Visit the Hawk Tuah Product

Here are the proposed solutions to get these tasks to register.

1) Clear cache and cookies.
2) Login again and attempt to complete the quest.

If you are attempting to do this on mobile and it is not working, please try on desktop.

Hopefully this will fix **@everyone**'s problem!



**Dor3ann**  11/28/24, 9:07 PM

We've reached 10,000 followers on Twitter. Thank you all for your support up until this point!

To celebrate this massive milestone, we are giving $HAWK tokens to 50 followers who like, RT and drop their Solana wallet in the comments on the post below!

Once again, thank you @everyone!

https://x.com/overHere_gg/status/1862314032172343583 (edited)



**overHere (@overHere_gg) on X**

We've reached 10,000 followers! To celebrate, we're giving away $HAWK tokens to 50 followers who like, retweet, and comment below with their Solana wallet address.

Twitter • 11/28/24, 8:54 PM

🪙 263     🔮 192     🔥 200     📈 166     🎺 163

**Dor3ann** 12/2/24, 10:26 PM
We've partnered with $PLEDGE to launch $HAWK!

More partners just keep coming **@everyone**!

https://x.com/thepledgememe/status/1863425863389483430



**The Pledge (@thepledgememe) on X**
We are excited to announce that $PLEDGE has partnered with @overHere_gg in the launch of the $HAWK token with @Halieywelchx, the internet's favorite meme queen.

Pledgers, check our discord to see if you have won a spot in the allowlist. 👀

🐦 Twitter • 12/1/24, 10:32 PM

🍆 75    💦 54    🔥 57    ❤️ 41    🧕 14    💅 13    👩 11    🌍 12    👮 12

December 3, 2024

**Dor3ann** 12/3/24, 12:31 PM
Time is running out for `@everyone` to get on the allowlist for their FREE $HAWK tokens!

The token launches on December 4, 2024 at 5:00 PM and free claims go live on Thursday, December 5, 2024 at 3:00 PM , which is a year ago .

Make sure you complete all the tasks on Galxe in order to qualify!

https://x.com/overHere_gg/status/1863978915984760972 (edited)



**overHere (@overHere_gg) on X**
📝 Reminder to register for your official @HaleyWelchX tokens to secure your free $HAWK tokens. Registration is open until December 3rd! This campaign is powered by @GalxeQuest.

🔗 Register here: https://t.co/N5S1i8GqKv

📲 Complete tasks: https://t.co/TbLaRggdJf

Allowlist Campaign
Free **$HAWK** Token Claim

Galxe     OH | OVERHERE

Twitter · 12/3/24, 11:09 AM

🟣 69    💎 35    🔥 36    📈 19    🏃 23



**Dor3ann** 12/4/24, 2:41 AM
Community partnerships keep on coming **@everyone**!

1000 allowlist spots for $HAWK are going to Memeland!

https://x.com/Memeland/status/1864206049735241851



**Memeland ❤️ Memecoin (@Memeland) on X**

Ahoy, Memeland crew! 🏴‍☠️

Thanks to our awesome friends at @overHere_gg, we've secured 1000+ $HAWK allowlist spots exclusively for our holders.

What's $HAWK?
It's Hawk Tuah Token, the meme-powered movement inspired by the viral legend, @HalieyWelchX. From TikTok remixes to the

🐦 Twitter • 12/4/24, 2:12 AM

🫳 94    💧 69    🔥 62    📈 48

**Dor3ann** 12/4/24, 12:17 PM
Below is an UPDATED timeline of when the token will launch and when you'll be able to claim your tokens!

- Official Token Launch on Solana DEXs: Happening on December 4, 2024 at 5:00 PM, which is a year ago !

- Allowlist Claim Opens: Now happens on December 4, 2024 at 7:00 PM , which is a year ago get ready to claim your FREE $HAWK!

- True Fan Claim: Also kicking off at December 4, 2024 at 7:00 PM, which is a year ago ! This is for the true fans of Hailey's across her social media accounts.

I hope @everyone is as excited for the launch of $HAWK as we are!



75    52    35    39    26

**Dor3ann** 12/4/24, 1:52 PM
The Alllowlist to claim your FREE $HAWK tokens is closed!

The close time for allowlist was approximately December 4, 2024 at 7:30 AM , which was a year ago .

If you completed your Galxe tasks after this time, you will not be eligible for free $HAWK tokens. However, you will have the opportunity to buy them once the token launches a year ago !

Thank you @everyone for your participation and support!

Now, let's get ready for launch!



67    44    35    27    36

**Dor3ann** 12/4/24, 5:57 PM
I've put the all the chats into slow mode do to an increase in spam content, scam content and racist massages. I will reduce slow mode as these messages slow down.

Finally, it is fine to talk about the token's price. However, please avoid using words such as "Rug" or "Scam". I would hate to insta ban you. If you have any further questions please open a # 🎫 | support-ticket !

Thank you @everyone for being in the community!

**Dor3ann** 12/4/24, 6:30 PM
Hawkonomics have arrived @everyone!

https://x.com/HaileyWelchX/status/1864448384326881713



**Haley Welch (@HaileyWelchX) on X**
Copy and pasting:

Hawkanomics:

Team hasn't sold one token and not 1 KOL was given 1 free token

We tried to stop snipers as best we could through high fee's in the start of launch on @MeteoraAG

Fee's have now been dropped

🐦 Twitter • 12/4/24, 6:15 PM

🍆 25    🥶 15    📊 8    🔥 9



**Dor3ann** 12/4/24, 5:23 PM

$HAWK is live for trading **@everyone**!

More information regarding claims will be released soon.

https://x.com/overHere_gg/status/1864433870910968117

**overHere (@overHere_gg) on X**

🚨 The wait for $HAWK Tuah is over!

$HAWK is officially live on Solana and ready to trade!

Visit https://t.co/fAJzc9tkBU for more info on how to get your $HAWK tokens.

🌟 Partnering with the Queen of Memes herself, @Halieywelchx, we're bridging Web2 with Web3.

To avoid being

🐦 Twitter • 12/4/24, 5:17 PM

🍆 38    🎊 20    🔥 16    📈 17



**Dor3ann** 12/4/24, 6:46 PM

Time to claim your FREE $HAWK tokens **@everyone**!

Check out this step by step guide in order to claim! If you have any questions, please open a # 🎫 | support-ticket!

https://x.com/overHere_gg/status/1864452662420193373 (edited)

**overHere (@overHere_gg) on X**

🦅 Attention $HAWK Community! The moment we've all been waiting for is here!
🎉 LIVE: You can now claim your free $HAWK tokens! Here's how 👇

🐦 Twitter • 12/4/24, 6:32 PM

🍆 18    🎊 8    🔥 6    📈 7    💯 6



**Dor3ann** 12/4/24, 11:17 PM
There has been a wild amount of fud circulating, let us explain:

The main piece going around X/ Twitter is the 96% cluster seen on bubblemaps which shows $HAWK tokens being sent by the deployer address (xxxx), to the related addresses, according to the tokenomics that was published.

The other 3% was seeded into a Meteora LP and burned (300m $HAWK + 2598 $SOL = 1.2 million USD @ 20m FDV) . We also seeded 0.3% into a Raydium pool.

Hailey's Team has sold absolutely no tokens whatsover.

Hailey's Team has 10% allocation which is locked for 1 year and vested over 3 years.

The rest of the tokens are distributed into the different wallets as according to the tokenomics.

More details to follow, but for now we invite the community to reply with other concerns they have and we'll address them as best we can.

Lastly, thank you @everyone for being here!

https://x.com/overHere_gg/status/1864433870910968117

> **overHere (@overHere_gg) on X**
> 🧢 The wait for $HAWK Tuah is over!
>
> $HAWK is officially live on Solana and ready to trade!
>
> Visit https://t.co/fAJzc9tkBU for more info on how to get your $HAWK tokens.
>
> 🌟 Partnering with the Queen of Memes herself, @Haileywelchx, we're bridging Web2 with Web3.
>
> To avoid being
> 🐦 Twitter • 12/4/24, 5:17 PM

❤️ 26    💯 16    📊 12



December 5, 2024

**Dor3ann** 12/5/24, 12:06 AM
Hailey is about to host a space in regards to a lot of the FUD.

@everyone should tune into this.

https://x.com/HaileyWelchX/status/1864506866065395738

> **Hailey Welch (@HaileyWelchX) on X**
> Come by y'all.
>
> https://t.co/wJYUEnM0d2
> 🐦 Twitter • 12/4/24, 10:07 PM

📞 23    👥 8    📊 6

**Dor3ann** 12/5/24, 1:09 AM
We understand that a lot of people have accidentally linked their socials to the wrong account. Furthermore, we understand that there is no "unlink" option. That was done by the dev because there were potential risks involved to the website.

So, in order to unlink your socials, please send an email ticket to **contact@overhere.gg**.

Within that email please include the following information:

1. Your Solana wallet address (they are trying to claim with)
2. The X (Twitter) handle you're trying to link.

I will be closing out @everyone's ticket related to this issue.

📊 36    📞 24    👥 10    🙌 11

December 16, 2024

 **Dor3ann**  12/16/24, 9:42 PM
The Truth About $HAWK: Our Vision for Web2 Airdrops

We want to set the record straight about $HAWK and what we set out to achieve.

Our startup saw $HAWK as the perfect use case for a groundbreaking idea: bringing airdrops to Web2 fans, for free.

Hailey Welch—a literal meme—launching a meme coin felt like synchronicity we couldn't ignore. It aligned with our mission to bridge Web2 and Web3 in a seamless, culture-driven way. No speculation. No gimmicks. Just the first-of-its-kind tech to onboard Web2 fans into crypto through culture.

And we built this for free.

We believed so deeply in that vision that we pushed forward, perhaps naively, even as challenges arose. We now see how rose-tinted glasses blurred our view of others' intentions as the project began to unravel.

But make no mistake: our mission was always pure. Airdrops for Web2 fans. For free.

Thank you @everyone for believing in us.

https://x.com/overHere_gg/status/1868799748305756667

**overHere (@overHere_gg) on X**
1/ The Truth: We Only Built Airdrop Tech for Web2 Fans, for Free

We saw $HAWK as the perfect use case for our startup's idea:

to bring airdrops to web2.

Hailey Welch—a literal meme—launching a meme coin felt like synchronicity.

Our goal was simple: bring Web2 fans into Web3

🐦 Twitter · 12/16/24, 6:25 PM

 🙏 12    🖤 5    🎉 5    ✅ 6

# Exhibit D



**04 December 2024**

Forwarded from:  overHere Announcements

We've adjusted our schedule for the launch of $HAWK!

Below is the adjusted schedule:

- Official Token Launch on Solana DEXs: Happening TODAY (4/DECEMBER/2024) at 5 PM EST!

- Allowlist Claim Opens: Now at 7 PM EST TODAY (4/DECEMBER/2024)—get ready to claim your FREE $HAWK!

- True Fan Claim: Also kicking off at 7 PM EST TODAY (4/DECEMBER/2024)! This is for the true fans of Hailey's across her social media accounts.

❤️ 16    👍 4    🐵 2

↩ 17  📌  👁 7.3K  12:22 PM

Forwarded from: **overHere Announcements**



$HAWK is now live for trading!

https://x.com/overHere_gg/status/1864433870910968117

2  📌  👁 4.1K 5:21 PM

# Exhibit E

Accessible at: https://x.com/i/spaces/1RDxlyvqpaMKL/peek *(Last visited November 17, 2025)*

Speaker A:

Hey, y'all. It's Hailey, and I just wanna say thank you for joining my space. And I also wanna thank you for my 15,000 holders. We got snipe botted today, but we didn't sell a single token. This is just a launch, and I wanna tell you I'm here to stay.

The plan is to give these coins to my real fans, the ones that buy my merch, watch my podcast, donate to my charity. And I also wanted to tell you that I learned a lot along the way, but I just wanna say, screw the sniper bots, and I'm not going anywhere.

Speaker B:

Yo, Hailey. They try to fuck us. It's all good. It's all good. Let them know you're here to fucking you're not you're not here to get sniper botted all day.

You're not here to get fucked. We're here to have some fun. We're here to meme. And most of those coins, by the way, are going to your community for free. There was only, like, 3%.

That's why that's why everyone's like, oh, 97% is bundled. 3% was in the the pool. That that 97% is all on chain. Yes. There was a strategic allocation that was done through SaaS for people outside The United States Of America because of all the security laws.

So, yes, 17% of the supply was taken from the and they were that was paid for. There was a there was a strategic allocation. And those those tokens, those people can do whatever they want. They're not from The US. They could do whatever the fuck they want with those tokens.

And some of them did sell. That happens. They're free to do whatever they will. But you're not gonna find 1 fucking token outside of that that was sold. Impossible.

How do we know? Because we fucking controlled that. Nobody sold. Now free tokens were gonna be given to white list. Right?

Like, free white list to communities. Yes. That was given out. It's all on chain. Right?

I want a real forensic and and, you know, analyst. I want a real Zach XBT. Zach, where are you at now, bro? Help us out. Help the guys trying to do something fun in this space.

Right? Then there was yes. There was there's a treasury. That's for exchanges. That's for market makers.

That's for all that kind of stuff. Haley and Team Token is being locked for a year with, a 3 year vest. So so nobody on the team is selling impossible. Okay?

Speaker C:

I don't

Speaker B:

know what language anybody fucking here speaks, but everyone just is so jaded. Everyone thinks that, oh, everything's a rug. Everything's a rug. Everyone's here to fuck you. No.

We're here to onboard real people outside of these spaces. Right? The people here that you you guys are already fucked. Y'all are fucked. Fucked in the head, fucked every day thinking everything's a scam.

And and you know what? You guys are right. Everything is a scam, but not this. Not this. We did not spend 6, 7 months of our lives dedicated to trying to do something cool.

Right? To to do something different, not dumping on you, not bundle snipes, not a 100% of the liquidity or or whatever was was bundle sniped by the team and propped up charts. None of that bullshit. Nothing on pump fun with insiders. Not snipe your own supply and dump on everyone.

This is the opposite of that. And it's sad that everyone just sees, oh, the of course, sniper bots spent millions of dollars to pump up the tokens. Of course. This is if this is your first rodeo, alright, sorry. That's what happens here.

And, yes, people did buy tops. Okay. We didn't tell anyone to buy. We're giving tokens away. Right?

And, yeah, the snipers dumped. Yes. Some some people who had strategic allocation, they sold, but not the team. Snipers are out. Right?

That's it. Now there's a lot more in in, you know, the circulating supply, and and a lot of tokens are gonna be given to Hailey's actual fans from TikTok, listeners to her from her podcast. Right? We're doing some really dope shit. People who bought our merchandise.

We have we have over 10,000 emails that are these are people that are outside of crypto that we're gonna be onboarding, and they don't give a shit. They don't even know what a market cap is. They just go, oh, cool. Free coin. Now I get to join the community.

Cool. Done. Right? People who donate to a charity. Right?

People that are actually doing some cool stuff that know nothing about crypto. The this you guys are not the target audience. Sorry to say. Right? This is not the target audience.

The target audience, which is why I'm even doing this, which is why what's cool about it, is it's not in these spaces. It's people that are totally out. People on our Instagram, people on our TikTok, listeners to our podcast. That's where we're that's where we're actually targeting to. You know, we're doing some really cool marketing integrations that have nothing to do with this, and we're not gonna talk about price or this or that.

That's all speculation bullshit. These meme coins, these are just here for fun. Right? Whatever you assign value to it, whatever. Right?

What we're doing here is not giving a fuck about all the same bullshit. I've been a holder of a lot of these meme coins. The reason why they're cool is because there's 0 promises. It's just a community, and that's exactly what we're trying to build here. We're trying to build a community.

You only need 1 token to be in this community. And listen, most of you, we don't want you in the community. Let's be real. Right? You're not great people.

I don't know y'all. Right? Some of you so I see some friendly faces in this audience. Some people I like here. Yeah.

Love to have you. No pressure. Well, you know, come in. Don't come in. You know, if you engage with Hailey, and if you like the hawk to a meme, then go ahead.

You probably get free coins. That's it. You'll probably get free tokens because we're giving them away. We're not selling them. We're giving them.

Here you go for free. That's the whole point of this project. If you look at the tokenomics that was tweeted from Hailey's account that she copy and pasted, right, literally said, copy and pasting this because, you know, Hailey is brand new to crypto. Right? She yes.

She's she's born from a meme, but she's brand new to crypto, and she's trying to learn. She's trying to do something that's really cool and different in the space. Alright? I don't care what anybody says. She has really great intentions, and this is not a celebrity token.

This is an actual meme that has, I don't know, 100,000,000,000 fucking impressions on all the different platforms that, like, normal people, if you walk down the street, I'm in I'm in Hollywood right now. Right? Guess what? You walk down the street, you ask 10 people. Do you know what Haktua is?

Right? 9 out of 10 people will fucking know what that is. I don't give a fuck. Right? They will know what that is.

If you ask them about the other 99 memes we have in the space, you might go 1 for 10. Maybe. Possibly. Other than Doge and Shiba Inu. Right?

Maybe 2 2 out of 10 if you're lucky on a good day. Right? But Hawk Tua is a cultural meme. We're not launching some celebrity bullshit. That's not what we're doing.

Right? Hawk Tua is a cultural meme that everyone knows here in America. So so if you wanna be part of this meme community, dope. If not, if you wanna just you know, you got I'm gonna say y'all, you guys. Right?

There's a lot of negativity in this space. I I think crypto brings the mentally ill into this thing. Right? Most if you guys are in crypto, you're most likely mentally ill. And I'm gonna I'm gonna count myself as mentally ill for even being here right now.

Right? I'm definitely mentally ill. I do love it. I do love memes. I do have a passion for this stuff.

I try not to be on x like I used to because it's just a bunch of miserable people trying to farm engagement and hate and say racist shit, negative shit, and they think it's fine. Well, the the world that I live in is not like that. We're trying to have fun. Right? We're trying to actually have fun.

We're trying to do something cool. We're trying to give meme tokens away for free to people who have never had any crypto before, any meme token. And you guys should be kissing my fucking ass because I'm trying to do something dope and give meme tokens to people, right, that have never ever ever had ever had meme coins before. I guarantee you, we'll be able to get I don't give a fuck about the price, by the way. Don't give a shit.

But send it to 0. Couldn't care less. But if you get if you get real users, real people going, oh, this meme is dope. This is fun. This community is cool.

Right? Hawk 2. I love Hawk 2. That shit's hilarious. Yeah.

Maybe that's a that's a a positive thing for the entire space because maybe when we onboard tens of thousands, 100 thousands when we talk about this shit on national television, right, maybe they might be interested in these other memes and these other NFTs that are in this community. Because if you like Hokktua, you might like dog with hat. If you like Hokktua, right, you might you might like Mogg. You might like Hecusi. You might like all these other memes that are amazing.

Right? But guess what? Nobody knows about them. These are all all these tokens, unfortunately, they're most of them are bundle farm tokens, you know, not not the ones I just mentioned. Not saying that.

But most of these tokens, there's, you know, 1 person, 10 people propping up the chart. We're trying to do the opposite. We're trying to give a little bit of token to a lot of different people. And I know a lot of people wanna see us fail. It's pretty sad because we're trying to do something cool for the space.

You know? But if you guys hit us with bullshit allegations, you know, I'm gonna fire back, and I'm gonna keep going, and Hailey's gonna keep going, and you can't get rid of us. Sorry. You could you guys could go post shitty charts all day. Doesn't fucking matter.

Don't give a shit. I'm part of all your meme communities. There's nothing you can do to get me out of these coins that I've been holding for a year to 2 years. Right? Sorry.

I'm part of it, and I'm gonna try to be doing something cool, and I don't care about putting my name on it. Right? So if you wanna see me fail, then you wanna see yourself fail. You guys you know? But if you wanna see somebody win with with good intentions, then, you know, come join the community.

You know? Come be a part of it. Engage with Hailey. You'll probably get this token for free. Over here, which is a this is their first launch.

Right? This is really cool what they're doing. I'm gonna pass it off to over here, and I think, like, what we're doing here, this is day 1. Yeah. Was a rough day.

Yeah. We got sniped to shit. But guess what? Moving forward, you know, over here and and we have a lot of fun stuff and fun stuff planned, and this is the beginning. So over here, take it from here.

Speaker D:

Thanks, doc. Hey, guys. Like, I think, yeah, doc, maybe a little bit exuberant. You know, it's it's been a long day. We've we've been up up a long time.

You know, obviously, launch had some some issues. You know? Like, we got sniped, unfortunately. I think, like, ultimately, you know, like I I think what we're trying to do here is target a little bit of a paradigm shift. Right?

So, you know, our project, we've been exploring the intersection of, like, web 2 and web 3 for some time, like, kind of, like, iterated through through a few different business models here and there. Ultimately, when we came across the Hawk Tour team, you know, they they were a little

bit different. You know, like, their their backgrounds kinda span from, like, you know, deep deep meme client NFT guys to, like, you know, kind of, like, some some really deep connections within the music and entertainment industry. And and so, like, their positioning here was, you know, look. We we haven't really seen a a kind of NFT or meme coin project or anything kind of related to, like, a Web 2 IP trying to transition into crypto that's ever kinda had any kind of sound like

Speaker A:

Over here, guys.

Speaker D:

Yeah. We haven't yeah.

Speaker A:

We haven't here.

Speaker D:

Hey, Haley. How are doing?

Speaker A:

I'm good. How are you?

Speaker D:

Good. Good. Good. Yeah. I mean, like, I think that, you know, I I kinda really, really

Speaker A:

Y'all cannot get rid of me. Good thing. Sorry about it. Yeah.

Speaker D:

I mean, like, we we kinda wanted to explore kinda, like, where where you know, we haven't really seen a a project that has been like a Web 2 IP trying to enter in the space legitimately and anything that's kind of ever been able to show kinda some sort of semblance of longevity over extended time frame. So when I linked up with these guys, you know, they've been in the space for a while. Their kinda interest was trying to see if we're gonna come up with a blueprint that could represent something that was, like, a little bit of a like, something that could be a reference point for something that could be a sustainable business model for, you know, Web 2 IPs that were looking to come into the space. And so I think we we kinda wanna try to go back to the drawing board and think about things from, like, first principles, and and I think that a lot of that is trying to create this paradigm shift that we're targeting. Ultimately, I think that the way that it plays out and it kind of appears from a optics perspective is that, you know, there's a lot of the the tokens that are, you know, controlled centrally, and that is true.

You know, like, at the end of the day, we did we did mint the tokens. If you look at the tokenomics that's been posted publicly, yeah. I mean, like, there's there is a there was a portion that was, like, reserved for the strategic round where we did raise a a private round, and that was done predominantly to mitigate any kind of concerns around, like, potentially being deemed to be selling securities to American citizens. That was obviously a very, very strong consideration for the team, and so we've done that. You know, we did that by private round, which would which involves SaaS that helped mitigate some of the risks there.

So that was, like, 1 of the intentional choices, basically, to kinda mitigate potential risks there. Haley's obviously a a publicly exposed person, and that was just, you know, the the legal advice that we we had and and wanted to be cautious around, like, how these things kinda work. But, yeah, I think the real kind of thing here is that we we've we've got kind of allocated a lot of the

supply to the community. So I think, you know, obviously, like, a lot of the big narratives that have been kind of, like, prevalent in this kind of cycle have been around, like, you know, things that we've been talking about for a long time. Right?

Like, mass adoption, you know, distribution, those type of things where, you know, like, realistically, you know, I've been in the space for, like, over 10 years and, you know, we've built a lot of stuff, but, like, you know, not a lot of not a lot of organic usage. Right? And so we kinda went back, and we were like, hey. You know, I think a lot of us here can probably remember the, you know, the Uniswap kinda airdrop moment. Right?

And I think that was kinda like, this kinda landmark moment in crypto history that kinda, like, served as this kinda reference point that I think that, you know, kind of redefined the meta for airdrops and, like, know, retroactive airdrops and how we think about, like, tokens for, like, you know, user user onboarding and, you know, user retention and stuff like that and, like, brand building through tokens and stuff like that. And so I think that, you know, the the meta has obviously evolved over time to, you know, where we see a lot of, like, the edge of farming type of stuff where, you know, largely kinda just like on chain activity and, like, you know, it's all it's all kinda just inorganic activity. And we wanted to kinda see if we could replicate that within the web 2 context. Right? And so for Hailey, what that meant was, like, we've gone back in time and taken a a snapshot that represents, like, you know, the the historical engagement.

Basically, we wanted to try and see if we could distribute these tokens to her true fans. Right? And I think that's another 1 of the biggest narratives of this cycle, you know, with the with the with memes. And, like, I think, you know, Vitalik wrote about this. Like, you know, what else can Meme Coins be?

Right? And and we definitely think that, you know, meme coins are a great way for, like, you know, I think as a community building tool. And, you know, like, I think that it creates this, like, strong tethering between, you know, token holders and stuff like that. And, you know, like, it's like this kind of way that, you know, by by being holders in, you know, I guess, like, mutual holders in this token, you know, we you then become, like, I guess, like, decentralized

shareholders in this kind of, you know, common movement where, you know, we're both you know, obviously, with both beneficiaries. Ultimately, you know, if you're a holder of the token, you're ultimately a beneficiary if the token does well.

And, you know, like, I think that, you know, everyone can kind of acknowledge that these these kind of social tokens, in general, they kinda trade predominantly on sentiment. Right? So it's like, you know, how much engagement can you get? How much, you know, mind share can you capture? And yeah.

So I think that starting from, like, how do we, you know, bootstrap in our niche community and how do we see that initial distribution? We're like, okay. Let's go back and, you know, look at metrics of historical engagement. So we went. We found, like, you know, people that had donated to a charity, people that had, like, you know, bought a merch, people that had that had listened to a Spotify, people that had, like, engaged on TikTok, Twitter, etcetera.

And we tried to create, a tiered system that would be, like, I guess, representative, you know, like a of the level of, you know I guess, like, your level of fandom. Like, how how true of a fan you are kinda, like, ranked by, you know, your historical engagement. And so we kinda create a snapshot there where we we've we've gone back and you look at look at historical engagement metric and distributing that via, you know, this 20% free claim that will be announced, the details of which will be announced, like, shortly. But, essentially, it can be claimed via the Overhear site. You know, we've taken a snapshot already, and, you know, people can come to the site and basically, you know, sign in with their social media accounts and basically to to to check eligibility for this free edge up.

We've allocated 20% of the tokens, which is why you may have seen, like, some of the tokens moving to a sports multisig. Like, a lot of that is to be, you know, to to be used to be funding the Solana program that we are basically distributing the free time tokens from. So there's that. And then, yeah, going forward, we we have this, you know, I don't know if it's in the the tokenomics published, but, yeah, the community fund sits there. Basically, that's like, you know, for how do we distribute our our tokens ongoing.

Right? And so, like, how do you once once you've once you've bootstrapped in your initial community, you've seeded the the initial tokens the initial distribution to your true, you know, your true fans in your community, then how do you go from there? Right? And I think, like, going back to that whole notion of these social tokens trading on, you know, pure sentiment, it's like, you know, we've taken the the analogy of Bitcoin here and kinda looking at, like you know, Bitcoin is like know, Bitcoin mining is essentially like distributing tokens over an extended period of time, you know, in the in the form of block rewards in compensation for, you know, miners coming to the network and contributing their computational hashing power. Right?

Because Bitcoin care the network cares about security. You know, miners contribute their computational hashing power and they compensate accordingly. Right? And in the context of, a social coin, essentially, right, like, these things trade feeling on sentiment. So, really, what we care about here is, like, impressions.

Right? How do you propagate the the message in the IP? So the way that we think about it is kinda like, you know, distributing social mining rewards over an extended period of time, basically, in proportion to a user's proportional contribution of social hashing power. Right? So it's like, okay.

It's like it's basically like gamified social. So, you know, like, all these kind of galaxy campaigns that we see and stuff like that, you know, in in web 2, they call them, like, play walls. But, essentially, like, you know, how it might look like is, you know, Coffeezilla, you know, you you you might be like you know, we can we see today, we got, like, 10,000 impressions on Twitter, and we can track measure that, you know, you are responsible, and we can attribute, like, a thousand of those impressions to you. Therefore, you get, like, 10% of the rewards. And, like, obviously, that's a very simplistic lens through which to look at things, but it kinda gives you, like, an abstraction to kinda, like, understand, like, how we're thinking about these social mining.

Obviously, the the the models there need to be refined over time to to figure out, like, you know, what, I guess, top of funnel KPIs are driving, like, know, conversions further down the further

down the funnel and, like, you know, I guess refining the parameters and the the weightings and stuff like that. It's a very, very, like, guess, quantitative, like, driven kind of, like, direction. And, you know, you know, we need to we need to figure out, like, what what metrics we can kind of attractively measure with, like, a high degree of confidence. But, yeah, I mean, broadly speaking, you know, like, that's kind of a little bit of, like, how we're thinking about things. Obviously, you know, maybe some of that wasn't as, you know, like, transparent or understood from from the launch.

But, you know, a lot of a lot of those details will be will be kind of released as we, you know, we we go along with the project. And, yeah, hopefully, it will it will a lot of this will be be extremely transparent. You know, like, I don't know if Doc mentioned earlier, but, you know, the the Teams tokens will be locked up for 12 months and and invested over 3 years. We we did have some problems, like, basically, when we're trying to deploy that using Magna. And so, like, yeah, that but that will happen, like, very, very, very shortly.

I think, you know, it might might show up on chain where, you know, like, I think, like, 10 of the supply lives in, a spot at the moment, but that'll that will soon be, you know, deployed on chain or be be or be, like, very transparent. You know? Like, I I don't think that that all all the tokens that appear in the in the in the tokenomics there, you know, will will follow those allocations, and that will all be, you know, like, kinda, like, transparent on chain. And so, yeah, I don't I don't think this like, is there any kind of questions? I'm really happy to answer

Speaker E:

any questions. I I have questions. I'm raising my hand. Hey, guys.

Speaker A:

What coffeezilla?

Speaker E:

David. This is 1 of the most miserable, horrible launches I've seen in my life.

Speaker A:

Okay. Then why the fuck are you on?

Speaker E:

I've been tracing it on chain for a while. You guys generated over a million dollars in fees while y'all's fans got rug pulled. There was snipers, but there was also insider trading directly linked to y'all's creator account. What are you guys doing?

Speaker B:

No. No. No. That's that's not true. That's

Speaker E:

not true.

Speaker F:

That's a fact.

Speaker B:

It's not.

Speaker E:

Well, it's a fact, and you could see it on chain. So

Speaker B:

Yeah. We we know. We we trust me. We're we were there. We could we could answer that.

Speaker E:

Know about the insider trading?

Speaker B:

No. There's no insider trading. That's why we can answer it.

Speaker E:

Okay. So there's tokens going directly from the main account.

Speaker B:

Coffeezilla. Just just chill for a second.

Speaker E:

Then it's getting sold for 50 k. Who is that?

Speaker B:

Definitely not us. You think we're doing this for 50 k? Yeah. Fucking right. Talking to the wrong guy.

You're used to these bullshit scammers out here, not us. Now we had That's what

Speaker E:

everyone says, by the way.

Speaker B:

Listen. Listen. It doesn't matter. No. No.

I'm not everyone. There's there's a strategic allocation, right, through a foundation. Every single 1 of those was signed through a Saft. The deployer wallet, you've heard of a, you know, strategic allocation or a plan

Speaker E:

How much did y'all get doing a presale? How much did y'all make? Not that we made. Fans.

Speaker B:

So over here, can you get big Hold on. Coffeezilla, take a chill pill, brother. You're

Speaker D:

Yeah. So

Speaker E:

y'all just front court a bunch of people.

Speaker B:

No. No. There's rug. We're here every single day. There's no rug pulled.

Not and it's not done by us. Yes. Sniped it up to an insane market.

Speaker E:

No. No. It's not just snipers.

Speaker B:

That was not us. That was listen.

Speaker D:

Know that.

Speaker B:

Listen. No. No. No. I'm telling you the truth.

Speaker E:

All made millions on fees from this little scheme.

Speaker B:

There's not a Well, sure.

Speaker E:

That's like you getting out those fees. Right?

Speaker D:

It's a scheme.

Speaker E:

The money on the fees. Who's making millions of dollars on fees from this rudder?

Speaker B:

That's not a scheme. That's that's the that's the project

Speaker E:

so we

Speaker B:

can la keep this thing going for for for years. Okay? That's how do you think there's so many expenses.

Speaker E:

Who makes the money on the fees? Someone just made over a million dollars on fees. Who made it?

Speaker B:

First of all, the fees were there with meteor pools, and that goes to, yes, the creator. Right?

Speaker E:

Who Who's Who who does that who belong who that who does that belong to?

Speaker B:

That belongs to the project. Right? Who's the project?

Speaker E:

Who is the project?

Speaker B:

Well, the project is over here, Hayley Welch. Right? And and

Speaker E:

How

much does Hailey Welch own?

Speaker B:

This is Hailey Welch's project.

Speaker E:

So she owns all it.

Speaker B:

Coffeezilla. Take

Speaker A:

your show. Make a million

Speaker E:

dollars on fees on

Speaker B:

a rough I'm just trying Do you know how do you know how how much it costs for lawyer fees to create a foundation in the Cayman Islands to hire directors? You think this stuff pays for itself? Right? We're we've

Speaker E:

So y'all wanted to make the money on day 1? I don't understand. I'm just asking We're here every single day billions of dollars fees from the

Speaker B:

2, day 3, you know, this is how you run a project forever, is you is you have to fund that. How and first of all, over here can speak to the extensive amount of work and time and people that are on this project. Over here has around 18 people working working on this right now as we speak. This is not a small time type of of of nothing. We we've we're really trying to do something here and not just do it for 1 day and do it 2 days like you're

Speaker E:

used to. Made the money? You haven't answered the question. Who made the money? How much did Hayley Walsh make of that million 1,800,000.0?

Speaker B:

Is it 2 it's a foundation that is running this project.

Speaker E:

How much does she own of it?

Speaker B:

It's a foundation. She owns 0 of the foundation.

Speaker E:

So y'all make the foundation?

Speaker B:

No. I I don't own the foundation either. A foundation in

Speaker E:

the Who Northern profited? Over a million dollars just made?

Speaker B:

You. A foundation that pays people out. And by the way, Coffeezilla, I'm not asking you, you know, questions that have that are irrelevant to the most important stuff that you said. Who cares where fees go? It goes to bills.

When you're charging 15% it goes to directors.

Speaker E:

If you're

Speaker B:

charging 15% of the

Speaker E:

rug pull, you're profiting from the rug pull,

Speaker B:

Because we didn't we didn't pull a rug. I don't know what you're trying to say. It's not true. You that's defamation.

Speaker E:

Doc, dude, do do the math.

Speaker B:

Do the math. Saying that we pulled the rug. There was no rug pulled. You're you're defaming our care you're you're not

Speaker D:

it's it's

Speaker E:

bullshit. Just talk over me. You talk over I

Speaker B:

I'm hearing bullshit. So why

Speaker E:

why are you you're talking over me. Let me just lay out your tokenomics. You guys released 3% to the Meteora pool while you have 17% of the token allocation unlocked day 1 on from your strategic allocation. Are you guys insane? What do you guys think exactly is gonna happen when your insiders get sent their tokens?

And by the way, who made the money from your 17% presale while you're giving a tiny piece of the pie to the public? Like, what the hell? This is the worst tokenomics I've ever seen, and it is a scam.

Speaker B:

It's not a scam.

Speaker E:

The tokenomics are a scam. That's my opinion. You can say whatever you want about it. You can cry defamation. That's my opinion.

It's a scam.

Speaker B:

Well

Speaker E:

And I only do this for a living. I've only seen a million of these projects.

Speaker B:

So so who pays you, Coffeezilla? Let's let's, let's track your wallet.

Speaker E:

Turn it around.

Speaker B:

Turn it Why why don't you tell Coffeezilla what we're doing with this project?

Speaker E:

Where did the fees go? Where did the money for the presale tokens go? Why did y'all unlock day 1 so people could dump on Hayley Welch's fans? And how involved was she really? And how much I just got muted.

Speaker D:

Yeah. So, I mean, like, we we as mentioned, like, we raised a 17% strategic allocation that was done at a $16,690,000 valuation. You know, we tried to kinda keep that as decentralized as possible. You know, like, we tried to basically, you know, we spend a lot of time going person by person at the start, you know, like, trying to raise, you know, 5 k checks. You know?

Like, obviously, the restriction there was you know, we we discussed this extensively with a lot of different people in the space. As mentioned, you know, I've been in the space myself over 10 years. And, you know, the the basic kind of premise here was that, you know, we we we had the restriction. Like, we we, you know, we heard we heard the the the request for us to do this in a public manner. And, you know, I think that we you know, having consulted with, like, lawyers, the the I guess, like, the legal opinion was that in order to kinda protect Haley and, you know, kinda mitigate any kind of considerations around potentially being deemed to have sold unregulated securities to Americans, that it should be done via, you know, SAF SAF agreements that that would, you know, via this this legal structure that, you know, we were we were advised to kinda set up in, I believe it was Cayman or or BBI.

And, you know, like, we tried to essentially have that as, like, 5 k checks, you know, like, and and scale that. Ultimately, that was kinda, like, quite difficult, and we kind of, like, you know, basically ended up raising a combination of, like, 10 k checks and some 25 k checks, some 5 k checks. It was like a bit of a range. And, ultimately, I think we had, like, over, like, I don't know, 3 202 hundred people participate. A lot of people within the industry that were very supportive of the vision because I think that they they too kinda saw that potentially this this might have been a pathway forward.

Like, you know, I think that, you know, we're kinda hoping that this this can be, like, a little bit of a paradigm shift. I mean, like like I said, nothing that we've seen thus far with, you know, people from the web 2 space trying to try to come into the space in a sustainable manner has ever kinda had any kind of semblance of of longevity of extended time frame, and we're just trying to, you know, like, try something different. Right? We we like we like I said, we went we went back

to first principles and kinda tried we're trying to do something different in a way that we think makes that makes sense, you know, by ultimately, you know, seeding the community through this kinda 20% free claim. You know, I I I think, you know, people that are kinda trying to come at us and be like, hey.

We're not you know, like, where was the community participation? Well, you know, like, I think that it it kinda shows with the economics, yeah, that we have, like, you know, actively tried to target, you know, her true fans by going and looking at historical engagement metrics. Like, obviously, the people that have bought them merchandise, people that have supported her by donating to a charity, people that have, you know, listened to her her podcast on Spotify, you know, etcetera, you know, TikTok, Twitter, etcetera. So, yeah, I think that that we we we kind of felt ultimately that that was probably the best representation of who were her true fans, and we wanted to kind of ensure that, you know, like, when she was running this initiative that, you know, we we got the tokens into the hands of the people that have been most supportive of of her and, like, kind of really engaged with her content and, you know, being supportive. And, yeah, I think that's kind of kind of, like, a lot of the the current positioning.

I think Faze has, like, put his head up a bunch. I I I don't know, doc. Like, how did you wanna do this?

Speaker B:

Yeah. Go ahead. Go ahead. I just I just, you know, I just want everyone to, you know, be respectful. Yeah.

But but yeah. Listen. This is this is a

Speaker F:

You guys

Speaker B:

are man. Means a lot. Go ahead. Go ahead, Fage Banks.

Speaker G:

Appreciate it. I just heard this guy blab about pretty much nothing and repeat the same shit that he said the first time around. You said something about web 2, people from web 2 traditional web 2 entering web 3 and and Yep. Not being able to see stable, like, longevity, like, healthy relationship with the rest of the space. I came into crypto in 2018, 2019.

And, yeah, I've never launched a token or a project, and, I've done my due diligence to, like, know what to do, what not to do, and how to keep my fans safe from shit like what just happened. Hailey, I'm gonna talk to you directly right now because if you really own 10% of the supply of this token and it's locked up for a year and it's vested over 3 years, you got scammed harder than anybody, involved. This a 100% was a mismanaged, mislaunched like, this this is took what Coffeezilla said. I would I would label this a scam as well. It's pretty obvious.

Like, Coffeezilla brought up, 97% of the token was bundled into the same cluster. In in layman's terms, that just basically means 90%. 97% of all the tokens owned were were by related wallets, friends of friends of friends of friends. They were like No.

Speaker B:

No. No. That's not true.

Speaker G:

It's not true. Yes. It is true. Yes. No.

It's a 100% true.

Speaker B:

It's hell You're talking brother brother brother brother. Yeah.

Speaker G:

You're talking about you're talking about some fucking what did you say? Who in the Cayman Islands?

Speaker B:

It's it's what it's how you legally launch these types of things. It's a foundation. But listen. Listen. This isn't a bundled scam.

This is free tokens that have been held back to be allocated to Hailey's biggest fans on her social media given away for free. You know, this isn't this isn't what I think a lot of people are used to here, you know, because the the team was not dumping 1 token. That's not that's not the only the only tokens that could have been sold, it was that strategic allocation, which is what we were talking about. That 17% that was given to, know, strategically to people outside The United States through staffs and tokens that were given to MemeCoin communities and different communities and that were that that were there to be claimed. So this is not the team selling 97%.

It's not a bundle. It's it's the tokenomics were published, and we can go through them. Maybe over here, you can you can go through the the and and we can show all the different wallets, by the way, and prove that they were not sold by us. So the bubble map stuff was totally false. That's not that's not what happened.

But over here, maybe you can you can explain the the allocations to these different wallets and and clear up a lot of this, you know, these allegations that are just false.

Speaker D:

Yeah. I mean, like, in terms of, like, the distribution of the different wallets and stuff like that, like, obviously, it was, like, it was done via strategic you know, like, we did a private sale, basically, to strategics and, you know, like, it was distributed across, like, you know, 5 k, 10, 25 k checks to different wallets. Yeah. Faiza, I I think you want you wanna speak again?

Speaker G:

Yeah, please. Sorry.

Speaker D:

No. No.

Speaker G:

Again, I'm gonna talk Hailey, I'm gonna talk to you directly. The end of the day at the end of the day, your name was was was the poster child for the for the token. The whole hawk to a meme was used to, like, market it and launch it. At the end of the day, when Coffeezilla makes a video about this, you're gonna be in the thumbnail. Your name's gonna be in the title.

So what doc or whoever the fuck was saying earlier about traditional web 2 influencers coming in the space and having a bad, like, reputation in the space. It's for this reason exactly. It's because people enter the space like this with whoever the fuck basically, what I'm getting at, and and I'll wrap up here with just whoever whoever guided you in this or whoever directed you to do this or gave you the advice to do this, you should fire them immediately. And yeah.

Speaker E:

Yeah. I just wanna jump in here.

Speaker A:

Yeah. I'm doing the best I can. Thank you, Faze.

Speaker B:

Yeah. We're we're all doing the best we can. Listen. This is day 1. Yeah.

Ugly launch. Cool. There's day 2. There's day 3. There's day 4, and the key is just not giving up.

Key is showing up every single day, memeing. The key is actually onboarding her real true fans. This might not be for everybody. It's not it's not a big deal to us. We ain't going anywhere.

Hailey's not going anywhere. And the Hawk 2 and meme is definitely not going anywhere. So this is definitely not, you know, the a 97% bundled thing that everyone thinks. Yes. Those tokens were held back.

Yes. They were from the Deployer Wallet, but they're put into wallets for her true fans to claim. They were not sold. None of those tokens were sold. And I just wanna make that very, very, very clear.

We could we could show forensic, you know, analysts that that are showing this same thing. Yeah. It got sniped to shit. Everyone knew that. We put the contract address out there early, and everyone was like, why did you do that?

You should have sniped it yourself. We did that for multiple reasons. A, so there was in a million different tokens launching saying this is, you know, Haley's token or this is the Hoktua token. This is the official token. So we wanted to to put that out there.

Unfortunately, yes, it got sniped. Yeah. It's it's unfortunate. Right? That does happen.

We all kinda knew that that was gonna happen. It sucks that that happened. But those snipers were the ones dumping. And, there was a 17% of supply that was given to that strategic allocation. Yes, some of them did sell.

That's it. There was no team, selling any tokens from any other parts of the of the tokenomics, from from any 1 if not 1 fucking token. But listen, it's all love. I understand everybody around here is kinda used to the same thing. There's only 1 way to prove that this is not just like everything else, which is just not give up.

Right? And keep going and keep doing everything, you know, that you possibly can, right, to to keep to keep pushing. And the only way that it's a rug or the only way that it's a scam is if you give up on it. And that's the 1 thing that we can say is no one's given up on this. So so, over here, or or if you wanna ask Hailey some questions, let's let's, like you know, like, Hailey is somebody who's an incredible person, and she and she's had a lot of fun memeing.

She really enjoys x. I think, like, I think we we have to really stick with the facts, and we can show all the transactions. Right? And we've had them analyzed now. We can show all the transactions.

That's the thing. It's like the blockchain doesn't lie, and we will publish those transactions. It's not a big deal. It's very confusing reading that stuff, but that's not from the team. Yes.

The yes. It got 90 yes. The it was 3% in the pool. 97 that was that was held back, all for really Hailey most of that for Hailey's fans, right, to claim. And there's a there's a long extensive claim process.

But over here, you wanna say something or have Hailey say something? Go ahead.

Speaker D:

No. I mean, I just wanted to be like, you know, obviously, Hailey's been through through a journey and, like, know, this this launch has obviously gone the way it's gone. But, yeah, I think that, maybe it'd be helpful for for the community to kinda hear, you know, Hailey's story because, ultimately, you know, like, I think part of the reason behind kinda, like, the the coin and stuff like that has been that, you know, there's been a bunch of fake tokens launched, right, off the Hawk Tour meme and IP. I think, like, everybody resonates with with with Hawk Tour as a as a meme. It's, 1 of the most viral memes of all time.

And, like, you know, like, I think people have been making a lot of money off, like, the derivative works, and, you people have launched a bunch of fake tokens, which I think kind of speaks to the, I guess, inherent meme ability of of the the the meme itself. And, you know, I think maybe it'd be helpful, I don't know if Hayley's comfortable sharing, the the kind of original story and, you know, like, I think of of of how things went and, you know, like, with with the original meme. Because I think that that kinda helps adding a lot of color to the story here that, you know, people have have been constantly trying to make, you know, like, profit off of of her IP. And, like, I think part of this was, like, her her attempt to try and do it right. You know?

Like, obviously, we understand we got bundles sniped here, you know, put our hands up and be like, hey. Look. Like, you know, maybe maybe maybe the lodge didn't go the smoothest. But, like, as Doc said, you know, we're gonna be be kinda showing up every day trying to trying to run the project. I think Hailey's Hailey's here for the long term.

You know, ultimately, like, her her career is, you know, like, just just kinda starting and, you know, like, you know, she's just she's accomplished a lot of amazing things in this short period of time and, know, like, obviously resonating, you know, really strongly with the with with the with the global audience. And I think, yeah, I I think it'd just be useful for color if if, you know, Hailey was able to kinda share a little bit about that original story because it I think it helps kinda paint the picture here a little bit of how she's constantly tried to, like, you know, build community and, like, use, I guess, what she's built to kind of, like, engage the the broader community and be very inclusive. And, you know, like, she's done a lot of cool stuff around, like, charity and, like, you know, I think she's like she really cares about dogs and stuff like that. And I think really cool

to see, like, you know, someone that's actually genuinely trying to do something, you know, I guess, cool with with what what she's been able to get in terms of, like, you know, she's she's obviously had, like, a very, very steep rise to to kind of, like, quote, unquote, fame.

But, like, yeah, I don't know if if, Hailey, that's something you're comfortable sharing with the community or if you feel like it's a little bit too too sensitive or or how you feel about that. But I definitely think that it's it's helpful for for the community to have that color.

Speaker A:

Yeah, guys. I'm just here to have fun. I don't really have a full head wrapped around this whole thing, but I'm figuring it out every day, and I'm here for the long term. My skin's getting thicker every day, and the hate's not gonna stop me. I'm here every day trying to work on this and get better at it, but I'm not going anywhere.

Speaker B:

Yeah. Yeah.

Speaker D:

That's the

Speaker B:

right attitude, man. That's the right attitude. Like, listen. When times get tough, and and this was a learning experience also, you know, for all of us, we don't want we don't you know, this is not what we do. Right?

We believe in Haley. We believe in the the actual cultural meme outside of this space. That's what we that's why we're here. We believe in, you know, the meme. We believe in Hailey and what she what where her her intentions are.

And if you've been following Hailey for the last few months, yes, she gets a lot of hate sometimes, but guess what? She always turns around for good. She's she started this, charity, Paws Across America. And she's done so much incredible stuff for dogs, and she wants to continue doing that. And then now we have this meme, this meme coin that you can integrate in all these different things she's doing, including her podcast every Tuesday.

I mean, she literally, you know, was is is talking about her meme token on on a on a really big podcast, on a charting podcast, and and onboarding and talking about, you know, these memes, all different types of memes, all different memes that everybody holds in this community, you know, and bringing awareness to it. So it's like, it sucks that everyone, like, wants to, you know, see it fail and are aren't aren't very supportive of it yet. But I think in week 2, in week 3, in week 5, no matter what happens, when the entire community says, Oh, wow. This is actually different than what we originally thought, Right? I think this is gonna take on a life of its own, and an entire new community is gonna be built around it.

So, I mean, that's my belief. That's why we're doing it. We're doing something, you know, super innovative in in in my opinion, you know, with with the meme token. But, yeah, Trevor, go ahead, man.

Speaker C:

Yes. So, I think I think the audience is very, very, very frustrated listening to this right now, and I think it's because people people don't really wanna know about, like, the reason for the idea or what you're gonna do next or the vision. They just wanna know, like, about the dumping. Like, they don't it's not about the sniping. Like, people wanna know what you're saying the bubble map is not correct.

Like, just provide the the facts.

Speaker D:

Like

Speaker E:

I think I can explain a lot of this if I I keep getting muted. I keep getting muted. I think

Speaker C:

I can explain a lot of this.

Speaker B:

I'll go

Speaker C:

to you in second, Coffey.

Speaker H:

People wanna know who dumped. People wanna know do you

Speaker C:

want proof that it's the strategic allocation? You guys said that you raised at a 17,000,000 valuation, and there are about 200 different strategic investors. The bubble map the bubble map

showed that there were 12 addresses. So I think you guys need to just need to focus on squaring the reality of what happened because the perception, is not good. Right?

So you just gotta stick to the facts and focus on the data and just clear that up, and I think that that will be the most productive use of your time.

Speaker D:

Thanks, Trevor. I mean, like, makes it makes a ton of sense. Yeah. I mean, I think that we can go away and kinda compile something and then, like, kinda put it out and, like, written form and might be might be useful. I mean, like, I think all all all that lives on chain.

So, you know, like, it's it shouldn't be too hard for us to kinda go go go back and, like, kinda compile that and, like, put it out. Yeah. But, like, that's that's that's very useful kinda, like, context. And I I I completely agree.

Speaker C:

I I I would urge you guys as well to share at least what you know now because while people are here, you know, they

Speaker D:

Yeah. No. For for sure. You know what I mean? Like like I said, like, I mean, it was I don't like, I haven't you know, like, I mean, the bubble maps, I I I don't know why it's showing, like you know, if it's showing, like, 12 holders or whatever it is.

Like but, like, you know, we distributed, you know, those tokens to I don't know how many hundreds of wallets, basically, in accordance with, you know, the strategic you know, like, a bunch of people invested. They got SaaS. They, you know, they sent funds in. We we distributed tokens. It was pretty standard.

Like, you know, like, I've I've participated in a bunch of, you know, token sales. I've signed a bunch of SaaS. It's well, it wasn't anything too dissimilar to that. And, like, yeah, it's all it's all kind of like it should it should be there. Like, I mean, like, if it's not showing up for whatever reason, like, I I mean, like, I can kind of yeah.

I mean, I can share it with you now, but, like, if if if you're if you're telling me that that that is not, like, the in alignment with what you're seeing on chain, then I I I'm I'd be extremely confused. But, like, yeah, we can kind of basically go and go and publish that. I mean, I do understand that that a big portion of the tokens does lie in in, you know, like, a a few different wallets. I mean, like I said, some of that would be, like, 10% of the supply that is for the team, which will be, you know, locked invested. You know, that will happen very soon once we figure out the situation with the, like, with Magna and, you know, the the, you know, the SQAS multi sig and stuff like that.

Some of it is, you know, allocated to the the the 20% for for the claims, stuff like that. But, yeah, I mean, like, all of that can be can be very comfortably explained as to where where the tokens lie and what they're for and, you know, where, you know, like, I guess, like, funds came in. You know, we distributed tokens to strategics. You know, basically, they signed staff. They invested at a 16.69 mil valuation.

And it's, yeah, not not more complex than that, really.

Speaker C:

And, I mean, you guys should you guys should, like, label the wallets. You guys should be as transparent as you can. I mean, I don't a staff doesn't have an NDA in it. Like, you know, there you guys really need to go above and beyond to, to gain back some ground here in terms of the trust.

Speaker D:

Sure. Sure. Yeah. I mean, like, we we can definitely go out then and endeavor to try and, like, I guess, like, dispel as much of the FUD as possible. I understand that there was probably not a lot of transparency coming into the launch, and they they there's obviously a lot of confusion.

A lot of people are thinking that, like, okay. They see on chain. Hey. You know, you guys have distributed a bunch of these tokens, quote, unquote, for free that were then obviously selling. You know, we don't we don't have control over how, like, you know, private sell investors, you know, like, I guess, like, you know, trade their tokens.

They're they're they're free to kinda like you know, we tried our best to curate that list of investors as best we could. Ultimately, we can't, you know, ultimately control how they trade their tokens, but, you know

Speaker C:

Well, you guys should've put you guys should've given a you guys should've given a cliff the same as Haley, for sure. I mean, the tokenomics, I think, were not great.

Speaker D:

Yeah. I mean

Speaker C:

were were pretty bad.

Speaker D:

So I mean, like, yeah, I I I I can see that. I mean, like, I think that there's there's also the perspective of, you know, like, I I don't know if you've been following along with, the supply

overhang kinda, like, recent narrative or, like, you know, people are talking about that. I mean, ultimately, I think that, you know, there's there's you know, it's not a 1 size fits all type of situation, but, like, I do think that there are some merits to having a lot of the tokens out on, you know, early and having, like, price discovery be a little bit more efficient because, you know, ultimately, I think that if you have, like, a lot of tokens, like, locked invested, you know, like, then then you you may not get to a, you know, a really strong, like, indication of, like, where the market equilibrium actually lies because you don't, like, allow for that

Speaker C:

Yeah. I'd price is showing. I get what you're trying to say, but, I mean, the proof's in the pudding for what happened today. Like, as a Sure. As a invest investor myself, I've done 80 deals, and I would never invest in a deal where the investors are fully unlocked on day 1.

Speaker D:

Yeah. No. Fair enough. Can you hear me? Sorry?

Speaker G:

Can you guys hear me?

Speaker D:

Yeah. Yeah. I can hear you. Who who's who's speaking?

Speaker G:

It's it's Ricky. It's Banks.

Speaker D:

Oh, how you doing,

Speaker G:

Yeah. I'm doing good. You I think we're just run you're just running around in circles right now repeating the same talking points over and over and over. I heard Doc say something about, like, 20% of the tokens allocated to to KOLs. Was that correct?

Presale?

Speaker D:

No. No. No. I mean, like, I mean, we did a like I said, we did a strategic fundraise where we You

Speaker G:

know, that's something that was a

Speaker B:

the lies. Also 0 tokens given to any KOL.

Speaker G:

So who who are they sold to prelaunch? Because I'm very good friends with Malcolm, Frank, Gods, Lee They got 0 threads. Yeah. Yeah. You guys because they didn't want any.

Speaker B:

It doesn't matter. They got 0 tokens. We didn't give them we didn't give them any tokens for free. So that's just it's all crap. You know?

Yeah. Listen. I I'm glad that I'm glad that, you know, we didn't give any tokens to KOLs because we'd be hearing we'd be hearing that, and that we would be at fault. Nobody got tokens for free. That's not and no team sold any tokens.

Alright? The team did not sell any tokens, so that's it's all bullshit. The obviously, the snipers, you know, we did get sniped to shit. That is true. And people in that private allocation, yes, they sold just like a lot of these types of tokens.

People buy them, people sell them, people enter rounds. It's a meme token. We didn't think locking, you know, people up on a meme token, you know, made a lot of sense. But at the same time, you know, this is this is something that this is something that's like we're all we're all in this together here in in this community with Hailey, with Over Here, with all of these holders. And, you know, there might be a negative sentiment today, but I think, like, when people realize that Hailey's not going anywhere and the Hawk 2 0 meme's not going anywhere and she's got it in, you know, a podcast and she's got all these verticals and she's doing all this cool stuff around it.

Like, you know, a new community will form. So my point is this, day 1, right, not the best launch. You know, we will we will show up every single day. Nothing changes. And at the and at the same time, it's like you got you've got Hailey who's been very committed, you know, and and memeing and bringing on a community.

So it's like, yes, this meme token, the launch was rough. It got sniped. Well, the snipers are gone. Now a community's formed. Like we said, it's got 14, 15000 holders, whatever it is.

That's a lot of people. There's gonna be more that are joining. They're gonna be claiming. They're gonna be getting these tokens. There's gonna be onboarding, which

Speaker C:

is

Speaker B:

cool. So, I mean, I'm just gonna focus on the positives, and, you know, no need to, like, you know, ask anymore, like or or say that, oh, this is this or this is that. The team didn't dump any tokens. It's not true. Right?

So let's let's let's just stop that there. And we will definitely put, you know, a a bunch of, like, forensics together to show, right, we know, who who are the ones selling. You know? And and then at the same time, it's like I think everybody will will start to realize that, oh, okay. Yeah.

They got sniped and some and and some pry you know, the some of the guys in the strategic allocation sold, and that was that. And a lot of these tokens that that had been that had been controlled by the deployer, they've been put into wallets for free claims to Haley's community, And that's it's as simple as that. So, yes, this was done different. Definitely definitely way different than the usual meme token launch. But at the same time, that's not a bad thing.

I think that it can still work, and and we're commit and we're committed to seeing it work, and we want Haley to be very successful in this space.

Speaker D:

I I think there's some other guys I wanna speak. Nick Nick, did you have something to say, man? Can can these guys speak?

Speaker B:

No. I don't I don't see I don't I don't even see Nick.

Speaker D:

Nick Nick O'Neil? Yeah. I can see him here. Like, how do I k. Yeah.

I think he just pinged saying that he had he had, like, some questions. Like

Speaker A:

Nick, can you hear us?

Speaker D:

He's a speaker now. Nice. Or Trevor. Anybody that wants to speak? Yeah.

Speaker B:

Nick, go ahead.

Speaker F:

Oh, it said muted by host, so I couldn't do anything. Can you

Speaker D:

hear man. Yeah. We got you.

Speaker F:

I'm bet better than you guys.

Speaker D:

Yeah. Yeah. Definitely definitely hasn't been the the the best 48 hours.

Speaker F:

So so I I'm curious. I got a couple of questions. I mean, 1, there's a there's like a man, there's like a multitude of things that I that that I'm curious about. 1 is I feel sorry for but, I mean, I can't completely like, in terms of it sounds like, like, there there's a delineation of sort of responsibilities here. It sounds like you guys are the team that's kind of, like, packaged this up, leveraging, like, Hailey's brand, essentially.

I'd be curious, like, what the deal is there. And you said that the tokens are locked up. Coffeezilla did bring up, like, 1 thing, which had to do with sort of the fees. 1 thing that a lot of people have harped on so far is the bundling, and it sounds like you're saying you're gonna provide forensics. I I don't I I have no idea what the situation is there.

And oftentimes, the price side is completely out of control. But I'm curious, like, in terms of the actual operational side of things, you said, yeah. We we raised money that goes to all of these funds. How is that I know that it goes through an organization. It's a pretty standard thing to have a Cayman organization, and then there's oftentimes an associated, like, BVI organization so that it all appears to be quote decentralized even though, like, in practice, it often isn't.

How much do you guys get paid as a result of that to, like, keep the operation going? And, like, what percentage of that goes to you all? Would be, like, kind of the first question that I'm sort of curious about here.

Speaker B:

We we have tokens that are locked for a year with a 3 year vest. And just to get this done, you know, in a regulatory way, we've spent over a half a million plus dollars just to just to get that done. We intend, and and a lot of people are employed on this on on this you know, even over

here on this over on this team. So, you know, those are those are operational costs. This is not something where we're looking to just just to make some quick money.

This is more of, like, a fun experimentation around what we can do with a

Speaker F:

meme Like outside of the space. Sorry. I didn't mean to interrupt, but, I mean, let's be clear. Like, all of us, as much as we can say it's experimental, like, we all run like, I run a business as well, and I, like and I have operational costs. And it's cool when, like, for example, those operational costs, for example, afford me to go fly somewhere internationally first class, for example.

I'm just using this as an example. So there's, like, an incentive for someone who's, like, operating a business to basically, like, have a successful operation that's going. So I'm sort of curious, like, not for the token price itself, but just in terms of the fact that there's fees that are being generated. There's an actual, like,

Speaker A:

flow

Speaker F:

of income.

Speaker A:

I hate to interrupt you, Nick. Hello there. But anyhoo, I'm gonna go to bed, and I'll see you guys tomorrow.

Speaker F:

Okay. And to I for I guess we're talking over here, and I I don't know what the distribution is, but are

Speaker B:

you guys able take in terms of the week? It's been a rough it's been a rough day. It's all good. We'll come back tomorrow, Nick. You know, we we ain't going nowhere.

Speaker F:

You you can't you can't just tell me what your salary is from this. I'll tell you what mine is. It's it's a $150,000. What's yours?

Speaker B:

Okay. I I don't I don't have a salary from this, but that's that's You don't? It's cool. No. I don't.

Unfortunately, I'm underpaid. But listen. It's all good. Have fun, guys. Neither of you get paid.

We ain't going nowhere. Right? We got we have a we have tokens that are locked up for a year with 3 year vests, so the incentive is to keep us showing up. That's the incentive, and and let's have some fun. It's all good.

We'll get over today. Anybody who wants to be part of of of Hailey's community, we'd love to have you. Right? And if not, if this is just, you know, a quick flip or whatever it is, then it's not for you. But god bless.

We love y'all.

# Exhibit F



overHere

OverHere

**SOLANA**

$HAWK Token Claim

  Token Claim from Allowlist Events

  Token Claim as Supporter

  Token Terms and Conditions

**ETHEREUM**

FTX Rug by Degen_Alfie

**FREQUENTLY ASKED QUESTIONS (FAQS)**

Wallets and Security

Technical Issues

Common Issues and Fixes

Staying Safe

Contact Support

**DOCUMENTS**

Terms and Conditions

Privacy Policy

---

SOLANA

# $HAWK Token Claim

Claim Free $HAWK tokens on Overhere

**1. Is $HAWK token claim available worldwide?**

While we aim to be as inclusive as possible, due to regulatory restrictions, we cannot offer token claims to individuals who are U.S. citizens or residents.

**2. Who is eligible to claim $HAWK tokens?**

Eligibility is based on:

- **Event 1:** Participants of our marketing events and community activities.
- **Event 2:** Fans who have previously supported or actively engaged with Hailey's content.

**3. Why do I need to link my social media accounts?**

Linking your social media accounts helps us verify your eligibility for the token claim.

**4. Can I claim tokens if I don't have a crypto wallet?**

Yes! If you're new to cryptocurrencies, you can create a new Solana wallet through our platform using your social media login. This embedded wallet allows you to receive and manage your $HAWK tokens without the complexities of traditional crypto wallets.

**5. Do I need SOL (Solana) to claim $HAWK?**

- **New Wallets Created via OverHere:** No SOL is needed to claim your tokens. We've got you covered!
- **Existing Solana Wallets:** Yes, you'll need a small amount of SOL to cover the transaction (gas) fees.

| Previous | Next |
| --- | --- |
| OverHere | Token Claim from Allowlist Events |

Last updated 10 months ago

overHere

OverHere

SOLANA

$HAWK Token Claim

Token Claim from Allowlist Events
Token Claim as Supporter
Token Terms and Conditions

ETHEREUM

FTX Rug by Depen_Alfie

FREQUENTLY ASKED QUESTIONS (FAQS)

Wallets and Security
Technical Issues
Common Issues and Fixes
Staying Safe
Contact Support

DOCUMENTS

Terms and Conditions
Privacy Policy

Q Search...

# Token Claim from Allowlist Events

If you have participated in our allowlist and community events, you may be eligible to claim free $HAWK tokens.

## Claim Your Allowlist Tokens

1. **Go to the Allowlist Claim Page**
   - Visit **https://overhere.gg/products/hawk-tuah/allowlist-claim** »
     - *Tip: If you're using mobile, use the Phantom App (in-app browser).*
2. **Log In to Your Account**
   - Click **Login**.
     - *Tip: If you've logged into OverHere before, use the same method. Look for the "Recent" label next to your previous login option.*
   - Choose to log in with an **existing Solana wallet or** your **social accounts** (e.g. X or Google).
3. **Link Your Accounts**
   - Link your **Solana wallet** and **X (Twitter) account** to verify your eligibility.
4. **Claim Your Tokens**
   - Click on **"Claim Tokens"** to proceed.
5. **Confirm Eligibility**
   - Confirm that you are **not a U.S. person** and comply with our terms and conditions.
6. **Success!**
   - You'll see a **"Success"** message confirming your token claim.
7. **View Your Tokens**
   - Click **"View in Explorer"** to see your transaction on the Solana blockchain.
   - Or click **"Exit"** to check your token balance in your wallet.

## FAQ

**I participated in the allowlist and community events. Why am I not eligible?**

- Check that you have completed all the mandatory requirements.
- Ensure you have linked the same Solana wallet and X (twitter) as what you have provided during the event.

## Need Help?

If you have any questions or need assistance during the process:

- **Visit our Support Page**: https://overhere.gitbook.io/docs »
- **Email:** Contact@overhere.gg ✉
- **Join Our Community Chat**: Get real-time help from team members and other community members.
  - Telegram »
  - X (Twitter) »

Previous
$HAWK Token Claim

Next
Token Claim as Supporter

Claim Your Allowlist Tokens
FAQ
Need Help?

**OverHere**

**SOLANA**

$HAWK Token Claim

   Token Claim from Allowlist Events

   **Token Claim as Supporter**

   Token Terms and Conditions

**ETHEREUM**

FTX Rug by Degen_Alfie

**FREQUENTLY ASKED QUESTIONS (FAQS)**

Wallets and Security

Technical Issues

Common Issues and Fixes

Staying Safe

Contact Support

**DOCUMENTS**

Terms and Conditions

Privacy Policy

🔍 Search...

# Token Claim as Supporter

If you have actively supported Hailey in the past, you may be eligible to claim free $HAWK tokens.

## Claim Your Tokens from Social Accounts

1. **Visit the Token Claim Page**
   - Go to **overhere.gg/products/hawk-tuah/token-claim** ↗.
2. **Log In to Your Account**
   - Click **Login**.
     - *Tip: If you've logged into OverHere before, use the same method. Look for the "Recent" label next to your previous login option.*
   - Choose to log in with your **social account** or an **existing Solana wallet**.
3. **Link Your Social Media Accounts**
   - Connect your social accounts (e.g. X, Email, TikTok, or Spotify) to check if you're eligible for tokens.
4. **Claim Your Tokens**
   - Click on **"Claim Tokens"** to proceed.
5. **Set Up or Link a Wallet**
   - If you already have one, you can **link your existing Solana wallet**.
     - *Tip: If you're using mobile, use the Phantom App (in-app browser).*
   - If you don't have an existing Solana wallet, you can **create a new embedded wallet for free in one click**.
6. **Confirm Eligibility**
   - Confirm that you are **not a U.S. person** and comply with our terms and conditions.
7. **Success!**
   - You'll see a **"Success"** message confirming your token claim.
8. **View Your Tokens**
   - Click **"View in Explorer"** to see your transaction on the Solana blockchain.
   - Or click **"Exit"** to check your token balance in your wallet.

## FAQ

**I have engaged with Hailey's social media before. Why am I not eligible?**

Eligibility is determined using a proprietary algorithm that considers various engagement factors.

## Need Help?

If you have any questions or need assistance during the process:

- **Visit our Support Page:** https://overhere.gitbook.io/docs ↗
- **Email:** Contact@overhere.gg ↗
- **Join Our Community Chat:** Get real-time help from team members and other community members.
  - Telegram ↗
  - X (Twitter) ↗

Previous
‹ Token Claim from Allowlist Events

Next
Token Terms and Conditions ›

Claim Your Tokens from Social Accounts

FAQ

Need Help?

# Exhibit G

| Strategic Allocation Wallets |
|:---:|
| EuuFDbX6tBrRRrMZBxLRfmyvfsMJBRUoiqYFoBwPuxvQ |
| DxUTDBdpEaZP1DeusNERwCs1CsfjMDxfcCJifPhUDqTX |
| EpUNtE9CCPXHEnJkHXpwAjyYVvZ82mHoSKnvA22tztQ6 |
| 4qFhHVQx6TM4Q5MPE2NF6vxw1Mq34UTyQtuGU2TgcvNr |
| 5Nk3tnSveGRNiWoEpFoQNg7wREbxSPomGQqFTxeCLT3p |
| 22fphQxw6UCdpVS4ciATDZnpkiFSMUd3qf3DrnKsisw5 |
| 8AJDKwxz921UFqUNA6nyLnfSKtpphDPcWDa1bnASzQ6T |
| G9npe7FKCQZJLDoAwoxkYw89i14zaC2G7pRS1h9FsEVi |
| ASZmL2X6Qr9yrgfXCwJcp1x564hiajb2sSnN4DWidVqp |
| HZ5kmaqGB3fT3y6pEJLDMhAsdZtuzzYgynZbCpJ45WnL |
| CfcQTGyVLGdXe8g97sMBxwgjYntQcjTgZMghMARUNbS5 |
| HauDstXrVdmihyZSsPEfczZtiFjUJWqL2qHXCUHRqgXr |
| 72p1RcXTjX6nuCowiqdZEMmpUntv9Cdm9pyDcxYtZkaL |
| Hfz1MLzjjSwfhYvq51c2K66xaSY3qtxJqUdW1VNhDENC |
| 3gmXCm6rD2JUBW6TkVkX8k9VrsJFD2TFgJDMhZs8Jo7u |
| 7MJBC1XSTZNEfP67V1pJQp6ap9fHzpL588L6eb7jrRk1 |
| 2Ch5myXWKxbwy14TVxK5J6KyDTg9ScFZskg7zhLK2L1f |
| 68btQnLRDckNUj5EnkE4vTcPQsxuj6GvXrdmr9BtRrta |
| D232iab6uzUe2ALzhSo3TsFnaTjaA5YCAfqTbW8ZBse1 |
| 9jYbqDinmDNCPLG716wh4mLjBDqXKSsrQZKmMDpgQRxj |
| BvVvyVVLjB7d4vUqoAxqSzgQXucNyLaaUnc99ygLj73B |
| 4dCsWcFYYXaDzuuL8KFaLXiFVMTVwaiFohrXZ892DSjc |
| 2YGh6DzeGysKUCdTo1EQFNRqknNpEfLo23MmiVosdkNi |
| ADw3jLRZ4uX6XrzqZM1nZBXW3evdY8qwCZF4XeTrehXd |
| 6B1NBhqRXMevu4vxQyuiuC2gK8dpVvBUaAZmy5vrFJdf |
| 7RtYS61rMaH3QnAK37BQrPLBbeD5omYTXUy76KtzqDLN |
| BTpGHf3rypEhPEGemTJURUB8otMi32BDphd6DXF2PCbL |

viuZ4fKLLC41MUwULPAiYdsZKnMc915PHJ7WBgB7gnP

56FVkGP1Zgo4nSRqAmJg2wefYYvFe8gd9PcyfqxP4gw2

35gRuSGrifF4VQacQN4fqEo4Kh5oRjJgNdtGVpFcDiTD

77aXHY29GYN922nH8NwZnbUQFCmWC7SJStPb9Wo2Bjae

6Cor235Cg5sMnnGKxW2TuMX5KwkoA93bnowY5V2cakXx

4BiFckR8bjQf7zSnc5a4Lr6CQP46tYkdx8qww5gVLmcW

9uGdnYcoefHAWAqm23WWchKBZLVH6dKkQJU27co6yBud

HfvjwBpr1qcJS7oaSYCqgyKkLAnwp4y7HxTboFcL1tx9

CNN721XGfTPYdGEb9svjucgoKgaMuw84WEXpJY1mjsMv

f2z6dYtH5BZaSHw6dpVqjQQKkVrhFTMmeHovhhUyiEt

BiRtJjNG8mJpmdU6owXdwizNcnTQPsWSioxLRo9zx478

4P8zED4Eivq9u1repj2ADAyDggsihEb9inYWoq1avj5t

9V2XCiCVdoymenZ22rkYiyeFHaJ5hYzLtoFoADgWBKbr

3JsLVGr8JrR8erQpwCzRYa93WVgHgwG9dB8FothXxpvU

Bfxn377iQXwrMkbT24ybfHYMpHJy7cskmpWjMJEqYqMm

6xkUcK8NH68z9NNRMUf9EvaJfbcU2m8HQvarJir2VSdA

DDKWYTwJNje7Ed9Ft8HxyhCfnBnCoFuDPuunaW7LJt9Z

5euvEJSn31FK2kMGrg6a8WG2Zy32ostcJxjFssTH3bV

CtmLWYaHJTh8K2kfVGXKFLSnSj2AVSy8BwpYcW1882kp

FQJ31g84i5YmNYxqDsdHreunQ5XBTP1FXqCFNk6XM2VD

Et7eP584pmp9ataJyvphofEFz1poTVPTAYrHvahCbhrq

E2nEAdeQbxjGxwHzwmqbwH1ys2h61hrh8u8D1vyCBZXN

6x1Vjqz4wZhSVfcEYxbUXtUWNPBjPrnw28QsWjaN39fY

GTES27uJXBCk82nGanSMniFWZCDv9MoP8GxACFRsnXpq

3R3u27G3MP5BjqrVgPumqrDusHVyz3guU1Tm2wdnLs8x

6RCyncMAWn6kbkJo1ZP9CxQMzke4u2NVhfVeaWvAjhVQ

5gwWDH2GjMDSB8A4Ectwcbf6vbY3Ph2H2sCbDXht8VFr

3D4GBjHbKm3ah3M9MKjijsGREUBB8AHK1uJghASucaCq

DVdhRkyUbgHWiANAP47amWJomUs9TRUF7VtdXKNb4ppB

G93RgRZbpKSU9ami6gU3w4VED9weULPo7KK6pmncxiia

| |
|---|
| 9V3KZ7aMZQBvpbMjiHoEE26iDz2DGz6iACMDHHscacnx |
| 7SdTiR3BUuLJWrj7NDprMAffTYAMFvo43FtRERsGgHpu |
| 36shXjGFrhmGhKroyBWU9XU47RE88CbKvC73BeFn6Afa |
| 5xxUkeuaWrMAc4MK7zAdTzRTEMZWGyK1PoscbQS6RCz6 |
| Do75L6oyJG8FfS6Wtn9G92VBqGMzNnpC9N15fL5me9wn |
| AXd22guLKeqQqSwhzRfB1KDua2sizxDDrxzLBmSsVqpN |
| 6uZVEWFz9og5ycUTAw8kuzubjwLDEVoG2dm1acW13bfb |
| GJwnFv2yrDyBNeY14KQnkbwAvSQhdMLb26sKvFWwiJLo |
| 5J4Xpuc19cP5EFsjr9BsRKvD9eQK1pNmLwq8sJwteDs6 |
| AtJNKfihLFqupG9w3Neit8FoP1TyagpMTgC5K9fdNkwf |
| DfBSkUTCvqJoYAnamgnsmN4L72VzooV8UMDKN7MMd9aP |
| 7xX3knqj6J4SeRTWN38Usp8SzctUox5QXuaBbofW2BYu |
| AmCtLn3FsUC8g6fuf1XYNQtwZQCMhnfs3kh74tuAwz3B |
| DYKXAfoEAye1JG4JkwJJbn31oxwUqA6WvSdKGhpapkWv |
| 2NQfwyu2S3Dv9ivVjKQZ91UiDdMBY49otcujpaVM3Qn1 |
| 65a4PMd97cfF6ARZrcVAi3FKwkVm3WQCLhNsWxEpti2m |
| CqLT35EvWidhVXT5pEXGmAyzQYprGRXG2HAo1aRLDrQc |
| 2QbTUMU2demLLnnndq1LRntwyoeAH8ZHHz4pecGXD2Mo |
| 5mMiJ7mTBzeEzgsNxLW8vbq6yDjcVPn56ZAtNV4nKTG3 |
| 8wkPmCNx9A28nNP4wEgDLnRdbNMASCb99rbneziEXXCP |
| 3SLFuUVFzWxd1vLTuCW4jNRyoEmsQnjgnQEibCD4uugi |
| 9GTqeyAMVheqssD5uuLyfNwuVbqrGNAmqkjdkvva1jzY |
| GezQLfQGLbA1Aa6CyHLt5XRfbyX3zwaa2XASGQ3tUUeM |
| 5iPxQnJEju8ZVPiWH4Kcg8u5vgY8Z7NtGpuEi2iexHWi |
| DHcgQJYhkkeQ66vmUTFLKH3EayzMc9a1uAKAaYV94z2g |
| GEqEEFi79vY8oyGJbsbHaZGRmK2FdV66F2H7WoCsB2sLk |
| RsUkWdrP8PjtDi1PLWVDknJ5VRgE5r1k6c2Tuj1DVK9 |
| FWUZtk2yc91opheKvChwgYc4qjRDLesJXtX4f3W6xX9M |
| C6vP9qorrfdAK41GgLVqngL7T4wrz3SgQAvfYevPNeSd |
| J5VoFp5PL4mCo7fKyVqbDca8EnZhDg9rG8FWRiT7VjKB |

| |
|---|
| 9Y6j3Cm7K162HEPVbNif4MKpnsCagpAzJtTLjSU2qQZP |
| 2uxewkXc21DF4jXvJg3GSKGZosKFpqUKphGGEvrv1xMo |
| 9UfK6FbBTHdrsvHpKQ18Tz125V3ttvarLuyBea7SSkdP |
| 7z7FsKGz2ogjyf4QrqNskWQ5Ug7r7r8MYeerS6TnBAJg |
| 2VX4CTEmhRcL1CKNXgQhjSQ3H9VgEKPhXU6sTWgx44Uy |
| 56U4L2Yf9U8fy4sV9jW4p5Kh2uo1WT2zVF1AbJuTGU22 |
| 9NPTGEBqzxVhnHt5yFxJpZjVQoUqKLzNnBcGL4XBCwqD |
| HQMDBW8ri2KLj2Bm8PZdWZbWsBk8YjcgPzJUdsGN7KVQ |
| BxV6yhXek1yWTXsXqqmoMyCksxvCAhVtqvmye9QMiC9m |
| 2B1jQLDLwjHHAu9HG4U3h1txkpJfi27gP6aev7VqYVPE |
| EsvpDS2cRMEq5QmQa8c9t36XVBA7rfQDWsKMDTGm9Njy |
| 92BKXYbBcMAkPerfcQgug4qfHNmfZA8f7LTgyLrTsdwM |
| 337sxUwQToEkviieAjPS2oNS1RJsWuPewP76x7oWdsVe |
| 2TbhKmfwqkFJFZ9yS6takCQCShhXJXuf8gLqoCLbncJr |
| 7U1dA2xyLcMevCVVNaYu2WevMGCAS39JbcubbpTv7RsP |
| ACKKUdpdFP14AzkyToRQr8x57DMVWYxoxJAcq6jpPJ8D |
| 3GdrGupFU8PxEzPrToJVxmV9jhmdtZVnh3rrdSvEBvH8 |
| 9Aj6Cu8KJqFnuR3hfyZ4f1xXivCfXbJwHsg6QGDwT82n |
| HafGpe12SEsHKGFUca4V6q6RtQXFKqAxUzEETFasUQkC |
| 8fZZKMDWVSLFA3JNVcLpRewPZWW7auskVa2XN2yp5D4r |
| E5TtkjBQhyAt3aWisP4H3fxHBz7unkEspK6b8yXJNazS |
| 6rcAES44GrBzvYHCR84SJnbBAuRYqTUMpbiqJurUnsAP |
| BBGAK4ThTWC7XWSEHepch1asrfaKDyF1N5jDb9nbnMXM |
| G6wH6zYHqbgQZ1hjYS91Usa4zYSqUj5xzhD8TyRx23zE |
| FoBbLF6jQ94pkhYHbi7c9u5HrUXuepqBgi5iNaFM1S8k |
| 5RewDeaTftjPzRzqCUWhEPxk1w3ZwFKjPngRpWZk82p8 |
| 8vENhoHk4yZoH28522kuzVh6cn4jYBkNYfxFCARqRp1d |
| CTmv7urz35TacqqEW8hbvszYsBEoVSG1YVFpYdps1XeH |
| 2VrAjFUdnHohAjCghEUfN87uDmu79FZkrUQpdq4Yy8Vo |
| FcquwbWM35Ybg2vTGkAXgNuaeJCymitjs9E8iFE5LgxB |

9hcbgR291rnBCNUomjKYHNWKistmvCsdqSDKj3bohFii

FDAhisWn8EFwEpWTRQKTuutXe4gvy56Z7cpyU572oaQZ

DK7o8NLoJXSPbmYnkx8njB8Fj893qvjmW66jgR3Bjvg4

ASaC6s1pUWZhS4q429azMDhGW6UhDLAb5f9bEYJCTw7H

BG54apBJiZPNoUmErnQFXNSje3wDGhCkXs7Kg8PT9Njc

DCdcSchTN2DGdmukxSmgdTehMN9Gns2GJPFi8aEWjzY1

3VCTHKxUKLd7HytPBFBtw44EsVbaWoq3vvVXoExzknez

2NxCFcyWhmCxxwRrQkmxKsaofs9tigAYLhuBm2m5pcCL

C9qWTVVYE3d9PJaGYyzVt6xnkE9s4Uuc2xSBWfGra8Fz

44SXvj8m5DLXiKzrBdmWHcTF1R3vSc6sQifBUMK1JX7a

6aiULxYJzk7BCVtqST59AtLgVRvNhqJUGDEhL6e5pLUk

71doURVXXtf9n9JDfEp13FWN5QkhvhG6NVSDYBU2ghF7

9Z2nNiPJiMLAEYW7jxoGJkQGU3G7kgYAz77tZa7iYyET

BFXuUSmMJS7dbX4oNDnyP5HJBT4XX2VLTpoyjB8jzcaT

EgrMG9u6LgpTFn4yiygKmKoisxfXUy1TW92wj6ApjhQz

2976dm92KRUJS3nERBTabnSrSDmYJCHZCbWFTe5HgZ8M

89NinRFCmDDLa7WazqZaM6MeFQw1i6YdTGXNk7kZ9tD2

3GG86ivKQe3fshPQsW53v13qUVpQyWpR4swWixNThHAH

4yQJLE3DeXmFugVnLwZW8bxt4Mc1PE1XTG5WSArqojmz

AbYgzWgFSYzPYos9KzgtsTfmDPhZTgFHghujkUD8T3KP

B52kkg9f2VJh67umQSjR4RRkAxcdFAeKsjsNJjNT6MtA

7iG6gHFXpDCUU7QUwjbdk3JyTYQ79M3rPfu8RACAKp1h

95XhfrLGtPxR71N2hjH9q5s82u4Pa49imXdP4UBVbpp1

4Uny4xAeDfZ53ymZkJNTTc8DToHAqKCBjucdoqcsPgeC

JDfQ45JkTzfu34aBDhDH89vvjetoidkhuwQPMBgZBQjh

ApnqmJnvZjUoixXe8HC7jpGwcAh8U1Mf5Fg3SGPkZt5C

8f47RFuzGvsfUZDXnGPgdaBUDQSNhR7s4Uyjh3m5LRiV

2WHYU7MG3WCLdibcbQqkhtArqLXCsL4wrsGyngES2iKY

GEpNNnqGcmJqqDQbkW5qw3aS6d5zxXX5aNqFrB7qZHri

FqAyiTu6seannxGmiiTeivCKJi9afCdsRvA5guwPeptu

| |
|---|
| 6hN5DssWWbUAyesEw6AGLxMJc4AGRUdP75CXjqBn1r56 |
| 3ViCmq9xCtguiFL4LRqMcmztsPeijAwXjjvDeWKACizV |
| 3KXNqBVsdJjMhSGWEZMx7mE9ErjSjz8yU9KaSVncoMff |
| jeyikGcbkHDKZ6eL5tNqJBwLD2C3YsKwWeqMmHznM8C |
| 22Ea4LsAtSjZ3HcfjtjHcAGEnfuymUEWMjSMqtHCHWTM |
| 54w21m39VY7jnfZF8CEQZQbHrvzZ3cA1ue7uZLbLqX9i |
| ADhkjAS1ZY1PreG4yCz7TqYVNDvAqUNUcHnXRANLRMiH |
| FwnHJjgMwmE99Gj5s8Cw9RffeeCHg9tMmNTJVRsy9nfz |
| BZWbUXYmqdAEz4ytCq6tGfByYKDNPYtB1JGqgEzQGt4K |
| FYXdkP8ECBigPbRymf5w8e48Zo3Sv92Cn9BMvzm4yM6c |
| Ak8EVX2uvui6Adr3mv6Ngror2rYLGmMnxqTWGwKPz6uP |
| 9HXdzGRYvcRCyPcvRuGPGSftqDkHjGykLaAMXC884rtt |
| hTUcaBRfn5SzfV7oL6CPcpqJqZX818fkcuwtqTTJCWm |
| CGdDCjZZCxkEtdXnDGYbzxbNzkqUV9fpwBwUQVWVGLyn |
| 3Yk5mJ4pKxxf3GBAweskTP6tDceJNGKGwWFxzQ9Q492B |
| 684jZm6hiMccfkFYFrzVACFJSwtKWrJd62S28daNVcFd |
| 82Esh3jf2gSvrqcFyCAPETWbrNFqt6Lp4q3HrfN2uzAh |
| A37VtvFXNZRVtzstLYb9bv5R9EiwaYKxNWqLciuFGGQB |
| G2Jw3SqrbA6thxULNS2vxtRjYqAJCNzNEDoSfTVnUJ7 |
| EjsuRJypL9oguUdCkv74SF5z9YSogqN3HXiiiU4FP5a5 |
| 3Wax3BVDLdKJ32ALpGVJwmouZTpHQZFhWipp3sj9jaav |
| 4quKrcTAuFmSnKG4JnB2V4rH8DsLTubT4Gk4Y6Z4EEFw |
| 8Db2Cd6osTRwDpRVGdNha6vFjDjSWHiw9tbd3uXdyboA |
| GvuHQA7MRfyjwukSoEJxXmPEAkbDo4SU7fByxh628XHn |
| 9xcLZHGdTpyFPiR3f5RAjcZCargNdDmwuATrD1aKCEMZ |
| 6y8WCcQbAwGgGo5ae1Lwk8ZndarDMUyyX149KEU7RxzD |
| 5HdHYZ6QJuAMdnw3TNVfd75UanRWvkg79dKmrgQUejby |
| 56cGABk5NhRjn4UpAbd8ZpLorgoVXDT84N1Gs4Qbo9YZ |
| 4hjtBumv3aDrW5j59r25qXUXzvRoBUkKe5e1FEYPFLee |
| 3CxoVMKTgxdiQTdaheqCFozDgfUCCVJf2u47FM6BzMh7 |

CgjauVXyLaHpijtKu37kBAw1j8P5L983As4RLYyy1Czb

J8ye4rLZCrqGC6CYWJhvTAEPCHUVJhcBL1PX9RKWQw3v

4uUdEZ5b7rnwnkYESWzwSCfaTdfmdyzxDu89FhDSfWVv

EejyU351aiTNtDQ7J5VLx5g481oFjdLzvJppjfYZo5gZ

GVpipCQNB7qKQdmpez9MCbwv9zprGidPqJVg8mCDojQa

CzjndmLA94pZgWWtxTQ3kL3nRs3t3RXzTH2rwLsLuiky

BsPLX6dv6Tiu8NSBoozAYhJL3CqPA3QLUkWommRWKFoZ

Et1irsCbbZXSTgVgSNxsg9EfRsjgUcuqUri1gUzDwdsx

8Q91m9NmrfUrJh3AHynGMqdGkryrz6V7RLsiP1S23Jsd

2MH2aE7Kq2vxRo1cnCXeEyRkWy98cZAbUCGERuUN3ERh

2yVcYG4Z4YiX5rm9rctimWtSQxeXkEugJygaqzUwmDaz

FevQRipEefwHeFmjh36zWi81sDyg57znokzow9xWd1mo

sGFdJ9cKzZW13kRchG9h5FBfA2WKXNH3aK86jxQj2uY

3VoLoC36pGQYzjpo5ELMQDXXpo9Et47SnR1DqBozvSpw

FZVNaJhkvCnHNvNxdbxi4ujbu5ULwbTMEpQ6bX2Sznde

5q855eVut8381ELzR4cZw1kc2JudgV3UFkU9ph7CTFVL

hy5UsA1mQgH64TLbrVcXH6QjagpnbnCNaUMGRH1vUx7

4DUzyNsCahtCK6hy1LyvAUzdnkN4i6yPPL7ohMaRgMzL

2QCFNGRukdHxoDSTERKbbuWGrb2MAWRjMpKnZTUPu8QT

FcDFMUjKMnDXmhVMN1qvaN9yFxfgJ9sGDARsR7gHJjUf

D1JZhuhUvfGczxoFS4w1b1NJV2z88fiJn2yCLdoqtXvo

FifJY3h2ieCR3SdbXNDytwQ2ukBuv1fwfF4wqjAY5iy9

32B9qSTWb7FkgJtDi1jCyLR8p4Dv5VueQogiuhjFW5ZW

3SE2gw8ZptrA8mccAfLvx7oDhHi5p5v5AQzrx6w6qMHJ

5FEy32548dGtBCNBiGm6FpL7ScYBmVgT3B9A8869kxah

6VuJn57rvwEUst7Bngg6jpp3kC7nwToehMPQWkJAGKyX

63GLPGixEbvLLkGUz9zAt8NTTYMYawJZDvrNfLms4qp1

6u2uinvXWXgLvCvqm8dvXxkMGizXd6JXiqW8UPQfVYbm

Gj8tkiXCumd6x17gAhag55EJ4E7Q1W24Lm2U1uDnUY8p

7W6YBRZWDn13QQrKxf8tXyDJmfiwwXnfwrp7MPsTRDxY

| |
|---|
| Awhnjyk4QdTkVR5B4GTVXBw5zscURmmecfau8EXP98Qe |
| 6fGgvZbupBT6ywbc5eL8f91fbUrkZsS9cBpKQhcUEwbG |
| AnDbjqD4fP1QGH88bGV1LMAL6CPF7qFYHkDtHMshR4Uq |
| FofhQKM7kphfZK5Pnis3ApzC11GFkVXwuXmdk1t7koRq |
| 7uwSRnSoRjywGk8hMXmKi28hz2KyWFPMoqZowWo1DJ38 |
| 4eUuQeZUnpf7kRMXUCo58vvQF9HMaNsLo2VVQP4CMVUB |
| 6tqgMMemjKr1mhSapDkBiFEAfbqyrecnBgxZ6Xpb53WT |
| EXtZj57gLFipdeRrRRpcsBEmSP7JH5Y5W9zFbtKQfzET |
| CtvZ5q3Uq9p1v4fvFxD3ByseFdczg7QdnyADu2Ro4HfG |
| ByXUJQASGMsbz8GyepaHaZSKCZw9RjhTDiLx6Dt9tN7U |
| 2vG4j5wxVE8HArRbMovKtfCXeQe7yXc4bv6fQZMrksVW |
| 3F1sAwhqqu6MoVKmdL73AxpWZ3K8smPfiaMZmkGs9mYj |
| GU1945EX3uzdUuZ3AwNz1khdPp7869njBLbRbboXDo63 |
| BuJY4cNqogPZGkcJw1duGRgtfdbSZTz2XuWzoHdaNg2r |
| 3x1qXExZPFCHM6R5a8gamDGLrqvMvwxMu1mRKLAr5qQc |
| MDvE6qayZVCjoUwBD1Y8YTwKEGRp2vmpRPMW48hqKdn |
| 2Rv1pSziMJRAKLxQAtVHwg1gnLQ8RmbuBiLKGyYQuXyk |
| FBA7Lz7U71aFxR9Q6tPZ8qaSbPPaJZj7HzDi517ci8Eo |
| 7iwN3vgX9yjfW6VFzWiC1hGK261fgmC7RYrQiwu9Sukk |
| 2Jg8D9GNGK7xpEAMeeJHi4kGsJKArpUR7gnPmusQtbaM |
| H1cFTkVLeTJ4fQaUyQX1XLF3oNMm9acnaAKRQSgt17Zq |
| 2keLPfdWUpcKzox4SNifJbGivjXc6ZLorQuxUyBYeAtU |
| 7fKTdwQPz3J3WDpdRBp6R2XxDJ5iuy52jnQbkyVt7M7t |
| Cu6F7vKWBS8WRSsV8tuandtcutMCTqJytGQU2gvsQpWM |
| Bx4FnJHtWNrZtYmpotvyLF1EZLa1DMVnf6ka2dgyGiTY |
| AZbcUPtQywecPXZAaJRpNVCiiiDPWjvyygKNBwwnPmj3 |
| 69X4Un6qqC8QBeBKk6zrqUVKGccnWqgUkwdLcC7wiLFB |
| 3fzT6Ndg9cy8MNwv6nXKSZtA9A4bh4KEcLx2e35Wfrb7 |
| Ec98xDxG8i23uxHQZ1wXyfC4Y5uXq1jxw2T7mqxzMvNk |
| 9R3Qn8At6zsdyBQNTUVNA6fXSNoTYvyCNCrXE3P5V8o3 |

6uedBHjGibFU27XhVFaZEyKyK2dhVdMqE8Fvw95SkAcw

Dv5w9PMa1UXsgrbcnuiiTYWLGiSALAdHB5JsKJe5DXjs

CVhWfUgAEsY4LfHU8t1mvyU5w7x643PSyu17NvYsMVeU

5aXYwDDaZaJcVR85sQrnvid6bkcvaM83Rfr8c1odYfeF

8RRdJUzmzBuY6rz1WtnZCc6G8dKwYMJLJYbT1eG3hccg

CJGrgLZoUhsa5jNGc9UTKczGy6CvB6RjpFLdrauxZBdG

3gyPmdcRZzo2juUnJmVfj3UeYqCWbhmxDFbsEEch6d3c

E45GbTLz1NaWUDMURSS4KQTYkjy6pKQZQGTZi9ccCLLE

Er8DUgchB8rSc2exJfnpfMy7C51tzCpvK6igfzK6dje4

43dBfiyVmApd6HBoCLGum1AC6mt6v5cgHJivKLaS6yYA

4W3Wvixg2mNVmHJtKhHQwCfwNogwbX7J2DfQvpNvMn4E

DmkaK9opxAXHjMNFwd4Rs6QQHxXWXX3uqc7wwPMN7vww

Fhn1HPkiPwgaM52VWKynyy37oW75hU8ScHrhB9cguv9J

9KGSkPsf3DakRbY8hf18gNbfVr8sKeVAqNQqqLr5WXS

6YWqkT4R589FtLsiDpmKJUt886eP83qTQdk8E5JLEvBD

CgvtbcWnBvAFtRVyzw6YCvunLiYvQnnSKTS5XBrkvzaM

39kFYW3gFz9LoXrVMfMv3TjwPn84SFVpfN5x4Dgobtc1

3cPzK8HDviM5jhWLnZ1NJ3WNKnK4F6udYHAr36Wjsakd

971r6LdYfitXPuEWLiScFtGM5qjRNoT9nLUE6Vs4Jcf8

6bNnuYNrAVZQXgCZj6phvCUu3vkvu4rmsRbJx5B2Z1nM

9rxUYZGRwhZGCMymngMcDL71b7QAhKEBSK1mFLHdsAx6

7oWNxMNN4Jyq6vZbDGFjsGdLoLUCde7priK7TeVRAvcT

EE7F9izf4Vq6NTrAs4J7mHYFjJwmEVsVtVv6AUrcohVx

4chapqZ7EZmAixVym7to6WdKcQZPP3QsPX966J7SKAyW

EU86gAXBHfiVUjjfoN1PmRopMcsYGWqy6d9qTCcvpzYM

8HLC1gNNuyuSftUPP3iWFRA4hMakAFqydC9dRYwZaHkS

AqLVrkd4K1enzgAtjfhypeBWUkSrnuz9KEU1ZJoLNwtx

F8Zw2cCXDLuMwb3ocyj3U3xkSJEkUDqBKf4yGyQeQEi1

4rfzNQ4VZKqv4KPn4mXb4crxhGoz3m9CfP1szf6itUEQ

GBfg6upCpmmKnref3B4ucRJLA2FxrgufC4YRp3NtL9UJ

| |
|---|
| DTBhmVLAaC5dX5vXwoPsEuwLRTmYPULC5SAC1aDftnR7 |
| ChFMHkBf1mH6NjYwLggTfFFAZAoFqdwuszT35PWo3BfR |
| 9mGPf7yAwTC9TqMPE7TzBSBoB3CH175sKxju9zU9xp3j |
| CT4bFiuYJscJWr2mHvQ2pXm4fq7sBu1S6D7TJyz5Lhii |
| 5V8zLDm3SUoKiFt2iVk77LncTUSsHzSbTT5qtZL3bNXJ |
| 7B9hiBpuwNhiAEkSc2JR45VsEhXvkMBTsg9TiXuSVWJQ |
| BSvVTUHzupaJcGU2HXUrNaGKfs9nj6CJBEfPEc3fF9SG |
| CZyv4ABaadFKK6DEMEF8UbZ852scVApk5wmhMMuPuRLE |
| 72TE5wxLxvszTLaqVn3yktZYsezWAXm8zc1bNfEXLB91 |
| HBN5EHp1zszWdVv8k8AWCWu2QyyQQk53iLhWwyvpMwhM |
| F3KqScb9ikpZeL2d3DDtTzbFTuPm1YiFH15AGUQ4D6Lu |
| 3gaQTBHD2xiKxMhYfCjmBZYHbsK3ScEhV2QKcMf1nixt |
| 9M29gzYM8nE7yKUjF2xrcbDjiS1vwrtpzjLDhA62Ys15 |
| 3qA8MjH44XQ1AcNdqqtjuaj31i1mv1yJE8bmY6VhK4Zf |
| 4XeAGTCkagWohVEA3yW9q8XLhdB76uNHu7NKyRKZrJuC |
| gqM3Crc3qG5nLP8kA9J3sVwGTW9XAErxapZPysWwpEK |
| CEH4tB7NKorzxrKAghywBJBzuMvZKS6LJNkNgfgXJj1j |
| HvYBBzVg2XWxU6RTuJcAGFMgfxKX1e7yeiWKL6GzHo1g |
| F12hNAJA4wziCEAQYL1LnbaSvhgTjMjHU2jhTPX6ojgK |
| G3jNDN7KLEy11953B2PtpiM4XmGKHuhrBi4oQVYxJ7PV |

# Exhibit H





Detrade
BOOST YOUR BALANCE
50% FIRST DEPOSIT BONUS
CLAIM NOW

| ⓘ Fee | 0.00185917 SOL ($0.24) |
| ⓘ Priority Fee | 0.00185417 SOL ($0.24) |
| ⓘ Compute Units Consumed | 391,671 |
| ⓘ Transaction Version | Legacy |
| ⓘ Recent Block Hash | 7tCq3GkStpnZT8TM1ghfqt9LoNSg5nr8mh8E8BktGTAS ⊙ |
| ⓘ Your Notes | ✏ |

# Exhibit I



# Exhibit J





# Exhibit K



**Distribution**
- Community pool (42%): 4,200,000,000 $HAWK
- Community Engagement Rewards (42%): 4,200,000,000 $HAWK allocated to Haliey's cult audience.
- Reserve (25%): 2,500,000,000 $HAWK
- Purpose: Reserved for exchange listings, liquidity provision, future development, marketing, and strategic partnerships
- Liquidity pools (10-20%): Locked (Meteora, Jup)
- Strategic allocation (20%): 2.000,000,000 $HAWK
- Vesting Schedule:
- 6-month lock-up followed by a 2-year linear vest.
- Haliey and Her Team (10%): 1,000,000,000 $HAWK
- Vesting Schedule: 12-month lock-up followed by a 3-year linear vest
- Public (3%): 300,000,000 $HAWK
- Community Whitelist (0.75%): 75,000,000 $HAWK
- Open Public (0.25%): 25,000,000 $HAWK
- Vesting Schedule: Fully unlocked at TGE

8:56 AM



## HALIEY WELCH REACHES

# 4.6 MILLION+

### SOCIAL FANS GLOBALLY



**244B+**
Potential
Impressions[2]

...across **2.9M online
mentions** following her
viral moment[2]

  

**2.6M+**
FOLLOWERS
FIRST POST
JULY 1, 2024

**1.67M+**
FOLLOWERS
FIRST POST
JULY 1, 2024

**300K+**
FOLLOWERS
FIRST POST
JULY 26, 2024



### ON INSTAGRAM AND TIKTOK, SHE CONTINUES TO GROW
### HER FOLLOWING SIGNIFICANTLY, ADDING OVER

# 260 THOUSAND

### NEW FOLLOWERS IN THE LAST MONTH



**CAAdata** Sources: Lulus & CrowdTangle. [Quant query using terms: "Hailey Welch" OR #haileywelch OR "hawk tuah" OR @haileywelchtx OR #hawktuah OR "talk tuah"



# AUDIENCE DEMOGRAPHICS

**Haley Welch reaches…**



| | 70% Male |
|---|---|
| | 30% Female |

Over-performs with **College students** by 1.1x

**52.3% Single**
**47.7% Married**
Over-indexes by **1.8x** with married audiences

Reaches **multiple age groups**, but over-indexes most strongly with ages **30 to 44**



| Age | Value |
|---|---|
| Age 17 and under | 2.1% |
| Age 18 to 20 | 6.8% |
| Age 21 to 24 | 14.1% |
| Age 25 to 29 | 24.1% |
| Age 30 to 34 | 21.8% |
| Age 35 to 44 | 19.5% |
| Age 45 to 54 | 6.6% |
| Age 55 to 64 | 1.8% |
| Age 65 and over | 1.4% |

…through her X, Instagram and TikTok.

**CAA**data

Source(s): DemographicsPro | Estimates/infers likely audience demographic characteristics based on social media usage. (Instagram, TikTok, and X — Global Audience, as of Q3 2024. Index compared to 1.6K other digital talent within CAAintel.) (3x = Avg) As of 9/30/2024.

---

**Haley reaches fans outside the US**

**56.4%**
**INTERNATIONAL REACH**

**43.6%**
**U.S. REACH**

| RANK | COUNTRY | EST REACH | % OF AUDIENCE | INDEX VS PEERS |
|---|---|---|---|---|
| 1 | United States | 2,289,206 | 56.4% | 1.0X |
| 2 | United Kingdom | 448,824 | 11.1% | 1.7X |
| 3 | Germany | 162,064 | 4.0% | 1.3X |
| 4 | Canada | 161,658 | 4.0% | 1.6X |
| 5 | Australia | 153,128 | 3.8% | 2.4X |
| 6 | Italy | 99,107 | 2.4% | 2.1X |
| 7 | South Africa | 83,266 | 2.1% | 2.4X |
| 8 | France | 81,235 | 2.0% | 1.8X |
| 9 | Switzerland | 62,560 | 1.6% | 7.0X |
| 10 | Brazil | 48,335 | 1.2% | 0.5X |
| 11 | Sweden | 47,523 | 1.2% | 3.6X |
| 12 | Netherlands | 41,430 | 1.0% | 1.9X |

3

---

# AUDIENCE INTERESTS BY CATEGORY

Haley's audience **over-indexes** with… (1.0x index = average)

**Haley audience brings interests across Sports & Fitness, Food, Fashion, Entertainment, and more.**

Read as: **Haley's audience is 2.8x (or 180% more likely)** to be interested in **NASCAR** compared to the average account following of other digital talent.

### Sports & Fitness
| | |
|---|---|
| Softball | 3.8x |
| NASCAR | 2.8x |
| Golf | 2.6x |
| Hockey | 2.3x |
| Surfing | 2.2x |
| American Football | 1.9x |
| Formula 1 | 1.8x |
| Skateboarding | 1.7x |
| Snowboarding | 1.7x |
| Baseball | 1.6x |
| Sporting goods | 1.5x |
| Yoga | 1.2x |

### Food & Beverage
| | |
|---|---|
| Chicken | 2.4x |
| Beer | 2.0x |
| Vodka | 1.8x |
| Energy Drinks | 1.8x |
| Mexican food | 1.5x |
| Soft Drinks | 1.2x |

### Fashion & Beauty
| | |
|---|---|
| Hats | 2.3x |
| Swimwear | 1.4x |
| Watches | 1.4x |
| Eyewear | 1.3x |
| Shoes | 1.0x |

### Music
| | |
|---|---|
| Country | 2.0x |
| Americana | 1.7x |
| Rock | 1.4x |
| Live Music | 1.1x |
| Rap/Hip Hop | 1.1x |

### Film/TV
| | |
|---|---|
| Reality TV | 1.4x |
| Sport Film/TV | 1.2x |
| News | 1.1x |
| Romance | 1.0x |

### Other
| | |
|---|---|
| Poker | 3.2x |
| Rodeos | 1.6x |
| Radio | 1.4x |
| Comedy | 1.3x |
| Toys | 1.3x |
| Education | 1.2x |
| Dating/Romance | 1.2x |
| Pets | 1.1x |
| Resorts/Travel | 1.1x |

**CAA**data

Source: DemographicsPro (Instagram, TikTok, and X) | 2024 Q3. Index compared to 1.7K Top digital talent

4



# HALIEY'S INSTAGRAM CONTENT IS DRIVING HIGH ENGAGEMENT
### SINCE HER FIRST POST JULY 1, 2024

 **3.0X**

## STRONGER ENGAGEMENT
#### COMPARED TO THE AVERAGE OF HER PEERS WITH SIMILAR REACH
9.8% engagement rate vs 3.6% benchmark average!

## HER VIDEO CONTENT ON INSTAGRAM YIELDS...

 **4 MILLION**
### AVERAGE VIEWS PER VIDEO
across 41 POSTS

## MANY OF HALIEY'S TOP POSTS INCLUDE POSTS HIGHLIGHTING MEETING OTHER FAMOUS FRIENDS LIKE JAX AND MATT RIFE.

  

**10X**
Stronger Engagement
COLLABORATIVE POST
WITH @JAX
(1.8M FOLLOWERS)

**7X**
Stronger Engagement
POST WITH
@THESKETCHREAL (1.7M FOLLOWERS)

**6X**
Stronger Engagement
HALIEY MEETING
MATT RIFE

  

**6X**
Stronger Engagement
HALIEY VISITS CALIFORNIA

**6x**
Stronger Engagement
HALIEY MEETING MATT RIFE

**9x**
Stronger Engagement
PET ADOPTION

CAAdata   Source: JuTox | *Indexed against 100 digital talent & personalities l for 5M followers. | Data as of 9/20/24

---

## SHE POSTED HER FIRST TIKTOK VIDEO ON JULY 1, 2024, AND HAS ALREADY ACCUMULATED

# 215 MILLION+
### VIEWS ACROSS JUST 36 VIDEOS

Her videos give her fans an authentic lens into her humor, personal life, and new reality since gaining fame from her viral moment.

### SHE AVERAGES HIGH VIEWERSHIP AND ENGAGEMENT ACROSS HER VIDEOS

## 6.0 MILLION+
### AVERAGE VIEWS PER VIDEO

## HALF A MILLION
### AVERAGE ENGAGEMENTS PER VIDEO
*Across 36 TikTok Videos*

    

**39.4M VIEWS**   **28.9M VIEWS**   **25.3M VIEWS**   **14.1M VIEWS**   **10.3M VIEWS**

    

**9.5M VIEWS**   **8.7M VIEWS**   **8.6M VIEWS**   **8.2M VIEWS**   **7.5M VIEWS**

CAAdata

Source: Tubular Labs. As of 9/19/2024



SHE AVERAGES HIGH VIEWERSHIP AND ENGAGEMENT ACROSS HER VIDEOS

▼

## 6.0 MILLION+
**AVERAGE VIEWS PER VIDEO**

## HALF A MILLION
**AVERAGE ENGAGEMENTS PER VIDEO**

*Across 36 TikTok Videos*

SHE POSTED HER FIRST TIKTOK VIDEO ON JULY 1, 2024, AND HAS ALREADY ACCUMULATED

# 215 MILLION+

**VIEWS ACROSS JUST 36 VIDEOS**

Her videos give her fans an authentic lens into her humor, personal life, and new reality since gaining fame from her viral moment.

   

**39.4M VIEWS**   **28.9M VIEWS**   **25.3M VIEWS**   **14.1M VIEWS**   **10.3M VIEWS**

    

**9.5M VIEWS**   **8.7M VIEWS**   **8.6M VIEWS**   **8.2M VIEWS**   **7.5M VIEWS**

CAAdata

Source: Tubular Labs, As of 9/19/2024

6

---



Since launching early September "Talk Tuah" podcast already reaches

# 270 THOUSAND
**F O L L O W E R S   A C R O S S   P L A T F O R M S**

THE PODCAST'S FOLLOWING IS CURRENTLY LARGEST ON TIKTOK, BUT CONTINUES TO GROW THROUGH OTHER PLATFORMS

  

**143.6K**        **62.9K**        **59.8K**
FOLLOWERS    SUBSCRIBERS    FOLLOWERS

## POSTCAST VIEWERSHIP & ENGAGEMENT BY PLATFORM
SINCE LAUNCH SEPTEMBER 2024

**30M VIEWS**
(1.8M VIEWS PER VIDEO)

**1.5M ENGAGEMENTS**
17 Videos

TOP VIDEOS



**8.5M VIEWS**   **4.8M VIEWS**   **3.6M VIEWS**

**2M VIEWS**
(180K VIEWS PER VIDEO)

**49K ENGAGEMENTS**
10 Videos

TOP VIDEOS





**1.0M VIEWS**   **285K VIEWS**

**262K VIEWS**   **41K VIEWS**

CAAdata

Source: Tubular | data as of 9/20/24

8



# Exhibit L





**Haliey Welch** ✓ @HalieyWelchX · Dec 4                    ···
Copy and pasting:

Hawkanomics:

Team hasn't sold one token and not 1 KOL was given 1 free token

We tried to stop snipers as best we could through high fee's in the start of
launch on @MeteoraAG

Fee's have now been dropped



👥 **Readers added context they thought people might want to know**

The "team" and insiders have actually been selling their token since
launch.

A majority have never purchased anything and have only sold the
tokens they were given.

Hailey is lying and will likely have to "talk tuah" judge about this.

x.com/ZeusLFG/status...

Do you find this helpful?                    **Rate it**

Context is written by people who use X, and appears when rated helpful by others.
Find out more.

 8.9K     3.2K     13K     8.2M     

# Exhibit M

| Initial Tokenomics Distribution Wallets |
|---|
| 29udqTzS8uCMAT3JnumTVVTbsdW2m5R9BiyMgL5MVpB2 |
| 9vGnSkqUqoZmey1T3AQvUd4VyYDKyMx27AJ5mvS2wuv |
| AW2S41i9sVxkv9EArvaRe3GxRqX5J4Li2LAyuHhdAhtG |
| AcAVtwJ9bek9T3ZV1Go6g3GCeW4LWi3bPRTCGyd4DAub |
| Gfrg66Ha8efCBWVo5ZmcWpP5ALKwXscDidrgjNt1XnZg |
| 2XSQnJ1JbF5NGGyyPEriLts51v5gH5m5vkTbxdEeqpa1 |
| 3n7FyHZLEukzkxaAGCaRYTPvG4VGqioq77X2L41smWXv |
| BANKDTWej9dYSdqHHu3SJBTr1sHfCR64ZqoZwpguTor1 |
| BUtx4KTjDgNxmwhdPawu4gRG7T2RM3C2wfg8Bq7fMc9W |
| CoXZFArp1JR9ZuVuqBLPBgRDGMzrsTKUGpbinWBGA1if |
| pTh3ooZKteicmCg9Sk2chy9e3e2DNpW6HQ7FwXPDKxL |
| 8cutMT57Fvzm77yvkWEQt7Rgj2KxxxNNBf9sN1kPcjxp |
| 5mkjLvsEgdQQh9m1RWkUHjRGYPfH7UU55MN3Ybzvress |
| HAWKXJXitdzwEopf2AtLtBkHR1WCUjGfZDk1uS8P4yAm |
| 5qR7QeiCDNxmRPK8EXRURdc8KHXmn7NCjKuCFHhBRoDm |

# Exhibit N





# $HAWK

**Hawk Tuah Token**

$HAWK isn't just a Meme Coin, it's a part of the culture. Hailey is using her meme to unite her entire community. From: TikTok, Talk Tuah podcast listeners, merchandise buyers, and even her charity supporters. Hundreds of thousands of non-crypto users will be onboarded by $HAWK because Hailey is making it easy, fun, and engaging. If you love Hailey, you love memes. And $HAWK is where it all comes together.

TRADE TOKENS



Copyright overHere 2024

 OVERHERE

## $HAWK: THE MEME COIN FOR EVERYONE

$HAWK isn't just a token—it's the bridge bringing memes to the everyday person. No crypto wallet? No problem. Eligible fans can claim their first tokens for free with just a social login and start their journey. Whether you're a meme degen or a blockchain beginner, $HAWK is your entry ticket to begin your degen roller coaster ride.

## JOIN THE ALLOWLIST AND CLAIM YOUR TOKENS

Secure your spot on the Allowlist and be part of the $HAWK community from day one. Claim your tokens early and own a piece of the next big meme movement. No paywalls, no shady backdoors—just pure, free token distributions and allowlist campaigns to bring eligible participants along for the ride. It's simple, quick, and open to everyone.

## THE HALIEY WELCH EFFECT

From the start, $HAWK has been about access and fun. With Haliey's infectious energy, Talk Tuah podcast fame, and a global fanbase, $HAWK is ready to bring people together like never before. It's more than a coin—it's a movement.



 OVERHERE                                    

## TALK TUAH(US)

This isn't your average meme coin. Hailey is bringing a diverse community of meme loving degens and some of the blockchain's best to transform the way people think of a meme coin. Whether you're here for the culture, the tech, or the vibes, $HAWK is where it all comes together.

**CLAIM YOUR $HAWK**



[Terms & Conditions](#) | [Privacy Policy](#)

The token claim and distribution of tokens on this site are not offered to or intended for U.S. persons (as defined under Regulation S of the U.S. Securities Act of 1933) or persons located in the United States. Access to this site and participation in any token-related activities are prohibited for such persons. By proceeding, you confirm that you are not a U.S. person and are not accessing this site from the United States.

Copyright overHere 2024

# Exhibit N





# $HAWK

**Hawk Tuah Token**

$HAWK isn't just a Meme Coin, it's a part of the culture. Hailey is using her meme to unite her entire community. From: TikTok, Talk Tuah podcast listeners, merchandise buyers, and even her charity supporters. Hundreds of thousands of non-crypto users will be onboarded by $HAWK because Hailey is making it easy, fun, and engaging. If you love Hailey, you love memes. And $HAWK is where it all comes together.

TRADE TOKENS



Copyright overHere 2024

 **OVERHERE**

## $HAWK: THE MEME COIN FOR EVERYONE

$HAWK isn't just a token—it's the bridge bringing memes to the everyday person. No crypto wallet? No problem. Eligible fans can claim their first tokens for free with just a social login and start their journey. Whether you're a meme degen or a blockchain beginner, $HAWK is your entry ticket to begin your degen roller coaster ride.

## JOIN THE ALLOWLIST AND CLAIM YOUR TOKENS

Secure your spot on the Allowlist and be part of the $HAWK community from day one. Claim your tokens early and own a piece of the next big meme movement. No paywalls, no shady backdoors—just pure, free token distributions and allowlist campaigns to bring eligible participants along for the ride. It's simple, quick, and open to everyone.

## THE HALIEY WELCH EFFECT

From the start, $HAWK has been about access and fun. With Haliey's infectious energy, Talk Tuah podcast fame, and a global fanbase, $HAWK is ready to bring people together like never before. It's more than a coin—it's a movement.







## TALK TUAH(US)

This isn't your average meme coin. Hailey is bringing a diverse community of meme loving degens and some of the blockchain's best to transform the way people think of a meme coin. Whether you're here for the culture, the tech, or the vibes, $HAWK is where it all comes together.

**CLAIM YOUR $HAWK**



Terms & Conditions | Privacy Policy

The token claim and distribution of tokens on this site are not offered to or intended for U.S. persons (as defined under Regulation S of the U.S. Securities Act of 1933) or persons located in the United States. Access to this site and participation in any token-related activities are prohibited for such persons. By proceeding, you confirm that you are not a U.S. person and are not accessing this site from the United States.

Copyright overHere 2024

# Exhibit O



💬 231      ↓↑ 166      ♡ 2.4K      📊 174K      🔖      ⬆️

**Haliey Welch** ☑️ @HalieyWelchX · Nov 5

Tuah the moon 🌕

💬 196      ↓↑ 142      ♡ 3.6K      📊 197K      🔖      ⬆️

**Haliey Welch** ☑️ @HalieyWelchX · Nov 5

**Haliey Welch** ✓ @HalieyWelchX · Nov 26
Send me ur Solana wallet @mcuban

I'm giving Memecoin and NFT communities 100+ free whitelists each. Who should I pick?? 👇



0:01

💬 915     ↻ 270     ♡ 1.7K     📊 1M     🔖  ⬆️

 **Haley Welch** ✓
@HalieyWelchX

Let me copy paste:

These meme and nft communities have been chosen for free whitelists claims and 50 commenters from this post will be chosen for a free wl claim

Launching December 4th, 5pm EST.

Official Contract Address:
HAWKThXRcNL9ZGZKqgUXLm4W8tnRZ7U6MVdEepSutj34

Winners can claim their free whitelist 👉 overhere.gg/products/hawk-...

Communities chosen 
@kekeceth @dogwifcoin @bonk_inu @POPCATSOLANA @itsafwog
@PupsToken @mew @GIGACHAD_meme @pnutsolana @MooDengSOL
@ponkesol @michionsolana @retardiosolana @mumu_bull
@SigmaOnSol69 @NeiroOnEthereum @LockinONCHAIN @wenwencoin
@JupiterExchange @metaplex @MadLads @MeteoraAG @moonshot
@VaticanLuce @BagsApp @MOTHERprovides @Memeland
@MOTHERprovides @brainletCTO @petuniafun @nubcat
@HarambeCTO @GalacticGeckoSG @SolanaMBS @DeGodsNFT
@Claynosaurz @DegenApeAcademy @okayxyz @quekz_ @MogCoinEth
@RealHPOS10I @spx6900 @pepecoineth @PINEOWL_ETH
@boppybatcn @sprotogremlins @arcthecommunity @cryptopunksnfts
@BoredApeYC @Azuki



This is the end of the Tweet.

# Exhibit P





# Exhibit R

This Exhibit contains Chainalysis Reactor graphs, which trace funds across blockchains.



**Crypto Investigations**

**Reactor**
Investigate and trace funds across blockchains

**Wallet Scan**
Check recovery seeds for seizable crypto

**Rapid**
Instant crypto triage with AI-powered insights

# Know what happens on blockchains

Chainalysis is the blockchain data platform. We provide data, software, services, and research to government agencies, exchanges, financial institutions, and insurance and cybersecurity companies in over 70 countries. Our data powers investigation, compliance, and market intelligence software that has been used to solve some of the world's most high-profile criminal cases and grow consumer access to cryptocurrency safely.

**Careers at Chainalysis**

The below image displays a Chainalysis Reactor graph that traces assets transferred between:
1. $HAWK Sniper Wallet
2. $HAWK Sniper Funder 4
3. Libra Market Maker 1



The below image displays a Chainalysis Reactor graph that traces assets transferred between:

1. $HAWK Sniper Wallet
2. $HAWK Sniper Funder
3. Trump Token Feeder 1



The below image displays a Chainalysis Reactor graph that traces assets transferred between:
1. $HAWK Sniper Wallet
2. $HAWK Sniper Funder 6  & $HAWK Sniper Funder 7
3. $TRUMP Sniper Wallet



# Exhibit S

This Exhibit contains Chainalysis Reactor graphs, which trace funds across blockchains.



## Crypto Investigations

### Reactor
Investigate and trace funds across blockchains

### Wallet Scan
Check recovery seeds for seizable crypto

### Rapid
Instant crypto triage with AI-powered insights

# Know what happens on blockchains

Chainalysis is the blockchain data platform. We provide data, software, services, and research to government agencies, exchanges, financial institutions, and insurance and cybersecurity companies in over 70 countries. Our data powers investigation, compliance, and market intelligence software that has been used to solve some of the world's most high-profile criminal cases and grow consumer access to cryptocurrency safely.

**Careers at Chainalysis**

The below image displays a Chainalysis Reactor graph that traces assets transferred between:
1. $HAWK Sniper Wallet
2. $HAWK Sniper Funder 2
3. Coinbase Exchange



The below image displays a Chainalysis Reactor graph that traces assets transferred between:
1. $HAWK Sniper Wallet
2. $HAWK Sniper Funder 4
3. Coinbase Exchange



The below image displays a Chainalysis Reactor graph that traces assets transferred between:

1. $HAWK Sniper Wallet
2. $HAWK Sniper Funder 5
3. Coinbase Exchange



The below image displays a Chainalysis Reactor graph that traces assets transferred between:
1. $HAWK Sniper Wallet
2. $HAWK Sniper Funder 8
3. Coinbase Exchange



# Exhibit T

This Exhibit contains Chainalysis Reactor graphs, which trace funds across blockchains.



**Crypto Investigations**

**Reactor**
Investigate and trace funds across blockchains

**Wallet Scan**
Check recovery seeds for seizable crypto

**Rapid**
Instant crypto triage with AI-powered insights

# Know what happens on blockchains

Chainalysis is the blockchain data platform. We provide data, software, services, and research to government agencies, exchanges, financial institutions, and insurance and cybersecurity companies in over 70 countries. Our data powers investigation, compliance, and market intelligence software that has been used to solve some of the world's most high-profile criminal cases and grow consumer access to cryptocurrency safely.

**Careers at Chainalysis**

The below image displays a Chainalysis Reactor graph that traces assets transferred between:

1. $HAWK Sniper Wallet
2. $HAWK Sniper Funder 2
3. Kraken Exchange



The below image displays a Chainalysis Reactor graph that traces assets transferred between:

1. $HAWK Sniper Wallet
2. $HAWK Sniper Funder 4
3. Kraken Exchange



The below image displays a Chainalysis Reactor graph that traces assets transferred between:

1. $HAWK Sniper Wallet
2. $HAWK Sniper Funder 5
3. Kraken Exchange



The below image displays a Chainalysis Reactor graph that traces assets transferred between:
1. $HAWK Sniper Wallet
2. $HAWK Sniper Funder 6
3. Kraken Exchange



The below image displays a Chainalysis Reactor graph that traces assets transferred between:
1. $HAWK Sniper Wallet
2. $HAWK Sniper Funder 8
3. Kraken Exchange



# Exhibit U

This Exhibit contains Chainalysis Reactor graphs, which trace funds across blockchains.



**Crypto Investigations**

**Reactor**
Investigate and trace funds across blockchains

**Wallet Scan**
Check recovery seeds for seizable crypto

**Rapid**
Instant crypto triage with AI-powered insights

# Know what happens on blockchains

Chainalysis is the blockchain data platform. We provide data, software, services, and research to government agencies, exchanges, financial institutions, and insurance and cybersecurity companies in over 70 countries. Our data powers investigation, compliance, and market intelligence software that has been used to solve some of the world's most high-profile criminal cases and grow consumer access to cryptocurrency safely.

**Careers at Chainalysis**

The below images displays a Chainalysis Reactor graph that traces assets transferred between Binance exchange and $HAWK Sniper Funder 2.



The below images displays a Chainalysis Reactor graph that traces assets transferred between Binance exchange and $HAWK Sniper Funder 3.



The below images displays a Chainalysis Reactor graph that traces assets transferred between Binance exchange and $HAWK Sniper Funder 4.



The below images displays a Chainalysis Reactor graph that traces assets transferred between Binance exchange and $HAWK Sniper Funder 5.



The below images displays a Chainalysis Reactor graph that traces assets transferred between Binance exchange and $HAWK Sniper Funder 8.



The below images displays a Chainalysis Reactor graph that traces assets transferred between Binance exchange and $HAWK Sniper Funder 9.



# Exhibit V

This Exhibit contains Chainalysis Reactor graphs, which trace funds across blockchains.



**Crypto Investigations**

**Reactor**
Investigate and trace funds across blockchains

**Wallet Scan**
Check recovery seeds for seizable crypto

**Rapid**
Instant crypto triage with AI-powered insights

# Know what happens on blockchains

Chainalysis is the blockchain data platform. We provide data, software, services, and research to government agencies, exchanges, financial institutions, and insurance and cybersecurity companies in over 70 countries. Our data powers investigation, compliance, and market intelligence software that has been used to solve some of the world's most high-profile criminal cases and grow consumer access to cryptocurrency safely.

**Careers at Chainalysis**

The below image displays a Chainalysis Reactor graph that traces assets transferred off-chain to Hawk Team Wallet :



The below image displays a Chainalysis Reactor graph that traces assets transferred off-chain by Pre-Sale Investment Funds (First Hop):



The below image displays a Chainalysis Reactor graph that traces assets transferred off-chain by Pre-Sale Investment Funds:

